1  David T. Pritikin (*pro hac vice*)
       <dpritikin@sidley.com>
2  Hugh A. Abrams (*pro hac vice*)
       <habrams@sidley.com>
3  SIDLEY AUSTIN LLP
   One South Dearborn
4  Chicago, Illinois  60603
   Telephone:   (312) 853-7000
5  Facsimile:    (312) 853-7036

6  Theodore W. Chandler (Bar No. 219456)
       <tchandler@sidley.com>
7  SIDLEY AUSTIN LLP
   555 West Fifth Street, Suite 4000
8  Los Angeles, California  90013
   Telephone:   (213) 896-6000
9  Facsimile:    (213) 896-6600

10 *Attorneys for Defendant*
   *Animas Corporation*

11

12                UNITED STATES DISTRICT COURT

13               CENTRAL DISTRICT OF CALIFORNIA

14                     WESTERN DIVISION

15

16 Medtronic MiniMed Inc.; Medtronic          No. 2:12-cv-04471-RSWL-RZ
   Puerto Rico Operations Co.; MiniMed
17 Distribution Corp.,                          **DEFENDANT ANIMAS**
                                                **CORPORATION'S MEMORANDUM**
18        *Plaintiffs*,                          **IN SUPPORT OF ITS MOTION FOR**
                                                **PARTIAL SUMMARY JUDGMENT**
19        vs.                                    **OF INVALIDITY OF THE**
                                                **ASSERTED CLAIMS OF U.S.**
20 Animas Corporation,                          **PATENT NO. 5,665,065, AND, IN**
                                                **THE ALTERNATIVE, IN SUPPORT**
21        *Defendant*.                           **OF ITS PROPOSED CLAIM**
                                                **CONSTRUCTIONS**

22                                              Judge:       Hon. Ronald S.W. Lew
                                                Hr'g Date:   March 4, 2014
23                                              Hr'g Time:   10:00 a.m.
                                                Place:       Courtroom 21
24
                                                Discovery cutoff:  Dec. 18, 2013
25                                              Pre-trial conf.:   Aug. 5, 2014
                                                Trial date:        Sept. 9, 2014
26

27

28

# **TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................1

II.   FACTUAL BACKGROUND .................................................................2

III.  ARGUMENT..........................................................................................4

      A.    The Asserted Claims in the '065 Patent Are Invalid For Indefiniteness ...........................................................................4

           1.    The Claim 1 "Controller Means" Limitations Are Means-Plus-Function Limitations That Are Subject to Special Rules........5

           2.    Where a Patent Claim Contains a Means-Plus-Function Limitation, But the Specification Describes No Specific Structure That Can Be Used to Perform the Function, the Claim Is Invalid for Indefiniteness .................................................6

           3.    The Asserted Claims of the '065 Patent Are Invalid For Indefiniteness Because They All Incorporate a "Means-Plus-Function" Limitation Involving "Controller Means" Without the Required Disclosure of any "Controller Means" Algorithm ...........................................................................8

      B.    In The Alternative, If The Court Does Not Invalidate The Asserted Claims, The Disputed Claim Terms Should Be Construed ...................11

           1.    "controller means for automatically controlling said delivery means to deliver a selected dosage to the patient according to a first medication dispensing protocol"....................................12

           2.    "means responsive to said data for recommending a second medication dispensing protocol" ...................................................15

           3.    "patient accessible manual set means for enabling said controller means to deliver the medication to the patient according to a selected one of said first and second medication dispensing protocols".....................................16

           4.    "means for inputting blood data to said controller means" ...........18

           5.    "reservoir means for receiving and storing a supply of a selected medication" ...................................................................20

           6.    "delivery means for delivering a selected dosage of the medication from said reservoir means to a patient" .....................21

IV.  CONCLUSION ..................................................................................22

1

## <u>TABLE OF AUTHORITIES</u>

2

3

### <u>Cases</u>

4

*Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*,
  521 F.3d 1328 (Fed. Cir. 2008) ................................................................passim

5

*Blackboard, Inc. v. Desire2Learn Inc.*,
  574 F.3d 1371 (Fed. Cir. 2009) ................................................................8, 9

6

*D.M.I., Inc. v. Deere & Co.*,
  755 F.2d 1570 (Fed. Cir. 1985) ................................................................6

7

8

*ePlus, Inc. v. Lawson Software, Inc.*,
  700 F.3d 509 (Fed. Cir. 2012) ................................................................8

9

*Function Media, L.L.C. v. Google, Inc.*,
  708 F.3d 1310 (Fed. Cir. 2013) ................................................................8

10

11

*Halliburton Oil Well Cementing Co. v. Walker*,
  329 U.S. 1 (1946) ................................................................5

12

*Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*,
  732 F.3d 1376 (Fed. Cir. 2013) ................................................................8

13

14

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,
  344 F.3d 1205 (Fed. Cir. 2003) ................................................................6, 7

15

*Mettler-Toledo, Inc. v. B-Tek Scales, LLC*,
  671 F.3d 1291 (Fed. Cir. 2012) ................................................................14, 16, 18

16

17

*Valmont Indus., Inc. v. Reinke Mfg. Co.*,
  983 F.2d 1039 (Fed. Cir. 1993) ................................................................5, 6

18

19

### <u>Statutes</u>

20

35 U.S.C. § 112 (2006) ................................................................23

21

35 U.S.C. § 112, ¶ 6 (2006) ................................................................passim

22

23

24

25

26

27

28

-iii-

## I.  **INTRODUCTION**

The parties dispute the construction of several claim terms in one of the Patents-in-Suit, U.S. Patent No. 5,665,065 (the " '065 patent").  However, because the disputed claim terms are in "means-plus-function" format, the issue of the validity of the claims is closely related to the issue of claim construction, and these issues in the context of "means-plus-function" claims are typically considered by a Court at the same time.

On its face, a claim drafted in "means-plus-function" format seemingly covers any conceivable "means" for achieving a particular function.  Because of the potential breadth of "means-plus-function" claim language — "all means" could well encompass more than the inventor invented — the law imposes special restrictions on inventors that employ this claiming format.  By statute (35 U.S.C. § 112, ¶ 6), a means-plus-function claim is limited to the corresponding structure (and equivalents) disclosed in the patent specification.  And if the patentee employs the means-plus-function format but the specification fails to describe a corresponding structure, then the claim is invalid as indefinite.  Because the Court must scrutinize the patent specification in construing a means-plus-function claim in order to identify the corresponding structure, it makes sense for the Court to decide at the same time whether there is corresponding structure disclosed and, if not, to find the claim invalid.

The courts have been especially strict in assessing the validity of means-plus-function claims where the only structure disclosed in the patent specification for performing the function is a "controller" or "microprocessor."  In those circumstances, the claim is invalid.  Rather, the specification must set forth a software program or an algorithm used by the controller or microprocessor for performing the function.  The failure to do so invalidates the claim on indefiniteness grounds, as explained in greater detail below.  In this case, the '065 patent claims contain means-plus-function limitations that are performed by a "controller," but the patent specification fails to

-1-

disclose programming or an algorithm.  Indeed, plaintiffs admit as much in proffering a legally inadequate construction that purports to identify the corresponding structure as simply a "controller."  Both of the asserted claims of the '065 patent are therefore indefinite and invalid.

In addition to the means-plus-function claims involving software, there are several other means-plus-function claim limitations as to which the parties agree that corresponding structure is disclosed in the specification, but they dispute the correct way to characterize the structure.  Animas submits that its proposed constructions link the claims to the specific structures disclosed in the specification as the statute requires and should be adopted.

## II.  **FACTUAL BACKGROUND**

The '065 patent (Ex. C) involves an invention that is usable with either an insulin pump or an insulin pen.  Insulin pumps and insulin pens are used by diabetic patients to deliver accurate dosages of insulin into the patient's body.  An insulin pump is a device that continually pumps insulin into a diabetic's body, drawing the drug from a reservoir in the pump.  The pump described in the '065 patent provides a background or "basal" dosage of insulin to mimic the effective amount of insulin that normally would be provided by the pancreas in the body of a non-diabetic person.  The insulin pen described in the '065 patent is used by the patient to manually inject that same basal dosage of insulin throughout the day.  The rate of delivery of that background insulin dosage is described in the '065 patent as a "first medication dispensing protocol."

The insulin pump that is shown in the patent looks similar to a pager, and could be worn on the patient's belt.  The pump dispenses insulin into the body of the patient through an infusion set or catheter tubing and small needle that fits into the skin.  An insulin pen, by contrast, resembles a large fountain pen that has a dial at one end to retract a plunger in order to set the dosage, and a syringe at the other end that is inserted into the patient's skin.

Whether using an insulin pump or pen, diabetic patients need to check their blood glucose levels numerous times throughout the day (and often during the night). The patient typically takes a blood drop sample by pricking the end of his or her finger and then using a strip to absorb the blood droplet.  The strip is placed into a separate blood glucose meter, which electronically determines a numerical blood glucose reading (amount) and shows the number on a numeric display.  Additionally or optionally, the patient may use a glucose sensor that is inserted or implanted into the body for purposes of obtaining continuous glucose readings.  The diabetic patient uses the blood glucose reading to determine if the basal rate of insulin needs to be modified, or if a supplemental dosage of insulin is required.

The specification of the '065 patent describes three options for the patient with regard to control of the insulin dosage rate.  In the first option, which is reflected in block 32 of Figure 3 of the patent, a "controller" uses the blood glucose reading from the sensor to automatically recommend and automatically implement a modified medication protocol.  In other words, the controller uses the blood glucose reading to calculate and administer a new dosage rate (called a "second medication dispensing protocol" in the patent).

In the second option, which is reflected in blocks 34 and 36 of Figure 3 of the patent, the controller uses the blood glucose reading to automatically recommend a second medication protocol, but the patient has the option to accept or reject the proposed modified protocol.  In other words, the second option automatically recommends a new dosage rate, but allows the patient the choice whether or not to actually implement the new dosage rate.

In the third option, which is reflected in block 38 of Figure 3 of the patent, the patient is allowed to override the automatic control of the controller and manually implement a protocol of the patient's choice.  In other words, the third option allows the patient to manually input a dosage rate separate from any rate that is calculated by the controller.  This third option is called a "third manually inputted medication

ANIMAS'S CLAIM CONSTRUCTION AND SUMMARY JUDGMENT BRIEF
No. 2:12-cv-04471-RSWL-RZ

1   dispensing protocol" in the patent, and does not necessarily use the blood glucose

2   reading.

3          The asserted claims of the '065 patent pertain to the second option (reflected in

4   blocks 34 and 36 of Figure 3) — a system in which the controller uses the blood

5   glucose reading to recommend a "second medication dispensing protocol" but the user

6   needs to select it in order for it to be delivered.  As is evident from reading the

7   asserted claims, the controller means utilizes the blood data to recommend the second

8   protocol.  But the specification provides no description of the programming or

9   algorithm used by the controller to achieve this function.

10         The specification makes clear that the "controller" requires "controller

11  software."  Ex. C at 4:47–:48.  But how one would go about producing suitable

12  software to operate the "controller" is simply not specified in the patent.  To be sure,

13  the "controller" is shown in a patent figure (Figure 2) as numbered item 24.  The word

14  "CONTROLLER" appears inside a black box.  But no further information concerning

15  the necessary software is provided.

16  **III.   ARGUMENT**

17         **A.   The Asserted Claims in the '065 Patent Are Invalid For
            Indefiniteness**

18

19         Claim 1 of the '065 patent contains several limitations that reference the

20  claimed "controller."  Claim 1 requires:  "controller means for automatically

21  controlling said delivery means to deliver the selected medication dosage to the

22  patient according to a first medication dispensing protocol."  It also requires that the

23  controller means includes "means responsive to said data for recommending a second

24  medication dispensing protocol" and "patient accessible manual set means for

25  enabling said controller means to deliver the medication to the patient according to a

26  selected one of said first and second medication dispensing protocols."  Plaintiffs

27  point to a "controller" as the corresponding structure for the "controller means" and

28  "means . . . for recommending."  There is no programming or algorithm disclosed for

carrying out these functions.  Plaintiffs have asserted two claims from the '065 patent, claims 3 and 9.  Both claims depend from claim 1 and incorporate its limitations, including the indefinite "controller means" limitations.  Therefore, because claim 1 is invalid as indefinite, the two asserted claims are also invalid for the same reason.

### 1.   The Claim 1 "Controller Means" Limitations Are Means-Plus-Function Limitations That Are Subject to Special Rules

The language in claim 1 that describes the crucial "controller means" involves a so-called "means-plus-function" limitation.  This is undisputed.  *See* Ex. A at 2:5–:6, 3:13–:14, 4:3–:4.

As explained above, a means-plus-function limitation describes a function (say, catching a mouse), and then broadly claims all means for doing so (literally encompassing, in the case of mouse-catching, the use of mousetraps, adhesive surfaces, poison, cats, etc.).  In 1946, the Supreme Court prohibited the use of means-plus-function language to describe the "most crucial element" of a patent claim, citing the "broadness, ambiguity, and overhanging threat" to the public of such claim language.  *Halliburton Oil Well Cementing Co. v. Walker*, 329 U.S. 1, 9 & 12 (1946).  The Supreme Court's concern was that if an inventor described (for example) a new mousetrap in a patent specification, but was then awarded a patent claim encompassing all "means for catching a mouse," the patent claim would not be limited to the trap that the inventor had actually invented, but could encompass new and different mouse-catching technology that was developed later by others.

After the Supreme Court's *Halliburton* decision in 1946, Congress reacted by enacting 35 U.S.C. § 112, ¶ 6.  The 1952 statute partially reversed what the Supreme Court had done in *Halliburton*.  Under the statute, patent applicants were permitted to make limited use of means-plus-function claiming, but had to comply with "a standard to make the broad claim language more definite."  *Valmont Indus., Inc. v. Reinke Mfg. Co.*, 983 F.2d 1039, 1042 (Fed. Cir. 1993).  Under that standard, the "applicant must

1  describe in the patent specification some structure which performs the specified

2  function."  *Id.*

3      By its express terms, § 112, ¶ 6 now requires federal courts to construe means-

4  plus-function limitations to cover only "the corresponding structure, material, or acts

5  described in the specification and equivalents thereof," 35 U.S.C. § 112, ¶ 6.

6  Accordingly, as the Federal Circuit has explained, "[i]n applying the 'means plus

7  function' paragraph of § 112," the "sole question is whether the single means in the

8  accused device which performs the function stated in the claim is the same as or an

9  equivalent of the corresponding structure described in the patentee's specification as

10  performing that function."  *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1575 (Fed.

11  Cir. 1985).  Therefore, if an inventor develops a new spring-based mousetrap and

12  describes that trap in a patent specification, any patent claim to a "means for catching

13  a mouse" will be limited to the specific disclosed spring-based trap (and its

14  equivalents).  Under the statute, other mousetraps having fundamentally different

15  structures are not covered.

16      **2.**    **<u>Where a Patent Claim Contains a Means-Plus-</u>**

17  **<u>Function Limitation, But the Specification</u>**
**<u>Describes No Specific Structure That Can Be Used</u>**

18  **<u>to Perform the Function, the Claim Is Invalid for</u>**
**<u>Indefiniteness</u>**

19      Where a patent claim contains a means-plus-function limitation, but the

20  specification contains no specific structure that can be used to perform the function,

21  the means-plus-function limitation does not satisfy the § 112, ¶ 6 statutory framework.

22  As the Federal Circuit has explained, "[t]he requirement that structure must be clearly

23  linked or associated with the claimed function is the quid pro quo for the convenience

24  of claiming in functional terms," and "[i]f the specification is not clear as to the

25  structure that the patentee intends to correspond to the claimed function, then the

26  patentee has not paid th[e] price" that Congress exacted when enacting § 112, ¶ 6.

27  *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 & 1219

28  (Fed. Cir. 2003).  It is the job of the federal courts to police compliance with the

1   statute: "[i]n order for the claims to serve their proper function of providing the public
2   clear notice of the scope of the patentee's property rights, we cannot allow a patentee
3   to claim in functional terms essentially unbounded by any reference" to a specific
4   structure that "one of skill in the art would understand from the public record." *Id.* at
5   1219.

6         Particularly in the area of microprocessors and software, many patentees have
7   misused means-plus-function claiming.  They have typically done so by purporting to
8   describe a function that could be performed by a microprocessor — and then claiming
9   that function — without disclosing any specific algorithm or software for
10  implementing the function.  In 2008, the Federal Circuit put an emphatic stop to this
11  practice when it decided *Aristocrat Technologies Australia Pty Ltd. v. International*
12  *Game Technology*, 521 F.3d 1328, 1332–38 (Fed. Cir. 2008).  *See* Ex. J.

13        *Aristocrat* involved a controller for an electronic slot machine.  The patent
14  described various things that the electronic slot machine would do, but never provided
15  any algorithm or other description for the underlying software, saying that one simply
16  needed a "microprocessor" with "appropriate programming."  *Id.* at 1334.  The patent
17  claims effectively claimed all "control means" that would give rise to the slot machine
18  functions as conceived by the inventors.  *Id.* at 1331.

19        The Federal Circuit said that this was not good enough.  The Court explained
20  that "general purpose computers can be programmed to perform very different tasks in
21  very different ways," and "simply disclosing a computer as the structure designated to
22  perform a particular function does not limit the scope of the claim to 'the
23  corresponding structure, material, or acts' that perform the function, as required by
24  section 112 paragraph 6."  *Id.* at 1333.  While the inventors were "not required to
25  produce a listing of source code or a highly detailed description of the algorithm to be
26  used to achieve the claimed functions," they were required "to at least disclose the
27  algorithm that transforms the general purpose microprocessor to a 'special purpose
28  computer programmed to perform the disclosed algorithm.'"  *Id.* at 1338.  Absent such

1  a disclosure, there was no structure to employ in claim construction, making the claim

2  invalid for indefiniteness as a matter of law.

3  Since *Aristocrat*, the Federal Circuit has clamped down on this sort of improper

4  claiming of software-related inventions.  It has repeatedly affirmed other summary

5  judgments of invalidity (or reversed denials of summary judgment) in cases in which

6  the patent failed to disclose any algorithm for performing the claimed function and

7  instead discloses only a generic computer or controller.  *See, e.g.*, *Ibormeith IP, LLC*

8  *v. Mercedes-Benz USA, LLC*, 732 F.3d 1376, 1377–82 (Fed. Cir. 2013) (affirming

9  summary judgment); *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1317–19

10  (Fed. Cir. 2013) (affirming summary judgment); *ePlus, Inc. v. Lawson Software, Inc.*,

11  700 F.3d 509, 517–20 (Fed. Cir. 2012) (reversing denial of summary judgment and

12  findings claims indefinite as a matter of law); *Blackboard, Inc. v. Desire2Learn Inc.*,

13  574 F.3d 1371, 1382–85 (Fed. Cir. 2009) (affirming summary judgment).

### 3. The Asserted Claims of the '065 Patent Are Invalid For Indefiniteness Because They All Incorporate a "Means-Plus-Function" Limitation Involving "Controller Means" Without the Required Disclosure of any "Controller Means" Algorithm

17  The asserted claims of the '065 patent are claims 3 and 9, *see* Ex. B at 9:12

18  (¶ 54), both of which depend from independent claim 1, *see* Ex. C at 6:25 & :46.

19  Claim 1 recites "controller means for automatically controlling said delivery means to

20  deliver the selected medication dosage to the patient according to a first medication

21  dispensing protocol" and further requires the controller means to include "means

22  responsive to said data for recommending a second medication dispensing protocol"

23  and "patient accessible manual set means for enabling said controller means to deliver

24  the medication to the patient according to a selected one of said first and second

25  medication dispensing protocols."  This "controller means" limitation is incorporated

26  by reference into the asserted dependent claims, claims 3 and 9.  The parties agree that

27  the "controller means" limitation is a means-plus-function limitations that is subject to

28  § 112, ¶ 6.  *See* Ex. A at 2:5–:6, 3:13–:14, 4:3–:4.

1    The '065 patent specification contains no algorithm or other description of the

2  software that could be used to perform the claimed functions:  delivering the selected

3  medication dosage to the patient according to a first medication dispensing protocol,

4  recommending a second medication dispensing protocol, and permitting the patient to

5  reject the recommended second medication dispensing protocol in favor of the first

6  medication dispensing protocol.  One could envision a wide variety of factors that

7  could be taken into account in different permutations and combinations and to varying

8  degrees in formulating a dispensing protocol — e.g., blood glucose levels, food to be

9  ingested, the patient's insulin sensitivity and more.  *See, e.g.*, Ex. F at 55:7–56:4,

10  57:22–58:4 (Colman deposition).  But no algorithm for balancing these factors and

11  providing a dispensing protocol is described in the patent.  Figure 2 does contain a

12  box, labeled "24," which says "CONTROLLER."  But the algorithm used to program

13  the "CONTROLLER" is never specified.  All the specification says on the subject is

14  that "controller software" is required.  Ex. C at 4:46–:47.  And the Federal Circuit has

15  found a box of this sort labeled "controller" to be inadequate.  *See, e.g.*, *Blackboard,*

16  *Inc. v. Desire2Learn Inc.*, 574 F.3d 1371, 1383 (Fed. Cir. 2009) ("The [access control

17  manager] is essentially a black box that performs a recited function.  But how it does

18  so is left undisclosed.").

19    Two inventors are named on the face of the '065 patent, and both were deposed.

20  When asked if the patent specification described an algorithm that could be used to

21  produce the software for the "controller means," inventor Colman admitted that "[t]he

22  patent does not describe the algorithm."  Ex. F at 62:6–:7 (Colman deposition).

23  Inventor Lord agreed.  Ex. E at 56:6–:9 (Lord deposition).  The reason that the patent

24  does not describe an algorithm is because the inventors had not developed one by the

25  time their patent application was filed.  Colman admitted this as well.  *See* Ex. F at

26  50:21–53:15.

27    According to Plaintiffs' interrogatory answers, there was no need (in Plaintiffs'

28  view) for any "controller means" algorithm to be disclosed because "an algorithm to

1  perform the function of controlling the pump's delivery means to deliver a selected

2  medication dispensing protocol was understood by one of ordinary skill in the art."

3  *See* Ex. I at 40. The Federal Circuit, however, rejected this very argument in

4  *Aristocrat*:

5          Whether the disclosure would enable one of ordinary

6          skill in the art to make and use the invention is not at issue

7          here. Instead, the pertinent question in this case is whether

8          Aristocrat's patent discloses structure that is used to perform

9          the claimed function. Enablement of a device requires only

10         the disclosure of sufficient information so that a person of

11         ordinary skill in the art could make and use the device. A

12         section 112 paragraph 6 disclosure, however, serves the very

13         different purpose of limiting the scope of the claim to the

14         particular structure disclosed, together with equivalents.

15  521 F.3d at 1336.

16         Put another way, asserting that the person of ordinary skill could come up with

17  the necessary algorithm is not good enough, because if the specific structure that the

18  inventors contemplated is not set forth in the patent specification, the court is left with

19  no structure that can be used to limit the means-plus-function limitation, as required

20  by § 112, ¶ 6. The Federal Circuit made this point as well:

21         In response to a question from the court, Aristocrat's

22         counsel contended that, in light of the breadth of the

23         disclosure in the specification, any microprocessor,

24         regardless of how it was programmed, would infringe claim

25         1 if it performed the claimed functions recited in the means-

26         plus-function limitations of that claim. That response

27         reveals that Aristocrat is in essence arguing for pure

28         functional claiming as long as the function is performed by a

-10-

1   general purpose computer.  This court's cases flatly reject

2   that position.

3   521 F.3d at 1336.

4   In 2003, Medtronic MiniMed Inc. sued Smiths Medical MD Inc. for alleged

5   infringement of the '065 patent (and another of the Patents-in-Suit).  The case was

6   filed in Delaware.  *See Medtronic MiniMed Inc. v. Smiths Medical MD Inc.*, No. 03-

7   776 (D. Del.).  Animas has no relation to Smiths Medical and had no involvement in

8   that case.  On June 1, 2005, the district judge in Delaware issued an opinion

9   construing some of the claim terms in the '065 patent, including the "controller

10  means" limitation.  *See* Ex. K at 22–40, 60–62.  The case settled before final judgment

11  was entered, and thus the Federal Circuit never reviewed the claim construction.

12  The *Smiths Medical* claim construction ruling did not address the question of

13  indefiniteness because it was never raised by the parties.  *See, e.g.*, Ex. K at 28–31

14  (not addressing indefiniteness of "controller means" limitation).  Moreover, since

15  2005, the Federal Circuit issued the seminal *Aristocrat* decision in 2008 concerning

16  indefiniteness, *see* Ex. J.  Therefore, the questions presented here concerning the

17  indefiniteness of the '065 patent claims have never before been considered by a court.

18  All of the asserted claims include by reference the "controller means"

19  limitations of claim 1, for which no algorithm is described in the specification.  Based

20  upon the current legal standard, as explained in *Aristocrat*, the claims are therefore

21  invalid, and the Court should enter partial summary judgment to this effect.

22  **B.    In The Alternative, If The Court Does Not Invalidate The Asserted Claims, The Disputed Claim Terms Should Be**

23  **Construed**

24  If the Court enters summary judgment of invalidity for the asserted claims of

25  the '065 patent, then the parties' claim construction disputes are moot.  However, if

26  the Court does not invalidate the asserted claims, then the disputed claim terms need

27  to be construed.  Animas's position concerning each disputed claim term is described

28  below.

-11-

ANIMAS'S CLAIM CONSTRUCTION AND SUMMARY JUDGMENT BRIEF
No. 2:12-cv-04471-RSWL-RZ

1.   **"controller means for automatically controlling said delivery means to deliver a selected dosage to the patient according to a first medication dispensing protocol"**

| '065 Term | Animas Construction | Medtronic Construction |
|---|---|---|
| "controller means for automatically controlling said delivery means to deliver a selected dosage to the patient according to a first medication dispensing protocol" | Agreed function: automatically controlling said delivery means to deliver the selected medication dosage to the patient according to a first medication dispensing protocol. | |
| | Structure: The following structures, located on the pump (or insulin pen): the controller 24 internal to pump 10 that responds to buttons 22 in Fig. 1 (col. 4:31); the controller block 24 shown in Fig. 2; and the "internal controller" (not shown) in Fig. 4 (col. 5:32); and the controller (not shown) internal to pump 10" in Fig. 5 (col. 5:56-60). | Structure: a controller |

*See* Ex. A at 2:5–:28.

The "controller means" limitation in claim 1 reads in full as follows: "controller means for automatically controlling said delivery means to deliver a selected dosage to the patient according to a first medication dispensing protocol." It is undisputed that this limitation is in means-plus-function form. *See* Ex. A at 2:5–:6. Therefore, the construction that is mandated by § 112, ¶ 6 has two parts: the Court must specify the function that is claimed, as well as the structure for performing that function that is set forth in the patent specification.

The parties agree about the function. It is "automatically controlling said delivery means to deliver the selected medication dosage to the patient according to a first medication dispensing protocol." *See* Ex. A at 2:6–:8. The sole dispute concerns the disclosed structure.

1   Because the patent specification is silent about the algorithm that should be

2   used for the "controller means" software, the claim is invalid as explained above.  In

3   the event the Court rules otherwise, the construction should state that the "controller

4   means" processor is located in the pump.  For the pump embodiment of the invention,

5   the specification explains that "[t]he pump includes an externally exposed array of

6   actuator key switches or buttons 22 for use in operating and/or programming an

7   internal controller 24 (FIG. 2)."  Ex. C at 4:2–:5.

8   The patent also describes an alternative pump embodiment, shown in Figure 5

9   as pump 10" "which may be constructed generally in accordance with the pump 10

10  shown in Figure 1" and which "operates a pump controller (not shown) in accordance

11  with the protocol flow paths described previously with respect to FIG. 3."  *Id.* at 5:55–

12  :56, :58–:60.

13  With respect to the pen embodiment, the patent specification states that "[a]n

14  internal controller (not shown in FIG. 4) responds to the data input to provide a

15  recommended medication dispensing protocol via the display 26'."  *Id.* at 5:32–:34.

16  Thus, while the patent specification is wholly silent on the algorithm needed for

17  the "controller means" software, there is a limited disclosure as to other aspects of the

18  "controller means" structure, as follows:

19      •   the controller 24 internal to pump 10 that responds to buttons 22 in

20          Figure 1 (col. 4:31)

21      •   the controller block 24 shown in Figure 2

22      •   the "internal controller" (not shown) in Figure 4 (col. 5:32)

23      •   the controller (not shown) internal to pump 10" in Figure 5 (col. 5:56–

24          :60)

25  Notably, all of the disclosed structures involve a "controller means" processor

26  that is inside the pump/pen.  Using an outside processor (such as a processor in a

27  patient's laptop computer) is not described.  Plaintiffs' proposed construction is wrong

28  because its proposed structure — "a controller" — could be either inside or outside

-13-

1   the pump/pen.  In particular, under Plaintiffs' construction, the claimed "control

2   means" could include external processors in, for example, the patient's laptop

3   computer.  The patent discloses no such thing, and therefore the claim cannot be

4   construed to encompass a laptop-based controller.

5           This case is similar to *Mettler-Toledo, Inc. v. B-Tek Scales, LLC*, 671 F.3d

6   1291, 1296 (Fed. Cir. 2012).  The issue there was whether the corresponding structure

7   for a means-plus-function claim was a generic analog-to-digital converter or the

8   specific analog-to-digital converter that was discussed in the specification — a

9   "multiple slope integrating analog-to-digital (A/D) converter 100."  *Id.*  The Abstract

10  of the patent referred to a generic analog-to-digital computer, but "[i]n every instance

11  where the specification refers to an 'A/D converter,'" it referred "to the preferred

12  embodiment, which only includes the multiple slope integrating A/D converter 100."

13  *Id.*  The Federal Circuit acknowledged that "generic A/D converters were known in

14  the art," but the Court held that the patentee was limited to the "disclosed

15  embodiments and equivalents."  *Id.*  According to the Federal Circuit, the "single

16  statement in the Abstract regarding an 'A/D converter'" was "not linked to any

17  claimed function," and "therefore does not support a broader construction."  *Id.*

18  Similarly, in this case, there is no generic disclosure of a "controller means" that is

19  linked to the claimed function (automatically controlling said delivery means to

20  deliver the selected medication dosage to the patient according to a first medication

21  dispensing protocol).

22
23
24
25
26
27
28

ANIMAS'S CLAIM CONSTRUCTION AND SUMMARY JUDGMENT BRIEF

2.     **<u>"means responsive to said data for recommending a second medication dispensing protocol"</u>**

| '065 Term | Animas Construction | Medtronic Construction |
|---|---|---|
| "means responsive to said data for recommending a second medication dispensing protocol" | Agreed function: recommending a second medication dispensing protocol that is responsive to the blood data. | |
| | Structure: The following structure, located on the pump (or insulin pen): the "recommend modified protocol" in block 34 of Fig. 3 (col. 4:50-57). | Structure: a controller |

*See* Ex. A at 3:13–4:2.

Claim 1 contains several additional means-plus-function limitations, some of which involve similar invalidity issues to the "controller means" limitation — no specific algorithms are disclosed for these limitations either.  For purposes of the present discussion, however, Animas puts those validity questions aside and focuses on how the claim limitations should be construed, assuming (for the sake of argument) that they are not fatally indefinite.

The first such limitation reads:  "means responsive to said data for recommending a second medication dispensing protocol."  Here again, the parties agree on the function.  *See* Ex. A at 3:13–:15.  However, the parties disagree about the corresponding structure that is disclosed in the specification.

The patent specification states that "the controller software can be set to provide a recommended dispensing protocol which can be visually displayed to the patient by means of the display 26.  This recommended protocol step is illustrated in FIG. 3 by block 34."  Ex. C at 4:50–:55.  Thus the corresponding structure for this means-plus-function limitation is the "recommend modified protocol" in block 34 of Fig. 3 (col. 4:50-57).

Plaintiffs' proposed construction is incorrect because it permits the claimed structure to encompass any generic "controller" — whether disclosed in the specification or not or whether located in the pump or not.  This is flatly inconsistent with the approach to claim construction required by § 112, ¶ 6.  *See, e.g.*, *Mettler-Toledo*, 671 F.3d at 1296.

### 3. <u>"patient accessible manual set means for enabling said controller means to deliver the medication to the patient according to a selected one of said first and second medication dispensing protocols"</u>

| '065 Term | Animas Construction | Medtronic Construction |
|---|---|---|
| "patient accessible manual set means for enabling said controller means to deliver the medication to the patient according to a selected one of said first and second medication dispensing protocols" | Agreed function: enabling said controller means to deliver the medication to the patient according to a selected one of said first and second medication dispensing protocols. | |
| | Structure: The following structure, located on the pump (or insulin pen): the "accept/reject modified protocol" in block 36 of Fig. 3.  The patient may accept or reject the recommended second protocol by pressing buttons 22, and the controller delivers either the first medication dispensing protocol or the second medication dispensing protocol. | Structure: control buttons, buttons, and a dial and plunger. |

*See* Ex. A at 4:3–:26.

Claim 1 has a further limitation for which the construction is disputed:  "patient accessible manual set means for enabling said controller means to deliver the medication to the patient according to a selected one of said first and second medication dispensing protocols."

Again, the parties agree that this is a means-plus-function limitation, and they agree on the function: "enabling said controller means to deliver the medication to the patient according to a selected one of said first and second medication dispensing

1   protocols." *See* Ex. A at 4:3–:6.  This is another function that must be performed by

2   the "controller means," thus raising the same invalidity issues discussed above — no

3   specific algorithms are disclosed — but again Animas puts those validity questions

4   aside and focuses on how the claim limitations should be construed, assuming (for the

5   sake of argument) that they are not fatally indefinite.

6          The parties dispute what the corresponding structure is in the specification.  The

7   '065 patent specification states:

8          [T]he controller software can be set to provide a

9          recommended dispensing protocol which can be visually

10         displayed to the patient by means of the display 26.  This

11         recommended protocol step is illustrated in FIG. 3 by block

12         34.  In this flow path, the patient 12 has an opportunity to

13         accept or reject the recommended modified protocol by

14         appropriate manipulation of the buttons 22, as represented

15         by block 36 in FIG. 3.  Upon acceptance of the

16         recommended modified protocol, the controller 24 operates

17         the pump [to] deliver the medication in accordance

18         therewith.  Upon rejection of the recommended protocol, the

19         controller 24 will deliver medication in accordance with a

20         preset or default protocol previously programmed into the

21         controller 24.

22   Ex. C at 4:50–:64.  Thus the corresponding structure for this means-plus-function

23   limitation is the "accept/reject modified protocol" in block 36 of Fig. 3.  As the

24   specification explains, the patient may accept or reject the recommended second

25   protocol by pressing buttons 22, and the controller delivers either the first medication

26   dispensing protocol or the second medication dispensing protocol.

27          Plaintiffs' proposed structure simply requires "control buttons, buttons, and a

28   dial and plunger."  But all of those things could be utilized in a "manual set means"

-17-

1   that was outside the pump/pen, such as in a pump remote control.  The patent

2   specification discloses no such thing.  Again, Plaintiffs should not be permitted to

3   interpret a means-plus-function limitation to encompass structures that are not

4   disclosed in the specification, or equivalent to what is disclosed, because doing so

5   flies in the face of § 112, ¶ 6.

6        The controller means must be part of the pump because no controller means is

7   disclosed in any remote device in the '065 patent specification.  Indeed, one of the

8   inventors emphasized at his deposition that the controller is internal to the housing of

9   the pump.  *See* Ex. E at 54:23–55:8.  Furthermore, the "buttons 22" are physically

10  connected to the controller, and both the buttons and the controller are part of the

11  pump itself.  There is no disclosure of a controller or "buttons 22" outside of either

12  the pump or the pen.  Plaintiffs' proposed construction is overbroad to the extent it would

13  encompass controllers or buttons outside of either the pump or the pen.  *See, e.g.*,

14  *Mettler-Toledo*, 671 F.3d at 1296.

### 4.   "means for inputting blood data to said controller means"

| '065 Term | Animas Construction | Medtronic Construction |
|---|---|---|
| "means for inputting blood data to said controller means" | Agreed function: inputting blood data to said controller means | |
| | Structure: The following structures, located either on the pump (or insulin pen) or on a remote sensor: the "glucose sensor/meter" block 16 shown in Fig. 2; the glucose sensor 16 shown in Fig. 1; and, the glucose/sensor meters 16', 16" shown in Figs. 4 and 5. | Structure: a glucose sensor or meter used either subcutaneously or adapted to receive and read a glucose test strip and a radio telemetry or infrared receiver. |

25  *See* Ex. A at 3:1–:12.

26       Claim 1 contains a further limitation that reads as follows:  "means for inputting

27  blood data to said controller means."  Again, the parties agree on the function:

28

1  inputting blood data to said controller means.  *See* Ex. A at 3:2–:3.  But they disagree

2  about the disclosed structure.

3        The specification states that "[i]n accordance with one aspect of the invention,

4  the pump controller 24 responds to a data input from the glucose sensor or meter

5  16 . . . . The glucose sensor or meter 16 is conveniently mounted directly onto the

6  pump housing 18 in a readily accessible position."  Ex. C at 4:11–:16.  The patent also

7  describes an alternative pump embodiment, shown in Figure 5.  With respect to that

8  pump embodiment, the patent states, "FIG. 5 shows . . . an in vivo glucose sensor 16"

9  . . . implanted within the body of a patient to provide continuous glucose level

10  readings."  *Id.* at 5:41–:44.

11        With respect to the pen embodiment shown in Figure 4, the patent states, "A

12  glucose sensor or meter 16' of the type previously described, such as a built-in sensor

13  for receiving and reading a glucose test strip, provides a data input to the delivery pen

14  10'."  *Id.* at 5:29–:32.

15        Thus the corresponding structures for this means-plus-function limitation are:

16    • the "glucose sensor/meter" block 16 shown in Figure 2

17    • the glucose sensor 16 shown in Figure 1

18    • the glucose/sensor meters 16', 16" shown in Figures 4 and 5.

19        Again, the problem with Plaintiffs' proposed structure construction is that it

20  goes beyond what is disclosed in the patent specification and purports to cover any

21  "glucose sensor or meter," including future designs that had not yet been developed.

22

23

24

25

26

27

28

ANIMAS'S CLAIM CONSTRUCTION AND SUMMARY JUDGMENT BRIEF

1

2

### 5.   "reservoir means for receiving and storing a supply of a selected medication"

| '065 Term | Animas Construction | Medtronic Construction |
|---|---|---|
| "reservoir means for receiving and storing a supply of a selected medication" | Agreed function: "receiving and storing a supply of a selected medication." | |
| | Structure: The following structure, located on the pump (or insulin pen): the block 30 identified as "reservoir" in Fig. 2; and the cartridge of medication received in barrel 40 in Fig. 4 (see col. 5:20-23). | Structure: a storage reservoir, a syringe, a syringe carried by the housing of an external pump, or a cartridge. |

*See* Ex. A at 1:13–:21.

Claim 1 contains another disputed limitation: "reservoir means for receiving and storing a supply of a selected medication." Again, the parties agree on the function: "receiving and storing a supply of selected medication." *See* Ex. A at 1:13–:14. But they disagree about the structure that is disclosed in the specification.

With respect to the pump embodiment shown in Figures 1–3, the patent states that "the controller 24 . . . operate[s] a pump element 28 which delivers the medication to the patient 12 from a storage reservoir 30, such as a syringe carried by the housing 18." Ex. C at 4:31–:36.

With respect to the pen embodiment shown in Figure 4, the patent states that "[t]he pen comprises a barrel 40 of generally cylindrical shape for receiving a cartridge (not shown) charged with a selected medication such as insulin." *Id.* at 5:20–:23.

Thus the corresponding structures for this means-plus-function limitation are:

- block 30 identified as "reservoir" in Figure 2
- the cartridge of medication received in barrel 40 in Figure 4 (see col. 5:20–:23).

Plaintiffs' proposed construction is not limited to what is disclosed in the specification, requiring only "a storage reservoir, a syringe, a syringe carried by the housing of an external pump, or a cartridge."  A "storage reservoir" could be any receptacle for insulin, including future designs that had not yet been developed.  This is plainly inconsistent with what § 112, ¶ 6 requires.

### 6. "delivery means for delivering a selected dosage of the medication from said reservoir means to a patient"

| '065 Term | Animas Construction | Medtronic Construction |
|---|---|---|
| "delivery means for delivering a selected dosage of the medication from said reservoir means to a patient" | Agreed function: delivering a selected dosage of the medication from said reservoir means to a patient. | |
| | Structure: the pump 28 and catheter tubing 14 in Fig. 1; and the plunger 44 and syringe in Fig. 4. | Structure: a drive motor connected to a syringe piston plunger and a manual plunger depression. |

*See* Ex. A at 1:22–2:4.

Claim 1 contains a final disputed limitation:  "delivery means for delivering a selected dosage of the medication from said reservoir means to a patient."  Again, the parties agree on the function: delivering a selected dosage of the medication from said reservoir means to a patient.  *See* Ex. A at 1:23–:24.  But they disagree about the disclosed structure.

With respect to the pump embodiment, the patent states that "pump element 28 . . . delivers the medication to the patient 12 from a storage reservoir 30, such as a syringe carried by the housing 18."  Ex. C at 4:33–:36.  The patent also states that the "syringe carries a luer fitting 20 which protrudes outwardly from one side of the pump housing 18 for suitable connection to the infusion tubing 14 through which the medication is delivered to the patient 12."  *Id.* at 3:65–4:2.

With respect to the pen embodiment shown in Figure 4, the patent discloses a "plunger 44 . . . so that a dial-in medication dosage can be administered to a patient upon subsequent manual plunger depression."  *Id*. at 5:24–:27.

-21-

1   Thus the corresponding structures for this means-plus-function limitation are:

2   • the pump 28 and catheter tubing 14 in Figure 1

3   • the plunger 44 and syringe in Figure 4.

4   Plaintiffs' proposed construction encompasses any "drive motor connected to a

5   syringe piston plunger and a manual plunger depression."  This proposed construction

6   is improper because it is not limited to the structures actually disclosed in the

7   specification.

8   **IV.   <u>CONCLUSION</u>**

9   The Court should enter partial summary judgment that the asserted claims of

10   the '065 patent, claims 3 and 9, are invalid for indefiniteness.  In the alternative, the

11   Court should adopt Animas's proposed claim constructions because they confine the

12   patentee to the disclosed structures in the specification, as mandated by § 112, ¶ 6.

13

14   Dated:  January 22, 2014                    By:  /s/ David T. Pritikin

15                                                     David T. Pritikin (*pro hac vice*)

16                                                       <dpritikin@sidley.com>
                                                      Hugh A. Abrams (*pro hac vice*)

17                                                       <habrams@sidley.com>
                                                      SIDLEY AUSTIN LLP

18                                                    One South Dearborn
                                                      Chicago, Illinois  60603

19                                                    Telephone: (312) 853-7000
                                                      Facsimile:  (312) 853-7036

20                                                    Theodore W. Chandler (Bar No. 219456)

21                                                       <tchandler@sidley.com>
                                                      SIDLEY AUSTIN LLP

22                                                    555 West Fifth Street, Suite 4000
                                                      Los Angeles, California  90013

23                                                    Telephone: (213) 896-6000
                                                      Facsimile:  (213) 896-6600

24                                                    *Attorneys for Defendant*

25                                                    *Animas Corporation*

26

27

28

1

## **EXHIBITS**

2

Ex. A:   Amended Joint Claim Construction Statement (Jan. 22, 2014) [ECF No. 68]

3

Ex. B:   Amended Complaint (Oct. 29, 2013) [ECF No. 50], with currently asserted
claims highlighted

4

5

Ex. C:   U.S. Patent No. 5,665,065 (filed May 26, 1995; issued Sept. 9, 1997), with
asserted claims 3 and 9 highlighted

6

Ex. D:   Claim language from the '065 patent, with disputed terms emphasized

7

Ex. E:   Excerpts from the deposition of Peter Lord, named inventor on the '065
patent (Aug. 16, 2013) [Note:  Plaintiffs have confirmed the cited pages may
be filed in the public record.]

8

9

Ex. F:   Excerpts from the deposition of Fredric Colman, named inventor on the '065
patent (Sept. 10, 2013)

10

Ex. G:   Text of 35 U.S.C. § 112 (2006), before the AIA amendments on September
16, 2011

11

12

Ex. H:   Animas's contention that "controller means" in claim 1 of the '065 patent is
indefinite under *Aristocrat*

13

Ex. I:   Plaintiffs' response to Animas's contention that "controller means" is
indefinite under *Aristocrat* (Dec. 18, 2013) [Note:  Plaintiffs have confirmed
the cited pages may be filed in the public record.]

14

15

Ex. J:   *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328,
1331–38 (Fed. Cir. 2008) (affirming summary judgment that "control means"
was indefinite)

16

17

Ex. K:   Claim construction opinion in *Medtronic MiniMed Inc. v. Smiths Medical MD
Inc.*, No. 03-776 (D. Del. June 1, 2005), which did not consider whether
"controller means" in claim 1 of the '065 patent is indefinite

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

1   Luke L. Dauchot (S.B.N. 229829)
    luke.dauchot@kirkland.com
2   Alexander F. MacKinnon (S.B.N.
    146883)
3   alexander.mackinnon@kirkland.com
    Erin C. Kolter (S.B.N. 261452)
4   erin.kolter@kirkland.com
    KIRKLAND & ELLIS LLP
5   333 South Hope Street
    Los Angeles, California 90071
6   Telephone: (213) 680-8400
    Facsimile: (213) 680-8500
7
    *Attorneys for Plaintiffs*
8

David T. Pritikin (*pro hac vice*)
    <dpritikin@sidley.com>
Hugh A. Abrams (*pro hac vice*)
    <habrams@sidley.com>
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

Theodore W. Chandler (S.B.N. 219456)
    <tchandler@sidley.com>
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

*Attorneys for Defendant*

9

10

11

12

13              UNITED STATES DISTRICT COURT

14              CENTRAL DISTRICT OF CALIFORNIA

15                      WESTERN DIVISION

16
                                            No. 2:12-cv-04471-RSWL-RZ
17  Medtronic MiniMed Inc.; Medtronic
    Puerto Rico Operations Co.; MiniMed       **AMENDED JOINT CLAIM
18  Distribution Corp.,                       CONSTRUCTION STATEMENT**

19          *Plaintiffs*,                     Judge:        Hon. Ronald S.W. Lew

20      vs.                                   Discovery cutoff: Dec. 18, 2013
                                              Pre-trial conf.:  Aug. 5, 2014
21  Animas Corporation,                       Trial date:       Sep. 9, 2014

22          *Defendant*.

23

24

25

26

27

28

## AMENDED JOINT CLAIM CONSTRUCTION STATEMENT

Plaintiffs and Defendant (collectively, the "Parties") hereby submit their respective proposed constructions of claim terms in U.S. Patent Nos. 5,665,065 and 6,936,029. The following chart amends and supersedes the chart filed on December 20, 2013 [ECF No. 63].

| No. | Term | | |
|-----|------|---|---|
| 1 | Whether the preamble of claim 1 of the '029 patent is part of the claim | The parties agree that the terms in the preamble of claim 1 of the '029 patent are limitations. | |
| 2 | "reservoir means for receiving and storing a supply of a selected medication" (claim 1 of '065 patent and all asserted claims in the patent) | The parties agree that this term is a means-plus-function limitation, and that the claimed function is "receiving and storing a supply of a selected medication." The parties disagree on the corresponding structure: | |
| | | **Plaintiffs' Construction:** The corresponding structures are a storage reservoir, a syringe, a syringe carried by the housing of an external pump, or a cartridge. | **Defendant's Construction:** The following structure, located on the pump (or insulin pen): the block 30 identified as "reservoir" in Fig. 2; and the cartridge of medication received in barrel 40 in Fig. 4 (see col. 5:20-23). |
| 3 | "delivery means for delivering a selected dosage of the medication from said reservoir means to a | The parties agree that this term is a means-plus-function limitation, and that the claimed function is "delivering a selected dosage of the medication from said reservoir means to a patient." The parties disagree on the corresponding structure: | |
| | | Plaintiffs' Construction: The corresponding | Defendant's Construction: The following structure: the |

-1-

| | | | pump 28 and catheter tubing 14 in Fig. 1; and the plunger 44 and syringe in Fig. 4. |
|---|---|---|---|
| | patient" (claim 1 of '065 patent and all asserted claims in the patent) | structures are a drive motor connected to a syringe piston plunger and a manual plunger depression. | |
| 4 | "controller means for automatically controlling said delivery means to deliver the selected medication dosage to the patient according to a first medication dispensing protocol" (claim 1 of '065 patent and all asserted claims in the patent) | The parties agree that this term is a means-plus-function limitation, and that the claimed function is "automatically controlling said delivery means to deliver the selected medication dosage to the patient according to a first medication dispensing protocol." The parties disagree on the corresponding structure: | |

Plaintiffs' Construction:

The corresponding structure is a controller.

Defendant's Construction:

This claim element is indefinite under § 112, ¶ 2 because there is no specific algorithm or other disclosure for carrying out the function of "automatically controlling said delivery means to deliver the selected medication dosage to the patient according to a first medication dispensing protocol."

If the claim is not found indefinite, then it should be construed as follows:

The following structures, located on the pump (or insulin pen): the controller 24 internal to pump 10 that responds to buttons 22 in Fig. 1 (col. 4:31); the controller block 24 shown in Fig. 2; and the "internal controller" (not shown) in Fig. 4 (col. 5:32); and the controller (not shown) internal to pump 10" in Fig. 5 (col. 5:56-60).

AMENDED JOINT CLAIM CONSTRUCTION STATEMENT          No. 2:12-cv-04471-RSWL-RZ

| | | | |
|---|---|---|---|
| **5** | "means for inputting blood data to said controller means" (claim 1 of '065 patent and all asserted claims in the patent) | The parties agree that this term is a means-plus-function limitation, and that the claimed function is "inputting blood data to said controller means." The parties disagree on the corresponding structure: | |
| | | Plaintiffs' Construction: The corresponding structures are a glucose sensor or meter used either subcutaneously or adapted to receive and read a glucose test trip and a radio telemetry or infrared receiver. | Defendant's Construction: The following structures, located either on the pump (or insulin pen) or on a remote sensor: the "glucose sensor/meter" block 16 shown in Fig. 2; the glucose sensor 16 shown in Fig. 1; and, the glucose/sensor meters 16', 16" shown in Figs. 4 and 5. |
| **6** | "means responsive to said data for recommending a second medication dispensing protocol" (claim 1 of the '065 patent and all asserted claims in the patent) | The parties agree that this term is a means-plus-function limitation, and that the claimed function is "recommending a second medication dispensing protocol that is responsive to the blood data." The parties disagree on the corresponding structure: | |
| | | Plaintiffs' Construction: The corresponding structure is a controller. | Defendant's Construction: This claim element is indefinite under § 112, ¶ 2 because there is no specific algorithm or other disclosure of a controller means for carrying out the function of "recommending a second medication dispensing protocol." If the claim is not found indefinite, then it should be construed as follows: The following structure, located on the pump (or insulin pen): the "recommend modified protocol" |

AMENDED JOINT CLAIM CONSTRUCTION STATEMENT                    No. 2:12-cv-04471-RSWL-RZ

| | | | in block 34 of Fig. 3 (col. 4:50-57). |
|---|---|---|---|
| 7 | "patient accessible manual set means for enabling said controller means to deliver the medication to the patient according to a selected one of said first and second medication dispensing protocols" (claim 1 of the '065 patent and all asserted claims in the patent) | | The parties agree that this term is a means-plus-function limitation, and that the claimed function is "enabling said controller means to deliver the medication to the patient according to a selected one of said first and second medication dispensing protocols."<br><br>The parties disagree on the corresponding structure: |
| | | Plaintiffs' Construction:<br><br>The corresponding structures are control buttons, buttons, and a dial and plunger. | Defendant's Construction:<br><br>This claim element is indefinite under § 112, ¶ 2 because there is no specific algorithm or other disclosure of a controller means for carrying out the function of "enabling said controller means to deliver the medication to the patient according to a selected one of said first and second medication dispensing protocols."<br><br>If the claim is not found indefinite, then it should be construed as follows:<br><br>The following structure, located on the pump (or insulin pen): the "accept/reject modified protocol" in block 36 of Fig. 3. The patient may accept or reject the recommended second protocol by pressing buttons 22, and the controller delivers either the first medication dispensing protocol or the second medication dispensing protocol. |

DATED: January 22, 2014

By: /s/ Erin C. Kolter _____

Luke L. Dauchot (Bar No. 229829)
luke.dauchot@kirkland.com
Alexander F. MacKinnon
   (Bar No. 146883)
alexander.mackinnon@kirkland.com
Erin C. Kolter (Bar No. 261452)
erin.kolter@kirkland.com
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, California 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

*Attorneys for Plaintiffs Medtronic
MiniMed Inc.; Medtronic Puerto
Rico Operations Co.; MiniMed
Distribution Corp.*

By: /s/ Theodore W. Chandler _____

David T. Pritikin (*pro hac vice*)
   <dpritikin@sidley.com>
Hugh A. Abrams (*pro hac vice*)
   <habrams@sidley.com>
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

Theodore W. Chandler (Bar No. 219456)
   <tchandler@sidley.com>
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

*Attorneys for Defendant
Animas Corporation*

AMENDED JOINT CLAIM CONSTRUCTION STATEMENT

# Exhibit B

1  Luke L. Dauchot (S.B.N. 229829)
   luke.dauchot@kirkland.com
2  Alexander F. MacKinnon (S.B.N. 146883)
   alexander.mackinnon@kirkland.com
3  Erin C. Kolter (S.B.N. 261452)
   erin.kolter@kirkland.com
4  KIRKLAND & ELLIS LLP
   333 South Hope Street
5  Los Angeles, California  90071
   Telephone:   (213) 680-8400
6  Facsimile:   (213) 680-8500

7  Attorneys for Plaintiffs

8                 UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10

11
   MEDTRONIC MINIMED INC.;            CASE NO. 2:12-CV-04471-RSWL-
12 MEDTRONIC PUERTO RICO              RZX
   OPERATIONS CO.; MINIMED
13 DISTRIBUTION CORP.,                **AMENDED COMPLAINT FOR
                                      PATENT INFRINGEMENT,**
14              Plaintiffs,           **PERMANENT INJUNCTION
                                      AND DAMAGES**
15         vs.
                                      **DEMAND FOR JURY TRIAL**
16 ANIMAS CORPORATION,

17              Defendant.

18

19         Pursuant to the Court's October 2, 2013 Order, Plaintiffs Medtronic MiniMed

20 Inc. ("Medtronic MiniMed"); Medtronic Puerto Rico Operations Co. ("Medtronic

21 Puerto Rico"); and MiniMed Distribution Corp. ("MiniMed Distribution") are filing

22 this Amended Complaint against defendant Animas Corporation ("Animas"), alleging

23 as follows:

24                 **PARTIES, JURISDICTION AND VENUE**

25

26         1.     Plaintiff Medtronic MiniMed is a Delaware corporation, with its principal

27 place of business in Northridge, California.  Medtronic MiniMed is a leader in the

28 design and distribution of portable insulin delivery systems for use by individuals with

                 AMENDED COMPLAINT FOR PATENT INFRINGEMENT

diabetes.

2.     Plaintiff Medtronic Puerto Rico is a Cayman Islands corporation, with its principal place of business in Villalba, Puerto Rico. Medtronic Puerto Rico manufactures portable insulin delivery systems for use by individuals with diabetes.

3.     Plaintiff MiniMed Distribution is a Delaware corporation, with its principal place of business in Northridge, California. MiniMed Distribution distributes and provides customer support for portable insulin delivery systems for use by individuals with diabetes.

4.     Defendant Animas is a Delaware corporation, with its principal place of business in West Chester, Pennsylvania. Animas manufactures and sells portable insulin delivery systems.

5.     This action arises under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, and seeks damages and injunctive relief under 35 U.S.C. §§ 271, 281, 283-285.

6.     This Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. §§ 1331 and 1338(a) in that this action arises under the Acts of Congress relating to patents.

7.     Animas has had regular and systematic contacts with the State of California and with this judicial District by selling or offering to sell products that infringe, by inducing and contributing to the infringement of the patents-at-issue in this action, or by conducting other business within this judicial District.

8.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b), 1391(c) and/or 1400(b).

## COUNT I

9.     Paragraphs 1-8 are incorporated into this count by reference.

10.    United States Patent No. 7,819,843 (the "'843 patent," a copy of which is

2

attached hereto as Exhibit A), entitled "External Infusion Device With Remote Programming, Bolus Estimator And/or Vibration Alarm Capabilities," issued on October 26, 2010.  Plaintiff Medtronic MiniMed is the owner of the '843 patent. Plaintiffs Medtronic Puerto Rico and MiniMed Distribution are each exclusive licensees of the '843 patent and, together with Plaintiff Medtronic MiniMed, share the exclusive right to bring suit for infringement of the patent.

11.    Animas is infringing and has infringed claims 16 and 34 of the '843 patent by making, selling, offering for sale, and using infringing products, including but not limited to Animas' OneTouch Ping glucose management system ("OneTouch Ping"), within the United States.

12.    Animas' infringement of the '843 patent has been without the permission, consent, authorization or license of the plaintiffs.

13.    Animas' infringement of the '843 patent has caused and will continue to cause Plaintiffs substantial damages, and has caused and will continue to cause Plaintiffs irreparable harm for which there is no adequate remedy at law unless and until Animas is enjoined.

## COUNT II

14.    Paragraphs 1-8 are incorporated into this count by reference.

15.    United States Patent No. 7,109,878 (the "'878 patent," a copy of which is attached hereto as Exhibit B), entitled "External Infusion Device With Remote Programming, Bolus Estimator And/Or Vibration Alarm Capabilities," issued on September 19, 2006.  Plaintiff Medtronic MiniMed is the owner of the '878 patent. Plaintiffs Medtronic Puerto Rico and MiniMed Distribution are each exclusive licensees of the '878 patent and, together with Plaintiff Medtronic MiniMed, share the exclusive right to bring suit for infringement of the patent.

16.    Animas is infringing and has infringed claims 26 and 53 of the '878

3

**AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

==patent== by making, selling, offering for sale, and using infringing products, including but not limited to the OneTouch Ping, within the United States.

17.    Animas' infringement of the '878 patent has been without the permission, consent, authorization or license of the plaintiffs.

18.    Animas' infringement of the '878 patent has caused and will continue to cause Plaintiffs substantial damages, and has caused and will continue to cause Plaintiffs irreparable harm for which there is no adequate remedy at law unless and until Animas is enjoined.

## COUNT III

19.    Paragraphs 1-8 are incorporated into this count by reference.

20.    United States Patent No. 6,997,920 (the "'920 patent," a copy of which is attached hereto as Exhibit C), entitled "External Infusion Device With Remote Programming, Bolus Estimator And/Or Vibration Alarm Capabilities," issued on February 14, 2006.  Plaintiff Medtronic MiniMed is the owner of the '920 patent. Plaintiffs Medtronic Puerto Rico and MiniMed Distribution are each exclusive licensees of the '920 patent and, together with Plaintiff Medtronic MiniMed, share the exclusive right to bring suit for infringement of the patent.

21.    Animas is infringing and has infringed claims 24 and 27 of the '920 patent by making, selling, offering for sale, and using infringing products, including but not limited to the OneTouch Ping, within the United States.

22.    Animas' infringement of the '920 patent has been without the permission, consent, authorization or license of the plaintiffs.

23.    Animas' infringement of the '920 patent has caused and will continue to cause Plaintiffs substantial damages, and has caused and will continue to cause Plaintiffs irreparable harm for which there is no adequate remedy at law unless and until Animas is enjoined.

4

**AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

## COUNT IV

24.    Paragraphs 1-8 are incorporated into this count by reference.

25.    United States Patent No. 6,979,326 (the "'326 patent," a copy of which is attached hereto as Exhibit D), entitled "External Infusion Device With Remote Programming, Bolus Estimator And/Or Vibration Alarm Capabilities," issued on December 27, 2005.  Plaintiff Medtronic MiniMed is the owner of the '326 patent. Plaintiffs Medtronic Puerto Rico and MiniMed Distribution are each exclusive licensees of the '326 patent and, together with Plaintiff Medtronic MiniMed, share the exclusive right to bring suit for infringement of the patent.

26.    Animas is infringing and has infringed claims 22 and 29 of the '326 patent by making, selling, offering for sale, and using infringing products, including but not limited to the OneTouch Ping, within the United States.

27.    Animas' infringement of the '326 patent has been without the permission, consent, authorization or license of the plaintiffs.

28.    Animas' infringement of the '326 patent has caused and will continue to cause Plaintiffs substantial damages, and has caused and will continue to cause Plaintiffs irreparable harm for which there is no adequate remedy at law unless and until Animas is enjoined.

## COUNT V

29.    Paragraphs 1-8 are incorporated into this count by reference.

30.    United States Patent No. 6,936,029 (the "'029 patent," a copy of which is attached hereto as Exhibit E), entitled "External Infusion Device With Remote Programming, Bolus Estimator And/Or Vibration Alarm Capabilities," issued on August 30, 2005.  Plaintiff Medtronic MiniMed is the owner of the '029 patent. Plaintiffs Medtronic Puerto Rico and MiniMed Distribution are each exclusive licensees of the '029 patent and, together with Plaintiff Medtronic MiniMed, share the

AMENDED COMPLAINT FOR PATENT INFRINGEMENT

exclusive right to bring suit for infringement of the patent.

31.     Animas is infringing and has infringed claims 5 and 18 of the '029 patent by using products in a manner that infringes these claims of the '029 patent, including but not limited to the OneTouch Ping, within the United States.

32.     Animas has also induced and contributed to acts of infringement of the '029 patent, such acts having been committed in the United States.  Such acts of infringement have been committed by Animas customers using the OneTouch Ping. By selling, offering to sell, promoting and teaching the use of the OneTouch Ping, Animas has induced and contributed to the infringement and continues to induce and contribute to the infringement of the '029 patent, under 35 U.S.C. § 271(c), by selling, offering to sell, and promoting and teaching components and/or materials that are especially made or especially adapted for use in direct infringement of at least one of the methods claimed in claims 5 and 18 of the '029 patent, and are not a staple article suitable for substantial non-infringing use.

33.     Animas' infringement of the '029 patent has been without the permission, consent, authorization or license of the plaintiffs.

34.     Animas' direct infringement, inducement and contributory infringement of the '029 patent has caused and will continue to cause Plaintiffs substantial damages, and has caused and will continue to cause Plaintiffs irreparable harm for which there is no adequate remedy at law unless and until Animas is enjoined.

## COUNT VI

35.     Paragraphs 1-8 are incorporated into this count by reference.

36.     United States Patent No. 6,872,200 (the "'200 patent," a copy of which is attached hereto as Exhibit F), entitled "External Infusion Device With Remote Programming, Bolus Estimator And/Or Vibration Alarm Capabilities," issued on March 29, 2005.  Plaintiff Medtronic MiniMed is the owner of the '200 patent.

**AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiffs Medtronic Puerto Rico and MiniMed Distribution are each exclusive licensees of the '200 patent and, together with Plaintiff Medtronic MiniMed, share the exclusive right to bring suit for infringement of the patent.

37.     Animas is infringing and has infringed claims 12 and 52 of the '200 patent by making, selling, offering for sale, and using infringing products, including but not limited to the OneTouch Ping, within the United States.

38.     Animas' infringement of the '200 patent has been without the permission, consent, authorization or license of the plaintiffs.

39.     Animas' infringement of the '200 patent has caused and will continue to cause Plaintiffs substantial damages, and has caused and will continue to cause Plaintiffs irreparable harm for which there is no adequate remedy at law unless and until Animas is enjoined.

## COUNT VII

40.     Paragraphs 1-8 are incorporated into this count by reference.

41.     United States Patent No. 6,554,798 (the "'798 patent," a copy of which is attached hereto as Exhibit G), entitled "External Infusion Device With Remote Programming, Bolus Estimator And/Or Vibration Alarm Capabilities," issued on April 29, 2003.  Plaintiff Medtronic MiniMed is the owner of the '798 patent. Plaintiffs Medtronic Puerto Rico and MiniMed Distribution are each exclusive licensees of the '798 patent and, together with Plaintiff Medtronic MiniMed, share the exclusive right to bring suit for infringement of the patent.

42.     Animas is infringing and has infringed claims 4 and 9 of the '798 patent by making, selling, offering for sale, and using infringing products, including but not limited to the OneTouch Ping, within the United States.

43.     Animas' infringement of the '798 patent has been without the permission, consent, authorization or license of the plaintiffs.

**AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

44.     Animas has known of the '798 patent since at least June 15, 2007, when Animas filed an Information Disclosure Statement with the United States Patent Office during the prosecution of Application No. 11/764,023, citing the '798 patent.

45.     Animas' infringement of the '798 patent has been and continues to be willful, deliberate and/or objectively reckless.

46.     Animas' infringement of the '798 patent has caused and will continue to cause Plaintiffs substantial damages, and has caused and will continue to cause Plaintiffs irreparable harm for which there is no adequate remedy at law unless and until Animas is enjoined.

## COUNT VIII

47.     Paragraphs 1-8 are incorporated into this count by reference.

48.     United States Patent No. 6,551,276 (the "'276 patent," a copy of which is attached hereto as Exhibit H), entitled "External Infusion Device With Remote Programming Bolus Estimator And/Or Vibration Alarm Capabilities," issued on April 22, 2003.  Plaintiff Medtronic MiniMed is the owner of the '276 patent.  Plaintiffs Medtronic Puerto Rico and MiniMed Distribution are each exclusive licensees of the '276 patent and, together with Plaintiff Medtronic MiniMed, share the exclusive right to bring suit for infringement of the patent.

49.     Animas is infringing and has infringed claims 8 and 57 of the '276 patent by making, selling, offering for sale, and using infringing products, including but not limited to the OneTouch Ping, within the United States.

50.     Animas' infringement of the '276 patent has been without the permission, consent, authorization or license of the plaintiffs.

51.     Animas' infringement of the '276 patent has caused and will continue to cause Plaintiffs substantial damages, and has caused and will continue to cause Plaintiffs irreparable harm for which there is no adequate remedy at law unless and

**AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

until Animas is enjoined.

## COUNT IX

52.     Paragraphs 1-8 are incorporated into this count by reference.

53.     United States Patent No. 5,665,065 (the "'065 patent," a copy of which is attached hereto as Exhibit I), entitled "Medication Infusion Device With Blood Glucose Data Input," issued on September 9, 1997.  Plaintiff Medtronic MiniMed is the owner of the '065 patent.  Plaintiffs Medtronic Puerto Rico and MiniMed Distribution are each exclusive licensees of the '065 patent and, together with Plaintiff Medtronic MiniMed, share the exclusive right to bring suit for infringement of the patent.

54.     Animas is infringing and has infringed claims 3 and 9 of the '065 patent by making, selling, offering for sale, and using infringing products, including but not limited to the OneTouch Ping, within the United States.

55.     Animas' infringement of the '065 patent has been without the permission, consent, authorization or license of the plaintiffs.

56.     Animas' infringement of the '065 patent has caused and will continue to cause Plaintiffs substantial damages, and has caused and will continue to cause Plaintiffs irreparable harm for which there is no adequate remedy at law unless and until Animas is enjoined.

## OTHER ALLEGATIONS

57.     On information and belief, Animas had at least had constructive notice of the '843, '878, '920,'326, '029, '200,'798, and '276 patents by operation of law, and Plaintiffs and any predecessors-in-interest have complied with any marking requirements of 35 U.S.C. § 287 to the extent required by law.

**AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court:

1. Adjudge that Animas has infringed and is infringing the '843 patent;

2. Adjudge that Animas has infringed and is infringing the '878 patent;

3. Adjudge that Animas has infringed and is infringing the '920 patent;

4. Adjudge that Animas has infringed and is infringing the '326 patent;

5. Adjudge that Animas has infringed, induced and contributed to and is infringing, inducing and contributing to the infringement of the '029 patent.

6. Adjudge that Animas has infringed and is infringing the '200 patent;

7. Adjudge that Animas has infringed and is infringing the '798 patent;

8. Adjudge that Animas has infringed and is infringing the '276 patent;

9. Adjudge that Animas has infringed and is infringing the '065 patent;

10. Preliminarily and/or permanently enjoin Animas and its affiliates, subsidiaries, officers, directors, employees, agents, representative, licensees, successors, and assigns, and all those acting for it and on its behalf, or acting in concert with it, from further infringement, including inducement and contributory infringement, of the '843, '878, '920, '326, '029, '200,'798, '276, and '065 patents.

11. Award compensatory damages to Plaintiffs, together with interest;

12. Award damages to Plaintiffs for willful infringement of three times the damages so determined, as provided by 35 U.S.C. § 284, together with interest;

13. Order an accounting of all accrued damages;

14. Award any supplemental damages to Plaintiffs;

15. Award Plaintiffs their costs and, where appropriate, reasonable attorneys fees under 35 U.S.C. § 285; and

16. Award Plaintiffs any other such relief as the Court deems just and proper.

**AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

1    DATED: October 29, 2013          Respectfully submitted,

2                                     KIRKLAND & ELLIS LLP

3
                                      /s/ Alexander F. MacKinnon
4                                     Luke L. Dauchot (229829)
                                      luke.dauchot@kirkland.com
5                                     Alexander F. MacKinnon (146883)
                                      alexander.mackinnon@kirkland.com
6                                     Erin C. Kolter (S.B.N. 261452)
                                      erin.kolter@kirkland.com
7                                     KIRKLAND & ELLIS LLP
                                      333 South Hope Street
8                                     Los Angeles, California  90071
                                      Telephone:   (213) 680-8400
9                                     Facsimile:   (213) 680-8500

10                                    *Attorneys for Plaintiffs*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

# JURY TRIAL DEMAND

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

DATED:  October 29, 2013

Respectfully submitted,

KIRKLAND & ELLIS LLP

*/s/ Alexander F. MacKinnon*
Luke L. Dauchot (S.B.N. 229829)
luke.dauchot@kirkland.com
Alexander F. MacKinnon (S.B.N. 146883)
alexander.mackinnon@kirkland.com
Erin C. Kolter (S.B.N. 261452)
erin.kolter@kirkland.com
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, California  90071
Telephone:   (213) 680-8400
Facsimile:   (213) 680-8500

*Attorneys for Plaintiffs*

**AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

# Exhibit C

US005665065A

# United States Patent [19]

## Colman et al.

| [11] | Patent Number: | 5,665,065 |
|---|---|---|
| [45] | Date of Patent: | Sep. 9, 1997 |

[54] **MEDICATION INFUSION DEVICE WITH BLOOD GLUCOSE DATA INPUT**

[75] Inventors: **Fredric C. Colman**, Granada Hills; **Peter C. Lord**, Santa Clarita, both of Calif.

[73] Assignee: **MiniMed Inc.**, Sylmar, Calif.

[21] Appl. No.: **452,406**

[22] Filed: **May 26, 1995**

[51] Int. Cl.$^6$ .......................... **A61M 35/00**; A61M 37/00

[52] U.S. Cl. .................................. **604/66**; 604/50; 604/65; 604/67; 604/93; 604/131

[58] Field of Search ...................... 604/50, 51, 52, 604/53, 65, 66, 93, 95, 131, 132

[56]                **References Cited**

### U.S. PATENT DOCUMENTS

| 3,837,339 | 9/1974 | Aisenberg et al. | ...................... 128/213 |
|---|---|---|---|
| 4,633,878 | 1/1987 | Bombardieri | .............................. 604/31 |
| 4,871,351 | 10/1989 | Feingold | ................................ 604/66 |
| 5,101,814 | 4/1992 | Palti | ........................................ 604/31 |
| 5,104,374 | 4/1992 | Bishko et al. | ........................ 604/65 X |
| 5,165,407 | 11/1992 | Wilson et al. | ...................... 128/635 |
| 5,372,133 | 12/1994 | Hogen Esch | ......................... 128/631 |
| 5,376,070 | 12/1994 | Purvis et al. | ........................ 604/31 |

| 5,383,865 | 1/1995 | Michel | ..................................... 604/232 |
|---|---|---|---|
| 5,391,157 | 2/1995 | Harris et al. | .............................. 604/208 |
| 5,497,772 | 3/1996 | Schulman et al. | ..................... 604/66 X |

### FOREIGN PATENT DOCUMENTS

| 0554 995A1 | 8/1993 | European Pat. Off. . |
|---|---|---|

### OTHER PUBLICATIONS

Therapeutic Strategies in the Patient with Uncontrolled Diabetes Mellitus—Davidson May 20, 1988.

*Primary Examiner*—Sam Rimell
*Assistant Examiner*—Robert V. Racunas
*Attorney, Agent, or Firm*—Kelly Bauersfeld Lowry & Kelley, LLP

[57]                **ABSTRACT**

A medication infusion device such as a programmable infusion pump includes data input regarding a selected patient parameter such as a current blood glucose reading. The infusion device includes a controller responsive to this data input to develop a medication delivery protocol which can be implemented automatically, recommended via a display for subsequent approval or rejection upon manipulation of control switches, or otherwise overridden in favor of a different medication delivery protocol.

**21 Claims, 2 Drawing Sheets**





FIG. 1

FIG. 2

FIG. 3



*F I G. 4*



*F I G. 5*

5,665,065

**1**

# MEDICATION INFUSION DEVICE WITH BLOOD GLUCOSE DATA INPUT

## BACKGROUND OF THE INVENTION

This invention relates generally to improvements in medication infusion devices for use in delivering a selected medication to a patient. More specifically, this invention relates to a medication infusion device such as a programmable infusion pump or similar apparatus adapted for response to a parameter indicative of patient condition, such as a current blood glucose reading.

Infusion pump devices and systems are generally known in the medical arts, for use in delivering or dispensing a prescribed medication to a patient. In one form, such devices comprise a relatively compact pump housing adapted to receive a syringe carrying a prescribed medication such as insulin for administration to a patient through infusion tubing and an associated catheter or the like. The infusion pump operates a small drive motor connected to a syringe piston plunger to administer the medication to the patient.

Programmable control means are normally provided for operating the pump drive motor continuously, or at periodic intervals, to obtain a closely controlled and accurate delivery of medication over an extended time period. Such infusion pumps are utilized to administer insulin and other medications, with an exemplary pump construction being shown and described in U.S. Pat. Nos. 4,562,751; 4,678,408; and 4,685,903.

A typical programmable infusion pump includes a plurality of externally accessible control switches or buttons which can be manipulated in relation to a visual display to program the pump in accordance with patient medication requirements. Initial pump programming is normally performed by the patient's physician or by other medical personnel. However, particularly in the case of infusion pumps used to administer insulin to diabetic patients, the control buttons and related pump control circuitry are often designed to accommodate at least some patient intervention to vary medication delivery times and doses in accordance with anticipated patient requirements.

One alternative medication infusion device comprises a compact syringe-type implement constructed to resemble a fountain pen or the like, and thus adapted to be carried easily and conveniently by the patient. See, for example, U.S. Pat. Nos. 5,383,865 and 5,391,157, and European Patent Publication 0,554,995. Such pen-like implements include a rotatable dial or knob for retracting a syringe plunger through a predetermined stroke, with a visual display providing an indication of the medication units or volume to be delivered upon subsequent manual advancement of the plunger. The patient can thus set the implement to deliver a desired dosage, and then press the plunger to deliver the medication. The medication dosage and frequency are, of course, developed according to a dispensing protocol to meet the needs of each specific patient.

In recent years, there has been considerable interest in the development of improved medication infusion devices which can be used to deliver medication to the patient in accordance with current or actual patient requirements, as distinguished from anticipated medication requirements. In this regard, blood chemistry readings can provide current information regarding important patient condition parameters that can affect current or actual patient medication requirements. For example, blood glucose readings represent key data that can be used to determine current insulin requirements of a diabetic patient. Extensive research is

**2**

ongoing with respect to the development of improved and reliable glucose sensors, for example, as described in U.S. Pat. Nos. 4,650,547; 4,671,288; 4,781,798; 4,703,756; and 4,890,620. Similarly, a variety of systems have been proposed for use of a glucose sensor to automatically alter the operation of a medication infusion pump in response to current patient requirements, as described, for example, in U.S. Pat. Nos. 4,633,878; 3,837,339; 5,101,814; and 5,372,133.

While automatic control of an infusion device for insulin or other medication appears to be a desirable approach for some patients, diabetic patients often need more flexibility in their individual medication delivery protocols in order to accommodate a normal daily living schedule. That is, while a current blood glucose reading is an important factor in determining medication requirements, variable daily activity such as changing eating schedules, exercising schedules, etc., should be taken into account in determining the actual dosage and timing of medication delivery to each individual patient.

There exists, therefore, a significant need for further improvements in medication infusion devices of the type adapted for response to a current patient condition parameter, such as a current blood glucose reading, wherein actual dispensing of medication to the patient represents a balanced response which considers the monitored parameter in addition to current subjective patient activity factors. The present invention fulfills these needs and provides further related advantages.

## SUMMARY OF THE INVENTION

In accordance with the invention, an improved medication infusion device includes data input pertaining to a current patient condition parameter, such as a current blood glucose reading, and responds thereto to provide an appropriate medication delivery protocol for the patient. This medication delivery protocol can be implemented automatically, recommended via a visual display for convenient acceptance or rejection by the patient, or otherwise overridden in favor of a different or modified medication delivery protocol. Thus, depending upon subjective factors such as current patient activity, eating schedules, etc., the parameter-responsive protocol can be accepted or modified to best suit the individual patient.

In one preferred form, the medication infusion device comprises a compact programmable medication infusion pump adapted to receive and support a syringe carrying a prescribed medication such as insulin. The infusion pump has manual control switches or buttons which can be operated in association with a visual display to program a pump controller for delivering the medication to the patient in accordance with a predetermined dispensing protocol. The pump further includes a sensor or meter for detecting or receiving a current patient parameter, such as a blood glucose reading. The parameter sensor or meter provides a data input to the pump controller for altering the medication delivery protocol in an appropriate manner. In accordance with the invention, the altered protocol can be automatically implemented, but may in the alternative be recommended to the patient by means of the visual display for convenient acceptance or rejection by manipulation of one or more of the control buttons, or otherwise overridden entirely by the patient in favor of a different or modified delivery protocol.

In an alternative form of the invention, the medication infusion device comprises a manually operated syringe-type implement, such as a medication delivery pen of the general

5,665,065

| 3 | 4 |

type described in European Patent Publication 0,554,995. The delivery pen includes a manually adjustable dial or the like for retracting a syringe plunger through a predetermined stroke, in association with a visual display which indicates the medication dosage to be delivered upon subsequent plunger advancement. The delivery pen includes a controller which receives a patient parameter input from a sensor or meter, such as a current blood glucose reading. The controller responds to the data input representing the patient parameter to recommend a dispensing protocol which can be accepted or modified by the patient.

In a further alternative form of the invention, the sensor or meter may be provided for substantially continuous in vivo patient monitoring, such as an implanted or subcutaneous glucose sensor. The in vivo sensor is associated with a radio telemetry transmitter for sending a patient parameter signal to the infusion device which includes a receiver. The controller of the infusion device responds to the telemetered data input to recommend a medication delivery protocol which can be followed or modified by the patient.

Other features and advantages of the present invention will become more apparent from the following detailed description, taken in conjunction with the accompanying drawings which illustrate, by way of example, the principles of the invention.

### BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings illustrate the invention. In such drawings:

FIG. 1 is an exploded perspective view, shown somewhat in schematic form, illustrating a medication infusion pump with patient parameter data input, in accordance with the novel features of the invention;

FIG. 2 is a block diagram illustrating operation of the infusion pump of FIG. 1;

FIG. 3 is a flow chart illustrating operation of the pump controller and recommended dispensing protocol in response to a current patient parameter;

FIG. 4 is an exploded perspective view, shown somewhat in schematic form, depicting one alternative preferred form of the invention; and

FIG. 5 illustrates, somewhat in schematic form, a further modified arrangement of the invention.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

As shown in the exemplary drawings, a medication infusion device such as a programmable infusion pump is referred to generally in FIG. 1 by the reference numeral 10. The pump 10 is designed for programmable delivery of a selected medication such as insulin to a patient 12 via a length of infusion tubing 14 and a suitable catheter (not shown). The illustrative pump 10 includes a glucose sensor or meter 16 for receiving and/or deriving an indication of current blood glucose level so that a medication delivery protocol can be modified, as desired.

The infusion pump 10 shown in FIG. 1 has an overall construction and operation which is generally known in the art. More specifically, the infusion pump 10 comprises a relatively compact pump case or housing 18 adapted to receive and support a syringe (not shown) charged with a selected medication, such as insulin, to be administered to a patient. The medication-containing syringe carries a luer fitting 20 which protrudes outwardly from one side of the pump housing 18 for suitable connection to the infusion

tubing 14 through which the medication is delivered to the patient 12. The pump includes an externally exposed array of actuator key switches or buttons 22 for use in operating and/or programming an internal pump controller 24 (FIG. 2). A visual display 26 is provided on the face of the pump housing 18 for displaying information regarding pump programming and/or pump operation. Infusion pumps of this general type are depicted in U.S. Pat. Nos. 4,562,751; 4,678,408; and 4,685,903; which are incorporated by reference herein.

In accordance with one aspect of the invention, the pump controller 24 responds to a data input from the glucose sensor or meter 16, in addition to manually inputted instructions by means of the buttons 22. The glucose sensor or meter 16 is conveniently mounted directly onto the pump housing 18 in a readily accessible position, depending upon the type of glucose sensor or meter used. In one form, a sensor adapted for receiving and reading a glucose test strip can be incorporated into the pump 10, such as a built-in sensor of the type generally available from Miles Inc., of Elkhart, Ind., under the name Glucometer. Alternately, the sensor or meter 16 may be coupled in a suitable manner to an implantable or subcutaneous glucose sensor of the type described, for example, in U.S. Pat. Nos. 4,650,547; 4,671,288; 4,781,798; 4,703,745; and 4,890,620. In either case, data input is provided to the controller 24, as depicted in FIG. 2, so that pump operation may be regulated in accordance with controller programming and in response to a current patient condition parameter such as blood glucose level.

With reference to FIGS. 2 and 3, the controller 24 responds to manipulation of the buttons 22 in addition to the glucose reading data input to operate a pump element 28 which delivers the medication to the patient 12 from a storage reservoir 30, such as a syringe carried by the housing 18. Pursuant to one primary aspect of the present invention, the controller 24 functions in combination with the display 26 and the buttons 22 to provide the patient with important alternatives before actual medication delivery.

More specifically, as shown in the flow chart of FIG. 3, the controller 24 responds to the initial programming and the glucose reading to provide the patient with one of three different protocol alternatives. In one mode of operation, the controller 24 can be set to operate the pump element 28 automatically, by implementing any dispensing protocol modification which is recommended by the controller software, in response to the glucose reading data input. Such automatic implementation of a modified dispensing protocol is depicted in block 32 in FIG. 3.

As one import alternative, the controller software can be set to provide a recommended dispensing protocol which can be visually displayed to the patient by means of the display 26. This recommended protocol step is illustrated in FIG. 3 by block 34. In this flow path, the patient 12 has an opportunity to accept or reject the recommended modified protocol by appropriate manipulation of the buttons 22, as represented by block 36 in FIG. 3. Upon acceptance of the recommended modified protocol, the controller 24 operates the pump the deliver medication in accordance therewith. Upon rejection of the recommended protocol, the controller 24 will deliver medication in accordance with a preset or default protocol previously programmed into the controller 24.

As a further alternative, the controller software can regulate controller operation to permit patient implementation of a modified manually inputted protocol, as indicated by block

5,665,065

| 5 | 6 |

**38** in FIG. 3. Such implementation of a modified manually inputted protocol would normally occur after rejection of the proposed modified protocol, per block **36**, so that the precise dosage and/or timing thereof can be varied according to actual patient activity, eating schedules, etc.

Accordingly, the present invention provides the patient with a high degree of flexibility in adapting and/or modifying a medication dispensing protocol as a function of current glucose blood level readings. The dispensing protocol can be adjusted to reflect current patient activity and other subjective considerations, whereby the actual dosage and timing of such dosages can be uniquely tailored to suit the needs of an individual patient.

FIG. 4 shows an alternative form of a medication infusion device which can be operated in accordance with the present invention. As shown, the infusion device comprises a medication delivery pen **10'** of the general type disclosed in European Patent Publication 0,554,995, which is incorporated by reference herein. The pen comprises a barrel **40** of generally cylindrical shape for receiving a cartridge (not shown) charged with a selected medication such as insulin for a diabetic. A dial or knob **42** on the aft end of the pen is rotatable to mechanically retract a plunger **44** a preselected distance so that a dial-in medication dosage can be administered to a patient upon subsequent manual plunger depression. A display **26'** on the pen barrel **40** displays the dosage to be administered (typically in units), as the dial **42** is rotated. A glucose sensor or meter **16'** of the type previously described, such as a built-in sensor for receiving and reading a glucose test strip, provides a data input to the delivery pen **10'**. An internal controller (not shown in FIG. 4) responds to the data input to provide a recommended medication dispensing protocol via the display **26'**. As previously discussed, the patient may operate the dial **42** and plunger **44** to deliver the recommended dosage, or a modified dosage in accordance with current patient activity and requirements. The internal controller may store a record of actual dispensing events, for subsequent downloading and/or visual display.

FIG. 5 shows another alternative form of the invention, wherein an in vivo glucose sensor **16"** is shown implanted within the body of a patient to provide continuous glucose level readings or readings which may otherwise be taken whenever needed. Alternately, a subcutaneous sensor may be used. An implanted sensor may be constructed in accordance with copending U.S. Ser. No. 231,800, whereas a subcutaneous sensor and related sensor insertion set may be constructed generally in accordance with U.S. Pat. No. 5,390,671, both of which are incorporated by reference herein. The sensor **16"** is associated with a transmitter **46** used to send an appropriate glucose data signal via radio telemetry or infrared transmission to an appropriate receiver provided as part of the medication infusion device **10"**, which may be constructed generally in accordance with the pump **10** shown in FIG. 1. In this system arrangement, the radio telemetered glucose data signal is inputted to the pump **10"**, which then operates the pump controller (not shown) in accordance with the protocol flow paths described previously with respect to FIG. 3.

A variety of further modifications and improvements to the medication infusion device of the present invention will be apparent to those skilled in the art. Accordingly, no limitation on the invention is intended by way of the foregoing description and accompanying drawings, except as set forth in the appended claims.

What is claimed is:

1. A medication infusion device, comprising:

reservoir means for receiving and storing a supply of a selected medication;

delivery means for delivering a selected dosage of the medication from said reservoir means to a patient;

controller means for automatically controlling said delivery means to deliver the selected medication dosage to the patient according to a first medication dispensing protocol; and

means for inputting flood data to said controller means, said data being representative of a current patient condition parameter, said controller means including means responsive to said data for recommending a second medication dispensing protocol;

said controller means including patient accessible manual set means for enabling said controller means to deliver the medication to the patient according to a selected one of said first and second medication dispensing protocols.

2. The medication infusion device of claim 1 further including display means for displaying information pertaining to said selected one of said first and second medication dispensing protocols.

3. The medication infusion device of claim 1 wherein the patient condition parameter comprises a current blood glucose reading.

4. The medication infusion device of claim 3 wherein said device includes a housing having said reservoir means and said delivery means and said controller means mounted therein, said means for inputting data comprising a blood glucose sensor mounted on said housing.

5. The medication infusion device of claim 3 wherein said device includes a housing having said reservoir means and said delivery means and said controller means mounted therein, said means for inputting data comprising an in vivo sensor mounted on the patient and communicatively coupled to said controller means.

6. The medication infusion device of claim 5 wherein said in vivo sensor comprises an implanted sensor.

7. The medication infusion device of claim 5 wherein said in vivo sensor comprises a subcutaneous sensor.

8. The medication infusion device of claim 5 wherein said in vivo sensor is coupled to said controller means by telemetry.

9. The medication infusion device of claim 1 wherein said manual set means is further operable for enabling said controller means to deliver the medication according to a third manually inputted medication dispensing protocol.

10. A medication infusion device, comprising:

a housing having reservoir means for receiving and storing a supply of a selected medication;

delivery means on said housing for delivering a selected dosage of the medication from said reservoir means to a patient;

controller means for recommending one of a plurality of different medication dispensing protocols;

means for inputting flood data to said controller means, said data being representative of a current patient condition parameter, said controller means responding to said data to select the medication dispensing protocol to be recommended; and

display means on said housing for displaying the recommended medication dispensing protocol;

said delivery means being automatically operated by said controller means to deliver the selected medication

5,665,065

7

dosage to the patient, said controller means being programmable for operating said delivery means according to a first medication dispensing protocol, said controller means being responsive to said data to recommend a second medication dispensing protocol, said controller means including patient accessible manual set means for enabling said controller means to deliver the medication to the patient according to a selected one of said first and second medication dispensing protocols.

11. The medication infusion device of claim 10, wherein said manual set means is further operable for enabling said controller means to deliver the medication according to a third manually inputted medication dispensing protocol.

12. The medication infusion device of claim 10 wherein said delivery means is manually operated by the patient.

13. The medication infusion device of claim 10 further including display means for displaying information pertaining to said medication dispensing protocol.

14. The medication infusion device of claim 13 wherein said means for inputting data comprising a blood glucose sensor mounted on said housing.

15. The medication infusion device of claim 13 wherein said means for inputting data comprises an in vivo sensor mounted on the patient and communicatively coupled to said controller means.

16. The medication infusion device of claim 15 wherein said in vivo sensor comprises an implanted sensor.

17. The medication infusion device of claim 15 wherein said in vivo sensor comprises a subcutaneous sensor.

8

18. The medication infusion device of claim 15 wherein said in vivo sensor is coupled to said controller means by telemetry.

19. In a medication infusion device having a reservoir for receiving and storing a supply of a selected medication, and delivery means for delivering medication from the reservoir to a patient, a method of operating said infusion device comprising the steps of:

automatically operating the delivery means to deliver a selected dosage of the medication to a patient according to a first medication dispensing protocol;

inputting flood data representative of a current patient condition parameter to a controller having a plurality of different medication dispensing protocols programmed therein;

responding to the inputted data to recommend a second medication dispensing protocol from the plurality programmed into the controller; and

operating the delivery means with patient accessible manual set means to deliver medication to the patient according to one of the first and second medication dispensing protocols or a different dispensing protocol.

20. The method of claim 19 further including displaying the recommended dispensing protocol.

21. The method of claim 19 wherein the patient condition parameter comprises a current blood glucose reading.

*   *   *   *   *

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

**PATENT NO.** : 5,665,065

**DATED** : September 9, 1997

**INVENTOR(S)** : Fredric C. Colman and Peter C. Lord

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In claim 1, col. 6, line 11, delete "flood" and insert
--blood--.

In claim 10, col. 6, line 59, delete "flood" and insert
--blood--.

In claim 19, col. 8, line 12, delete "flood" and insert
--blood--.

Signed and Sealed this

Sixth Day of January, 1998

*Attest:*

BRUCE LEHMAN

*Attesting Officer*

*Commissioner of Patents and Trademarks*

# Exhibit D

## U.S. Patent No. 5,665,065

Claims 3 and 9 asserted

(disputed claim language emphasized)

---

1. A medication infusion device, comprising:

***reservoir means*** *for receiving and storing a supply of a selected medication*;

***delivery means*** *for delivering a selected dosage of the medication from said reservoir means to a patient*;

***controller means*** *for automatically controlling said delivery means to deliver the selected medication dosage to the patient according to a first medication dispensing protocol*; and

***means for inputting [b]lood***[1] ***data to said controller means***, said data being representative of a current patient condition parameter, said controller means including ***means responsive to said data for recommending a second medication dispensing protocol***;

said controller means including ***patient accessible manual set means for enabling said controller means to deliver the medication to the patient according to a selected one of said first and second medication dispensing protocols***.

3. The medication infusion device of claim 1 wherein the patient condition parameter comprises a current blood glucose reading.

9. The medication infusion device of claim 1 wherein said manual set means is further operable for enabling said controller means to deliver the medication according to a third manually inputted medication dispensing protocol.

---

[1] After the '065 patent issued, a Certificate of Correction was filed to change "flood" to "blood." *See* Ex. C, last page.

# Exhibit E

Highly Confidential - Outside Counsel Only
Peter Lord     August 16, 2013

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| MEDTRONIC MINIMED, INC.; | ) | CASE NO. |
| MEDTRONIC PUERTO RICO | ) | 2:12-cv-04471-RSWL-RZ |
| OPERATIONS CO.; MINIMED | ) | |
| DISTRIBUTION CORP., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| ANIMAS CORPORATION, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

DEPOSITION OF PETER LORD

TAKEN ON

FRIDAY, AUGUST 16, 2013

Reported by:  DENISE A. ROSS

CSR No. 10687

Highly Confidential - Outside Counsel Only
Peter Lord    August 16, 2013

Page 25

09:35:02  1

09:35:03  2

09:35:06  3

09:35:19  4

09:35:19  5

09:35:23  6

09:35:51  7

09:35:51  8

09:35:55  9

09:35:55 10

09:35:55 11

09:35:55 12

09:35:55 13

09:35:55 14

09:35:55 15

09:35:56 16         Q.   Let me show you what we've marked as

09:35:58 17   Exhibit 9, which is called the -065 patent.

09:36:01 18             Are you the Peter Lord who is the named

09:36:04 19   inventor -- one of the named inventors on that patent?

09:36:07 20         A.   I am.

09:36:13 21

09:36:14 22

09:36:18 23

09:36:21 24

09:36:22 25

Highly Confidential - Outside Counsel Only
Peter Lord     August 16, 2013

Page 53

10:19:23   1

10:19:27   2

10:19:31   3

10:19:31   4

10:19:36   5

10:19:36   6

10:19:38   7

10:19:41   8

10:19:45   9

10:19:49  10

10:19:51  11

10:19:51  12

10:19:54  13

10:19:57  14

10:20:00  15

10:20:01  16        Q.    And in designing the external pump that would

10:20:03  17   have a glucose sensor incorporated in it, such as

10:20:08  18   what's shown in Figure 1, did the sketches or drawings

10:20:11  19   that you prepared include schematics of the electronics

10:20:14  20   that would be necessary in order to incorporate the

10:20:18  21   glucose sensor into the pump?

10:20:20  22        A.    They did not.

10:20:21  23        Q.    In providing the sketches, did those sketches

10:20:23  24   include information regarding how the software would

10:20:28  25   need to be modified in the pump in order to incorporate

Highly Confidential - Outside Counsel Only
Peter Lord    August 16, 2013

Page 54

10:20:32  1    the glucose sensor into the pump?

10:20:35  2        A.  I did not make any invention or description

10:20:38  3    of the software.

10:20:39  4        Q.   Is that something that would have been

10:20:42  5    needed --

10:20:43  6         Would electronics, as well as software, have

10:20:46  7    been necessary to be designed in order to allow the

10:20:50  8    incorporation of the glucose sensor into the pump?

10:20:53  9         MS. KOLTER:  Objection; vague.

10:20:57 10         THE WITNESS:  Of course.  That's why there

10:20:59 11    are two inventors.

10:21:01 12    BY MR. ABRAMS:

10:21:01 13        Q.   And when you say "two inventors," did

10:21:04 14    Fred Colman design schematics that would show the

10:21:08 15    electronics that incorporated the glucose sensor into

10:21:12 16    the pump?

10:21:13 17        A.   I don't recall that Fred specifically

10:21:15 18    designed anything, but he confirmed for me that the

10:21:18 19    concept was workable.

10:21:19 20        Q.   And when you say, "confirmed that the concept

10:21:23 21    was workable," what was the basis for that, as far as

10:21:26 22    you know?

10:21:27 23        A.  The challenge obviously was to create

10:21:30 24    software and hardware electronics that would be common

10:21:38 25    for a pump controller and a glucometer inside that

Highly Confidential - Outside Counsel Only
Peter Lord     August 16, 2013

Page 55

10:21:45  1   housing.  And being a mechanical engineer, I didn't have

10:21:48  2   the skill set to make -- draw the conclusion that simply

10:21:53  3   because I felt it would physically fit, that you could

10:21:57  4   devise the software or the microelectronics assembly to

10:22:01  5   fit in that housing that would serve as both functions.

10:22:05  6            And that was Fred's area of expertise, and

10:22:08  7   that's what I meant by that's why there are two

10:22:11  8   inventors on the patent.

10:22:13  9       Q.   As far as your understanding --

10:22:15  10           Have you had a chance to review the patent in

10:22:17  11  the last few days?

10:22:18  12      A.   I've read the patent in the last few weeks,

10:22:21  13  yes.

10:22:22  14      Q.   Do you recall whether or not the patent

10:22:23  15  includes any disclosure or teaching of the -- the

10:22:28  16  electronics or the software that would need to be

10:22:32  17  designed in order for the glucometer to be incorporated

10:22:39  18  into the external pump?

10:22:41  19           MS. KOLTER:  Objection; vague.

10:22:42  20           THE WITNESS:  What I recall from looking at

10:22:43  21  the patent is what's in the -- in the two flow diagrams.

10:22:47  22  BY MR. ABRAMS:

10:22:47  23      Q.   By the "flow diagrams," you mean Figure 2 and

10:22:51  24  Figure 3?

10:22:54  25      A.   Yes.

Highly Confidential - Outside Counsel Only
Peter Lord    August 16, 2013

Page 56

10:22:55   1        Q.   And Figure -- neither Figure 2 or Figure 3

10:22:58   2   includes any schematics that describes the electronics,

10:23:01   3   such as how a processor would be designed that would

10:23:04   4   interact with the controller, et cetera?

10:23:05   5        A.   Correct.

10:23:06   6        Q.   All right.   And neither Figure 2 nor Figure 3

10:23:10   7   describes or includes software code that would set out

10:23:13   8   how this process is to be implemented?

10:23:15   9        A.   Correct.

Highly Confidential - Outside Counsel Only
Peter Lord     August 16, 2013

Page 64

10:33:18   1

10:33:22   2

10:33:33   3

10:33:35   4

10:33:36   5          Q.   Now, the patent goes on to say that you

10:33:41   6     can -- in the next sentence:

10:33:43   7               "This medication delivery

10:33:45   8               protocol could be implemented

10:33:47   9               automatically, recommended by a

10:33:50  10               visual display for convenient

10:33:53  11               acceptance or rejection by the

10:33:54  12               patient or otherwise overridden

10:33:57  13               in favor of a different or

10:33:58  14               modified medication delivery

10:34:00  15               protocol."

10:34:02  16          So am I correct that one of the options

10:34:05  17     available with the invention is that a blood glucose

10:34:11  18     test can be taken and that information can be used to

10:34:14  19     recommend a patient delivery protocol and that can be

10:34:22  20     implemented automatically by the device?

10:34:27  21               MS. KOLTER:  Objection; misstates the

10:34:29  22     document.

10:34:39  23               THE WITNESS:  The -- the term "automatically"

10:34:41  24     in this -- in this patent, at least to my reading, is

10:34:46  25     pretty much as an adverb, saying that whatever happens,

Highly Confidential - Outside Counsel Only
Peter Lord    August 16, 2013

Page 65

| | | |
|---|---|---|
| 10:34:50 | 1 | happens, because the machine does it, if that's your |
| 10:34:57 | 2 | question. |
| 10:34:57 | 3 | BY MR. ABRAMS: |
| 10:34:58 | 4 | Q.   Well, maybe I'll ask the question |
| 10:35:02 | 5 | differently. |
| 10:35:02 | 6 | If you can read to yourself -- in Column 4, |
| 10:35:05 | 7 | there is a description starting around Line 31 about |
| 10:35:09 | 8 | references to Figures 2 and 3; and it describes various |
| 10:35:12 | 9 | options. |
| 10:35:13 | 10 | A.   Uh-huh. |
| 10:35:14 | 11 | Q.   And if you can read that to yourself, I'm |
| 10:35:16 | 12 | going to ask you the question if you could explain to |
| 10:35:18 | 13 | me in your own words -- |
| 10:35:19 | 14 | A.   Sure. |
| 10:35:20 | 15 | Q.   -- the options. |
| 10:35:21 | 16 | A.   In Figure 3, you're talking about? |
| 10:35:23 | 17 | Q.   So why -- |
| 10:35:25 | 18 | A.   I'm sorry.  Say again. |
| 10:35:25 | 19 | Q.   So if you'll look at what's in Column 4 -- |
| 10:35:28 | 20 | A.   Yeah. |
| 10:35:29 | 21 | Q.   -- it references Figures 2 and 3.  Take a |
| 10:35:32 | 22 | moment to read that and look at it for yourself.  And |
| 10:35:34 | 23 | then when you're done, the question I'm going to ask |
| 10:35:35 | 24 | you is going to be along the lines of can you please |
| 10:35:36 | 25 | explain in your own words what's being described here. |

Page 66

| | | |
|---|---|---|
| 10:35:38 | 1 | MS. KOLTER:  What line specifically are you |
| 10:35:41 | 2 | pointing to? |
| 10:35:41 | 3 | MR. ABRAMS:  Starting around Line 31 and it |
| 10:35:44 | 4 | goes all the way down to the end and actually runs over |
| 10:35:47 | 5 | to the next page around Column -- around Line 5.  It |
| 10:35:51 | 6 | describes several options. |
| 10:36:57 | 7 | THE WITNESS:  Okay. |
| 10:36:59 | 8 | BY MR. ABRAMS: |
| 10:37:00 | 9 | Q.   So the question I have is:  Having had an |
| 10:37:02 | 10 | opportunity to review the patent, at least a portion of |
| 10:37:05 | 11 | it, can you please explain for me what is being |
| 10:37:09 | 12 | described in Figures 2 and 3, in your own words, as |
| 10:37:14 | 13 | to -- as far as to what the controller -- the operation |
| 10:37:16 | 14 | of the controller. |
| 10:37:18 | 15 | MS. KOLTER:  Objection; vague. |
| 10:37:20 | 16 | THE WITNESS:  So I look at Figure 2 as a |
| 10:37:25 | 17 | diagram.  And it describes the components of the system. |
| 10:37:35 | 18 | And the two arrows -- reservoir to pump and pump to |
| 10:37:39 | 19 | patient -- represent the -- the drug being delivered. |
| 10:37:44 | 20 | So in Figure 2, the program input is from the |
| 10:37:50 | 21 | user using the buttons to see something on the display |
| 10:37:58 | 22 | controlled by the controller.  The glucose meter/sensor |
| 10:38:04 | 23 | is connected to the controller and obviously is -- it |
| 10:38:11 | 24 | can -- is connected to the patient to get the reading or |
| 10:38:14 | 25 | is used with a drop of blood to get the reading.  And |

Highly Confidential - Outside Counsel Only
Peter Lord    August 16, 2013

Page 67

10:38:19  1    the pump delivers insulin from the reservoir.

10:38:22  2        The Figure 3 describes the -- the real flow

10:38:26  3    and function.  And in Figure 3, the glucose reading and

10:38:32  4    the input, the manual set, both are done on the face of

10:38:39  5    the device or on the device.  And the glucose reading

10:38:42  6    may be received, but it may also be a -- a strip into

10:38:47  7    the housing.

10:38:49  8        Now, when -- when the pump has both of these

10:38:52  9    pieces of information -- and this -- this is the -- the

10:38:57  10   nice thing is that it's one housing, and the receiver

10:39:01  11   is -- or the -- or the meter itself is in that housing.

10:39:06  12       When -- when the controller has both of those

10:39:09  13   pieces of information, it can display a recommendation

10:39:13  14   for some sort of a protocol correction.  And the user

10:39:19  15   can make a decision as to whether or not that change is

10:39:24  16   appropriate or not based on the other physiologic things

10:39:28  17   that are present, the health status, the -- whether or

10:39:33  18   not there's exercise going on and all those sorts of

10:39:36  19   things and make a judgment, as they usually do.

10:39:38  20       But now all of the transcription and math has

10:39:41  21   previously been done without error by the device.  So

10:39:45  22   now the user can -- can make or not make the decision to

10:39:49  23   accept that recommendation and make changes.

10:39:53  24       The dotted line is a situation where there is

10:39:59  25   no recommendation, and the device responds in a

Highly Confidential - Outside Counsel Only
Peter Lord     August 16, 2013

Page 68

| | | |
|---|---|---|
| 10:40:04 | 1 | closed-loop manner.  And so this -- in this case, the |
| 10:40:09 | 2 | device implements the protocol without the user input. |
| 10:40:16 | 3 | And then, 38, I look at that as the -- the |
| 10:40:22 | 4 | user doesn't take advantage of the display at all -- the |
| 10:40:27 | 5 | displayed values or recommendations at all and does a |
| 10:40:31 | 6 | simple button press to use the device without the |
| 10:40:35 | 7 | benefit of glucose -- I mean, without the advice of the |
| 10:40:39 | 8 | device to what -- as to what dose to give to correct. |
| 10:40:44 | 9 | So I think the illustration demonstrates the |
| 10:40:48 | 10 | options you have when you have a device that's |
| 10:40:51 | 11 | integrated this way and shows that it has a lot of |
| 10:40:55 | 12 | advantage. |
| 10:40:56 | 13 | BY MR. ABRAMS: |
| 10:40:56 | 14 | Q.   So in Figure 3, option -- one option is that |
| 10:41:02 | 15 | it goes through boxes 34 and 36 where, based on the |
| 10:41:06 | 16 | glucose reading, the machine recommends a modification |
| 10:41:11 | 17 | to the protocol and then the user in Box 36 has the |
| 10:41:15 | 18 | option to accept or reject that modification? |
| 10:41:19 | 19 | A.   Yes. |
| 10:41:20 | 20 | Q.   And then the second box -- second path or |
| 10:41:24 | 21 | possibility is through Box 32.  And in that, after the |
| 10:41:29 | 22 | glucose reading, the pump recommends a modified |
| 10:41:34 | 23 | protocol; and it's automatically implemented by the |
| 10:41:38 | 24 | machine? |
| 10:41:39 | 25 | A.   Right. |

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY
PETER LORD - 8/16/2013

1          I, DENISE A. ROSS, a Certified Shorthand

2   Reporter for the State of California, do hereby certify:

3          I am the deposition officer that

4   stenographically recorded the testimony in the foregoing

5   deposition;

6          That prior to being examined, the witness

7   named in the foregoing deposition was first duly sworn

8   by me to testify as to the truth, the whole truth, and

9   nothing but the truth pursuant to Section No. 2093 of

10   the Code of Civil Procedure;

11          That the foregoing transcript is a true

12   record of the testimony given;

13          Before completion of the deposition, review

14   of the transcript [ x ] was [  ] was not requested.  If

15   requested, any changes made by the deponent (and

16   provided to the reporter) during the period allowed are

17   appended hereto.

18          IN WITNESS WHEREOF, I have hereunto

19   subscribed my name this __20th__ day of __August__

20   2013.

21

22          _Denise Ross_

23

24          Denise A. Ross
            CSR No. 10687

25

# Exhibit F

FRED COLMAN - 9/10/2013

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


MEDTRONIC MINIMED, INC.,
et al.,

       Plaintiff,

   vs.               Case No. 2:12-cv-04471-
                             RWSL-RZ

ANIMAS CORPORATION,

       Defendant.
_____/




VIDEOTAPED DEPOSITION OF FRED COLMAN

Palo Alto, California

Tuesday, September 10, 2013




REPORTED BY:  SHEILA ARCENO, RPR, CSR No. 13293

FRED COLMAN - 9/10/2013

Page 33

| | | |
|---|---|---|
| 1 | | 10:30:19 |
| 2 | | 10:30:20 |
| 3 | | 10:30:22 |
| 4 | | 10:30:26 |
| 5 | | 10:30:29 |
| 6 | | 10:30:31 |
| 7 | | 10:30:33 |
| 8 | | 10:30:37 |
| 9 | | 10:30:40 |
| 10 | | 10:30:47 |
| 11 | | 10:30:51 |
| 12 | | 10:30:51 |
| 13 | | 10:30:53 |
| 14 | | 10:30:56 |
| 15 | | 10:30:58 |
| 16 | | 10:31:00 |
| 17 | | 10:31:00 |
| 18 | | 10:31:07 |
| 19 | | 10:31:07 |
| 20 | | 10:31:18 |
| 21 | | 10:31:20 |
| 22 | Q.  -- you can move some of those over if you'd | 10:31:20 |
| 23 | like.  Let me show you what we have previously marked as | 10:31:24 |
| 24 | Exhibit 9.  It's a copy of U.S. patent number 5665065. | 10:31:31 |
| 25 | A.  Okay. | 10:31:39 |

FRED COLMAN - 9/10/2013

Page 34

| | | |
|---|---|---|
| 1 | Q.  Are you the Fredric Colman who's listed as an | 10:31:39 |
| 2 | inventor of this patent? | 10:31:48 |
| 3 | A.  Yes, I am. | 10:31:50 |
| 4 | Q.  And you understand if we call it the 065 | 10:31:51 |
| 5 | patent, you'll know what we're talking about? | 10:31:58 |
| 6 | A.  I will. | 10:31:59 |
| 7 | | 10:32:01 |
| 8 | | 10:32:03 |
| 9 | | 10:32:05 |
| 10 | | 10:32:05 |
| 11 | | 10:32:10 |
| 12 | | 10:32:15 |
| 13 | | 10:32:16 |
| 14 | | 10:32:25 |
| 15 | | 10:32:31 |
| 16 | | 10:32:31 |
| 17 | | 10:32:34 |
| 18 | | 10:32:34 |
| 19 | | 10:32:43 |
| 20 | | 10:32:47 |
| 21 | | 10:32:50 |
| 22 | | 10:32:53 |
| 23 | | 10:32:59 |
| 24 | | 10:32:59 |
| 25 | | 10:33:02 |

FRED COLMAN - 9/10/2013

Page 50

| | | |
|---|---|---|
| 1 | | 10:52:00 |
| 2 | | 10:52:03 |
| 3 | | 10:52:05 |
| 4 | | 10:52:10 |
| 5 | | 10:52:13 |
| 6 | | 10:52:17 |
| 7 | | 10:52:20 |
| 8 | | 10:52:23 |
| 9 | | 10:52:27 |
| 10 | | 10:52:32 |
| 11 | | 10:52:33 |
| 12 | | 10:52:35 |
| 13 | | 10:52:37 |
| 14 | | 10:52:37 |
| 15 | | 10:52:40 |
| 16 | | 10:52:43 |
| 17 | | 10:52:46 |
| 18 | | 10:52:49 |
| 19 | | 10:52:52 |
| 20 | | 10:52:56 |
| 21 | BY MR. ABRAMS:  Q.  As of May 26, 1995, had you | 10:52:56 |
| 22 | and Peter Lord developed such an algorithm? | 10:53:00 |
| 23 | MS. KOLTER:  Objection, vague. | 10:53:05 |
| 24 | THE WITNESS:  I don't believe so. | 10:53:07 |
| 25 | BY MR. ABRAMS:  Q.  So when the patent | 10:53:10 |

FRED COLMAN - 9/10/2013

Page 51

1    application was filed, had you done -- had you -- well,          10:53:16

2    first of all, had you built a prototype of this?               10:53:19

3          MS. KOLTER:  Objection, vague.                            10:53:22

4          THE WITNESS:  I don't believe we built a                 10:53:25

5    prototype, no.  There were algorithms in the literature        10:53:28

6    we were aware of.  And I -- but I don't believe that we        10:53:32

7    built a device that -- I don't think we reduced it to          10:53:38

8    practice.  I don't think we built a prototype.                 10:53:41

9          BY MR. ABRAMS:  Q.  From May 1995 forward, did           10:53:44

10   you ever build a prototype?                                     10:53:47

11         A.  Yes.                                                  10:53:49

12         Q.  When did that occur?                                 10:53:49

13         A.  Dates are going to be a little bit tricky.           10:53:50

14   Mid, late '90s, I would think.  It was ongoing when I          10:54:02

15   left.                                                           10:54:14

16         Do you want me to tell you about it?  I'm not            10:54:15

17   sure.                                                           10:54:17

18         Q.  What project was that?  Did it have a name or a      10:54:17

19   number associated with it, in terms of a pump?                 10:54:21

20         MS. KOLTER:  Objection, vague.                           10:54:21

21         THE WITNESS:  It was a joint project between             10:54:23

22   MiniMed and Boehringer Mannheim who made a glucose             10:54:25

23   meter.  We were using an algorithm that was proposed by        10:54:33

24   a group of endocrinologists in Atlanta; Bruce Bode,            10:54:40

25   Dennis Steed, and I forget what the third partner's name       10:54:49

FRED COLMAN - 9/10/2013

Page 52

| | | |
|---|---|---|
| 1 | was. | 10:54:55 |
| 2 | They had a -- an algorithm <mark>we spent some time</mark> | 10:54:56 |
| 3 | <mark>fine tuning the algorithm, adding better feedback, loops</mark> | 10:55:00 |
| 4 | <mark>into it all.</mark>  The idea of the product -- and I believe | 10:55:02 |
| 5 | the name is GMS for glucose management system, was that | 10:55:04 |
| 6 | we would -- we built kind of a cradle into which you | 10:55:11 |
| 7 | could put the Boehringer Mannheim glucose meter and the | 10:55:15 |
| 8 | 507-C pump, 507-C had -- I think one of the additions to | 10:55:20 |
| 9 | the 507-C was infrared transmitted receiver so you could | 10:55:27 |
| 10 | communicate to the pump through IR without breaching, | 10:55:33 |
| 11 | without having to plug anything in. | 10:55:39 |
| 12 | I think it was that both of these devices could | 10:55:42 |
| 13 | be plug into the cradle.  Glucose measurements could be | 10:55:44 |
| 14 | taken using that meter, which would then communicate -- | 10:55:48 |
| 15 | I think with the cradle and then I think there was -- so | 10:55:53 |
| 16 | the cradle had its own processor in it, as I recall. | 10:55:55 |
| 17 | And then that could program or communicate with the -- | 10:55:59 |
| 18 | with the pump. | 10:56:03 |
| 19 | BY MR. ABRAMS:  Q.  Was that GMS product built? | 10:56:03 |
| 20 | MS. KOLTER:  Objection, vague. | 10:56:12 |
| 21 | THE WITNESS:  Not by the time I left, I don't | 10:56:15 |
| 22 | believe.  We were doing experiments with it, | 10:56:19 |
| 23 | prototyping.  But I think we were doing the algorithm on | 10:56:31 |
| 24 | the PC.  I don't know that we had a cradle actually | 10:56:33 |
| 25 | built.  So I think it was conception, but not built. | 10:56:36 |

FRED COLMAN - 9/10/2013

Page 53

```
 1          BY MR. ABRAMS:  Q.  So the algorithm was on a        10:56:39

 2     PC.  Do you recall what PC it was on.  Was that a          10:56:42

 3     TRS-80, by chance?                                         10:56:47

 4          A.  Oh, no, no, no, no, no.  No.  This was -- I       10:56:48

 5     think TRS-80s went away in the '80s.  This would have      10:56:50

 6     been a -- an IBM-style computer running Microsoft          10:56:58

 7     operating system, which version that was, probably        10:57:01

 8     windows '95.  I'm guessing.  I don't really know.  It      10:57:05

 9     was the -- the algorithm was developed -- I was tuning    10:57:09

10     it using a program Mathcad, which is a -- a -- it was     10:57:15

11     mathematical program you can buy off the shelf, which     10:57:24

12     would allow you to do simultaneous solution of            10:57:27

13     equations, which was involved in the model for glucose    10:57:32

14     and insulin, and applying the algorithm on top of that.   10:57:34

15     It's sort of a model of what the human body would do.     10:57:37

16                                                                10:57:44

17                                                                10:57:45

18                                                                10:57:47

19                                                                10:57:48

20                                                                10:57:49

21                                                                11:10:30

22                                                                11:10:30

23                                                                11:10:32

24                                                                11:10:34

25                                                                11:10:36
```

FRED COLMAN - 9/10/2013

```
 1           BY MR. ABRAMS:  Q.  And can you explain to me,        11:13:28

 2     then, what the three -- what the three options are for      11:13:30

 3     the implementation of the inventions that are showing in    11:13:35

 4     Figure 3?                                                   11:13:40

 5           MS. KOLTER:  Objection, vague, and calls for          11:13:40

 6     expert testimony.                                           11:13:42

 7           THE WITNESS:  The algorithm take input from a         11:13:43

 8     glucose sensor, and using that and previous glucose         11:13:52

 9     readings and previous insulin delivery, it will            11:13:58

10     calculate a new delivery of insulin.  The pump can be       11:14:02

11     set up to be programmed automatically so the user           11:14:08

12     doesn't need to do anything, just trust the algorithm is    11:14:13

13     correct.  And it will as often as the -- there are          11:14:16

14     glucose readings, it will modify the pump.                  11:14:20

15           Alternately, it can propose the change, and the       11:14:28

16     patient can choose to accept it, which is what's in         11:14:31

17     blocks 34 and 36.  And I think what's in 38 is they can     11:14:35

18     ignore it entirely and just program it any way they         11:14:44

19     want.  The user knows that they're about to eat             11:14:49

20     something that requires extra insulin and make sure just    11:14:53

21     to give themselves a different -- change -- or they know    11:14:58

22     that they're going to exercise and need less insulin.       11:14:58

23     So they may -- even though the algorithm is recommending    11:15:03

24     an increase in delivery, they know they're about to go      11:15:06

25     jogging, which would require less insulin because the       11:15:10
```

FRED COLMAN - 9/10/2013

Page 56

```
 1    exercise will be metabolizing glucose.  So they may        11:15:14
 2    choose to override it or have their own manual -- manual   11:15:19
 3    input data programming at the base rate or delivery        11:15:25
 4    rate.                                                      11:15:29
 5           BY MR. ABRAMS:  Q.  So you mentioned that one       11:15:29
 6    option is or one path that's automatically.  That's       11:15:34
 7    through blocks 32?                                         11:15:34
 8        A.  Yes.                                               11:15:34
 9        Q.  It takes the glucose reading, recommends a         11:15:34
10    protocol that is automatically implemented by the pump?   11:15:38
11           MS. KOLTER:  Objection, calls for expert           11:15:42
12    testimony.                                                 11:15:44
13           THE WITNESS:  Yes.                                  11:15:44
14           BY MR. ABRAMS:  Q.  And then you mentioned the      11:15:45
15    blocks 34 and 36, am I correct it takes a glucose          11:15:48
16    reading, it proposes a change, but the patient can        11:15:51
17    choose whether or not to accept it?                        11:15:55
18           MS. KOLTER:  Objection, calls for expert           11:15:57
19    testimony.                                                 11:15:59
20           THE WITNESS:  Correct.                              11:15:59
21           BY MR. ABRAMS:  Q.  And then the third option,      11:16:00
22    which is through block 38, am I correct that there's not  11:16:03
23    even a glucose reading that's not being done.  It's just  11:16:07
24    an individual deciding what they want to do implementing  11:16:11
25    the protocol?                                              11:16:15
```

FRED COLMAN - 9/10/2013

| | |
|---|---|
| 1 | MS. KOLTER:  Objection, calls for expert | 11:16:15 |
| 2 | testimony. | 11:16:18 |
| 3 | THE WITNESS:  That's correct.  If you reject it | 11:16:20 |
| 4 | in line -- in Box 36, then it just continues to operate | 11:16:23 |
| 5 | at whatever was previously programmed.  So you're not | 11:16:29 |
| 6 | making the change.  You can then further, since it is a | 11:16:31 |
| 7 | programmable -- patient programmable device, the patient | 11:16:35 |
| 8 | can also, at any time, choose to program or change the | 11:16:37 |
| 9 | protocol. | 11:16:42 |
| 10 | BY MR. ABRAMS:  Q.  And that's block 38?  In | 11:16:42 |
| 11 | other words, the line for block 38 that goes into block | 11:16:45 |
| 12 | 38 does not rely on any glucose reading, correct? | 11:16:48 |
| 13 | MS. KOLTER:  Objection, calls for expert | 11:16:52 |
| 14 | testimony, vague. | 11:16:55 |
| 15 | THE WITNESS:  Correct. | 11:16:55 |
| 16 | BY MR. ABRAMS:  Q.  Now, how does the system | 11:16:55 |
| 17 | recommend a change in a pattern of insulin delivery | 11:16:59 |
| 18 | based on just a single reading of blood glucose? | 11:17:03 |
| 19 | MS. KOLTER:  Objection, vague, calls for expert | 11:17:07 |
| 20 | testimony. | 11:17:10 |
| 21 | THE WITNESS:  It doesn't.  What I said before | 11:17:12 |
| 22 | was that the algorithm will take into account previous | 11:17:16 |
| 23 | glucose reading, it's looking for a trend, it's looking | 11:17:19 |
| 24 | for a rate of change of the glucose.  It would also take | 11:17:21 |
| 25 | into account the amount of insulin that has been | 11:17:24 |

FRED COLMAN - 9/10/2013

Page 58

| | | |
|---|---|---|
| 1 | delivered previously.  Those are both parameters that | 11:17:28 |
| 2 | would feed into the algorithm, which would then | 11:17:33 |
| 3 | recommend a change in the protocol, in the delivery | 11:17:36 |
| 4 | protocol. | 11:17:39 |
| 5 | BY MR. ABRAMS:  Q.  So it's your understanding | 11:17:39 |
| 6 | that the 065 patent is dealing with multiple glucose | 11:17:40 |
| 7 | readings, as well as multiple -- I'm sorry, first of | 11:17:47 |
| 8 | all, it's looking at multiple glucose readings? | 11:17:51 |
| 9 | MS. KOLTER:  Objection, calls for expert | 11:17:54 |
| 10 | testimony, vague. | 11:17:56 |
| 11 | THE WITNESS:  It's -- no, it's not my | 11:17:56 |
| 12 | understanding.  The patent specifically addresses that. | 11:17:58 |
| 13 | You're asking me about what the glucose algorithm would | 11:18:01 |
| 14 | do.  And generally, glucose algorithms will build on | 11:18:04 |
| 15 | what they did before and continue looking at the rate of | 11:18:09 |
| 16 | change to -- to propose the next change.  You could | 11:18:14 |
| 17 | start with a single glucose reading, and you often | 11:18:23 |
| 18 | would.  You take a reading, see it's very high, for | 11:18:25 |
| 19 | example, and you would propose a high rate of insulin | 11:18:28 |
| 20 | delivery.  Later on, you take another reading and now | 11:18:33 |
| 21 | you would see it has come down.  And based on where | 11:18:37 |
| 22 | were, the previous reading, now it takes both glucose | 11:18:40 |
| 23 | readings into account.  That's how the algorithm works. | 11:18:42 |
| 24 | I don't know that it's specifically addressed.  I don't | 11:18:45 |
| 25 | think it is in this patent. | 11:18:47 |

FRED COLMAN - 9/10/2013

Page 60

| | |
|---|---|
| 1 | 11:20:01 |
| 2 | 11:20:02 |
| 3 | 11:20:04 |
| 4 | 11:20:04 |
| 5 | 11:20:09 |
| 6 | 11:20:15 |
| 7 | 11:20:19 |
| 8 | 11:20:21 |
| 9 | 11:20:25 |
| 10 | 11:20:28 |
| 11 | 11:20:33 |
| 12 | 11:20:35 |
| 13 | 11:20:35 |
| 14 | 11:20:38 |
| 15 | 11:20:41 |
| 16 | 11:20:43 |
| 17 | 11:20:46 |
| 18 | 11:20:48 |
| 19 | 11:20:51 |
| 20 | 11:20:54 |
| 21 | 11:20:57 |
| 22 | 11:21:01 |
| 23 | 11:21:03 |

24    BY MR. ABRAMS:   Q.   And is there any discussion          11:21:04

25    in the patent of what you just told me about with this     11:21:05

FRED COLMAN - 9/10/2013

| | | |
|---|---|---|
| 1 | algorithm?  Where, in other words, the algorithm takes | 11:21:09 |
| 2 | into account multiple readings and makes a determination | 11:21:12 |
| 3 | based on multiple readings? | 11:21:16 |
| 4 | MS. KOLTER:  Objection, vague, calls for expert | 11:21:18 |
| 5 | testimony. | 11:21:20 |
| 6 | THE WITNESS:  I didn't read the patent that | 11:21:20 |
| 7 | careful.  I don't know if it does or not. | 11:21:22 |
| 8 | I do know it mentions algorithms in here | 11:21:24 |
| 9 | somewhere, but I don't -- I need to stop and reread it, | 11:21:28 |
| 10 | which we can do.  But I -- I know that that's what was | 11:21:29 |
| 11 | conceived of.  I know that -- because the controlled | 11:21:38 |
| 12 | algorithm doesn't work very well based on -- on one | 11:21:40 |
| 13 | discreet point.  The whole idea is if -- as an example, | 11:21:46 |
| 14 | if your glucose is very high, and I increase the rate | 11:21:51 |
| 15 | and I'm going to take another reading, I'm going to see | 11:21:55 |
| 16 | that it has comes down, certainly.  But how fast it | 11:21:57 |
| 17 | comes down is an important point in calculating the next | 11:22:01 |
| 18 | recommendation. | 11:22:06 |
| 19 | So I know that that's what was conceived in | 11:22:06 |
| 20 | this.  Whether it specifically talks -- again, I don't | 11:22:08 |
| 21 | think the patent is specifically about the algorithm. | 11:22:11 |
| 22 | So I don't know how much discussion is in here.  But I | 11:22:14 |
| 23 | know that that's part of it.  An algorithm with just a | 11:22:17 |
| 24 | discreet reading doesn't tell you very much. | 11:22:20 |
| 25 | BY MR. ABRAMS:  Q.  So if the patent only | 11:22:23 |

FRED COLMAN - 9/10/2013

| | | |
|---|---|---|
| 1 | describes a discreet reading, then the patent doesn't | 11:22:25 |
| 2 | tell you how to implement an algorithm as you're just | 11:22:28 |
| 3 | describing, correct? | 11:22:33 |
| 4 | MS. KOLTER:  Objection, calls for expert | 11:22:34 |
| 5 | testimony, incomplete hypothetical. | 11:22:37 |
| 6 | THE WITNESS:  The patent does not describe the | 11:22:40 |
| 7 | algorithm.  Is that what you asked me?  No, it does not. | 11:22:40 |
| 8 | | 11:22:42 |
| 9 | | 11:22:42 |
| 10 | | 11:22:45 |
| 11 | | 11:22:47 |
| 12 | | 11:22:50 |
| 13 | | 11:22:53 |
| 14 | | 11:22:54 |
| 15 | | 11:22:56 |
| 16 | | 11:22:58 |
| 17 | | 11:23:02 |
| 18 | | 11:23:19 |
| 19 | | 11:23:23 |
| 20 | | 11:23:27 |
| 21 | | 11:23:33 |
| 22 | | 11:23:36 |
| 23 | | 11:23:39 |
| 24 | | 11:23:44 |
| 25 | | 11:23:49 |

```
 1                    CERTIFICATE OF REPORTER

 2

 3         I, Sheila Arceno, RPR, a Certified Shorthand

 4    Reporter, do hereby certify:

 5         That the foregoing witness was by me duly

 6    sworn; that the deposition was taken before me at the

 7    time and place therein set forth; that the testimony and

 8    proceedings were reported stenographically by me and

 9    later transcribed into typewriting under my direction;

10         In witness whereof, I have subscribed my name.

11

12

13    Dated  10-7-2013

14

15

16

17                        _____

18                        Sheila Arceno, RPR
                           CSR No. 13293

19

20

21

22

23

24

25
```

# Exhibit G

A new paragraph relating to functional claims is added.

#### AMENDMENTS

1975—Pub. L. 94–131 substituted provision authorizing the writing of claims, if the nature of the case admits, in dependent or multiple dependent form for prior provision for writing claims in dependent form, required claims in dependent form to contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed, substituted text respecting construction of a claim in dependent form so as to incorporate by reference all the limitations of the claim to which it refers for prior text for construction of a dependent claim to include all the limitations of the claim incorporated by reference into the dependent claim, and inserted paragraph respecting certain requirements for claims in multiple dependent form.

1965—Pub. L. 89–83 permitted a claim to be written in independent or dependent form, and if in dependent form, required it to be construed to include all the limitations of the claim incorporated by reference into the dependent claim.

#### EFFECTIVE DATE OF 1975 AMENDMENT

Amendment by Pub. L. 94–131 effective Jan. 24, 1978, and applicable on and after that date to patent applications filed in the United States and to international applications, where applicable, see section 11 of Pub. L. 94–131, set out as an Effective Date note under section 351 of this title.

#### EFFECTIVE DATE OF 1965 AMENDMENT

Amendment by Pub. L. 89–83 effective three months after July 24, 1965, see section 7(a) of Pub. L. 89–83, set out as a note under section 41 of this title.

## §112. Specification

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

A claim may be written in independent or, if the nature of the case admits, in dependent or multiple dependent form.

Subject to the following paragraph, a claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed. A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.

A claim in multiple dependent form shall contain a reference, in the alternative only, to more than one claim previously set forth and then specify a further limitation of the subject matter claimed. A multiple dependent claim shall not serve as a basis for any other multiple dependent claim. A multiple dependent claim shall be construed to incorporate by reference all the limitations of the particular claim in relation to which it is being considered.

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

(July 19, 1952, ch. 950, 66 Stat. 798; Pub. L. 89–83, §9, July 24, 1965, 79 Stat. 261; Pub. L. 94–131, §7, Nov. 14, 1975, 89 Stat. 691.)

#### HISTORICAL AND REVISION NOTES

Based on Title 35, U.S.C., 1946 ed., §33 (R.S. 4888, amended (1) Mar. 3, 1915, ch. 94, §1, 38 Stat. 958; (2) May 23, 1930, ch. 312, §2, 46 Stat. 376).

The sentence relating to signature of the specification is omitted in view of the general requirement for a signature in section 111.

The last sentence is omitted for inclusion in the chapter relating to plant patents.

The clause relating to machines is omitted as unnecessary and the requirement for disclosing the best mode of carrying out the invention is stated as generally applicable to all types of invention (derived from Title 35, U.S.C., 1946 ed., §69, first defense).

The clause relating to the claim is made a separate paragraph to emphasize the distinction between the description and the claim or definition, and the language is modified.

# UNITED STATES CODE

## 2006 EDITION

CONTAINING THE GENERAL AND PERMANENT LAWS
OF THE UNITED STATES ENACTED THROUGH THE
109TH CONGRESS

(ending January 3, 2007, the last law of which was signed on January 15, 2007)

Prepared and published under authority of Title 2, U.S. Code, Section 285b,
by the Office of the Law Revision Counsel of the House of Representatives



## VOLUME TWENTY

### TITLE 31—MONEY AND FINANCE

TO

### TITLE 35—PATENTS

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 2008

# Exhibit H

FOURTH SUPPLEMENTAL CHARTS/CONTENTIONS (NONINFRINGEMENT AND § 112)

### IX.     U.S. Patent No. 5,665,065 ("the '065 patent") (I)

| U.S. Patent No. 5,665,065 | Accused One-Touch Ping and §112 Analysis |
|---|---|
| 1. A medication infusion device, comprising: | -- The accused "medication infusion device" includes both the Ping pump and the Ping remote.  The "medication infusion device" does not include both a pump and a remote, and such an interpretation is not supported by the patent specification.  The claim is invalid under §112. |
| reservoir means for receiving and storing a supply of a selected medication; | |
| delivery means for delivering a selected dosage of the medication from said reservoir means to a patient; | |
| controller means for automatically controlling said delivery means to deliver the selected medication dosage to the patient according to a first medication dispensing protocol; and | -- The accused feature requires "user selections," which does not occur unless the user decides to manually program the pump. Animas has no control over whether the user decides to manually program the pump. <br> -- The "controller means" is a means-plus-function limitation, where the function is "automatically controlling said delivery means to deliver the selected medication dosage to the patient according to a first medication dispensing protocol."  The corresponding disclosure in the specification is "controller 24," but there is no specific algorithm or other disclosure for carrying out the function of "automatically controlling said delivery means to deliver the selected medication dosage to the patient according to a first medication dispensing protocol" and thus this claim and its dependent claims are indefinite under § 112, ¶ 2.  See, e.g., *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1332–38 (Fed. Cir. 2008). <br> -- The specification of the '065 patent does not provide any description of a processor or the |

23

FOURTH SUPPLEMENTAL CHARTS/CONTENTIONS (NONINFRINGEMENT AND § 112)

| | |
|---|---|
| | details of the computer software (algorithm) that allows implementation of the features of the claim.  The specification of the '065 patent does not provide any description of how a processor can command a delivery system in a pump, or how the processor is to implement the proposed algorithm.  The specification does not provide any description of a first medication protocol (or a second medication protocol) or how to determine a first or second medication protocol.  Therefore, the claim in invalid under §112. |
| means for inputting blood data to said controller means, said data being representative of a current patient condition parameter, said controller means including means responsive to said data for recommending a second medication dispensing protocol; | -- Ping does not have "means responsive to said data for recommending a second medication dispensing protocol." The element in the specification that corresponds to the "means" clause is Block 34 in Fig. 3, which automatically provides a modified amount recommendation.  Also, the prosecution history confirms that the claim requires automatic recommendation of a modified amount. (See Response dated August 29, 1996, and Response dated January 7, 1997, discussed in the Supplemental Invalidity Contentions.) "Automatically" in the patent specification refers to an action taken by the machine (Lord Dep., p. 64-68).  Ping does not automatically recommend a second protocol.<br>-- The MiniMed infringement contentions delete the portion of the steps shown on page 202 of the Ping User Manual in which the user is given the option to manually enter a BG value.<br>-- The '065 patent specification does not provide any description of how glucose sensor 16" is able to send a glucose data signal to the pump 10.  The '065 patent specification does not provide any description of how to make a blood glucose sensor, or a sensor that is capable of sending a signal by radio transmitter to a pump.  The claim is invalid under § 112.<br>--The specification does not provide any description of a first medication protocol (or a second medication protocol) or how to determine a first or second medication |

FOURTH SUPPLEMENTAL CHARTS/CONTENTIONS (NONINFRINGEMENT AND § 112)

| | protocol.  Therefore, the claim is invalid under §112. |
|---|---|
| said controller means including patient accessible manual set means for enabling said controller means to deliver the medication to the patient according to a selected one of said first and second medication dispensing protocols. | -- The accused "controller means" includes the delivery of a bolus by the Ping remote.  The "controller means" limitation in the claim does not include a processor to deliver a bolus dose, and such an interpretation is not supported by the patent specification (Lord Dep., p. 59-60).  The claim is invalid under §112.<br>-- The accused "set means" includes the "array of buttons" on the Ping remote.  The "set means" limitation does not include a button on a remote device to cause delivery of medication to a patient, and such an interpretation is not supported by the patent specification.  The claim is invalid under §112.<br>-- The patent specification does not disclose corresponding structure for the "controller means."  The figures in the patent do not disclose the electronics or software necessary to incorporate the glucose sensor into the pump and operate the claimed system (Lord Dep., p. 52-56).<br>-- The specification does not provide any description of a first medication protocol (or a second medication protocol) or how to determine a first or second medication protocol.  Therefore, the claim in invalid under §112.<br>-- The Ping pump does not deliver either the first or the second medication dispensing protocol, as required by the claim.  Therefore, the Ping system does not infringe. |
| 3. The medication infusion device of claim 1 wherein the patient condition parameter comprises a current blood glucose reading. | -- see claim 1. |
| 9. The medication infusion device of claim 1 wherein said manual set means is further operable for enabling said controller means to deliver the medication according to a third manually inputted medication dispensing protocol. | -- see claim 1.<br>-- The accused "set means" includes the "array of buttons" on the Ping remote.  The "set means" limitation does not include a button on a remote device to cause delivery of medication to a patient, and such an interpretation is not supported by the patent specification.  The claim is invalid under §112.<br>-- The specification does not provide any |

FOURTH SUPPLEMENTAL CHARTS/CONTENTIONS (NONINFRINGEMENT AND § 112)

| | |
|---|---|
| | description of a third medication protocol or how to determine a third medication protocol. Therefore, the claim is invalid under §112. |

# Exhibit I

1   Luke L. Dauchot (S.B.N. 229829)
    luke.dauchot@kirkland.com
2   Alexander F. MacKinnon (S.B.N. 146883)
    alexander.mackinnon@kirkland.com
3   Erin C. Kolter (S.B.N. 261452)
    erin.kolter@kirkland.com
4   KIRKLAND & ELLIS LLP
    333 South Hope Street
5   Los Angeles, California  90071
    Telephone:   (213) 680-8400
6   Facsimile:    (213) 680-8500

7   Attorneys for Plaintiffs

8                     UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11  MEDTRONIC MINIMED INC.;              No. 2:12-cv-04471-RSWL-RZx
12  MEDTRONIC PUERTO RICO
    OPERATIONS CO.; MINIMED
13  DISTRIBUTION CORP.,                  **PLAINTIFFS' SECOND
                                         SUPPLEMENTAL RESPONSES
14             *Plaintiffs*,             AND OBJECTIONS TO
                                         DEFENDANT'S FIRST SET OF
15        vs.                            INTERROGATORIES**

16  ANIMAS CORPORATION,                  **HIGHLY CONFIDENTIAL –
                                         OUTSIDE COUNSEL ONLY**
17             *Defendant*.

18  _____

19

20        Subject to their General Objections stated below and the specific objections for

21  each interrogatory, Plaintiffs Medtronic MiniMed Inc., Medtronic Puerto Rico

22  Operations Co., and MiniMed Distribution Corp. ("MiniMed" or "Plaintiffs") hereby

23  supplement their responses to Defendant Animas Corporation's ("Animas" or

24  "Defendant") First Set of Interrogatories pursuant to Rules 26 and 33 of the Federal

25  Rules of Civil Procedure and the Local Rules of this Court.  Discovery is ongoing, and

26  MiniMed reserves the right to supplement or amend its responses to these

27  interrogatories pursuant to the Federal Rules of Civil Procedure.  Each of MiniMed's

28  responses is subject to and incorporates the General Objections detailed below.


1
2
3
4
5
6
7
8
9
10
11
12

**INTERROGATORY NO. 9:**

    Fully describe the complete factual bases for Plaintiffs' contention(s) that the asserted claims of the Patents-in-Suit are not invalid under 35 U.S.C. §§ 101, 102, 103, or 112; and, if Plaintiffs intend to rely on any secondary considerations or other objective evidence of non- obviousness (e.g., commercial success, long-felt need, commercial acquiescence, expressions of skepticism, copying, teaching away failed attempts by others, or simultaneous development), describe in detail the complete factual basis for each such factor.

21
22
23
24
25
26
27
28

**PLAINTIFFS' SECOND SUPP. RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES**

1

2

3

4

5

6

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9:**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFFS' SECOND SUPP. RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

   Animas alleges claim 1 of the '065 patent is invalid under § 112, paragraph 2 with respect to the limitation "controller means for automatically controlling said delivery means to deliver the selected medication dosage to the patient according to a first medication dispensing protocol."  Animas further alleges that this limitation is

39

indefinite because "there is no specific algorithm or other disclosure for carrying out the [recited] function." MiniMed disagrees. This limitation is not indefinite for at least the reason that, under the '065 specification, an algorithm to perform the function of controlling the pump's delivery means to deliver a selected medication dispensing protocol was understood by one of ordinary skill in the art.

40

## CERTIFICATE OF SERVICE

The undersigned certifies that on this day, December 18, 2013 a copy of the foregoing document:  **PLAINTIFFS' SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S FIRST SET OF INTERROGATORIES** was served on the interested parties in this action by transmitting via electronic mail to the e-mail addresses of counsel of record as set forth below:

David T. Pritikin (*pro hac vice*)
dpritikin@sidley.com
Hugh Abrams (*pro hac vice*)
habrams@sidley.com
Lauren Abendshien (*pro hac vice*)
labendshien@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Telephone:   (312) 853-7000
Facsimile:    (312) 853-7036

Theodore W. Chandler
tchandler@sidley.com
Sidley Austin LLP
555 West 5th Street, Suite 4000
Los Angeles, CA  90013-3000
Telephone:   213-896-5830
Facsimile:    213-896-6600

_____*/s/ Erin C. Kolter*_____
Erin C. Kolter

# Exhibit J

(1) functions of means-plus-function term did not require construction, and

(2) computer-implemented means-plus-function limitations of claim lacked sufficient disclosure of structure without algorithm.

Affirmed.

**1. Patents ⬅101(8)**

Functions of means-plus-function term, "control means," for patent directed to electronic slot machine that allowed game player to select winning combinations of symbol positions, were not required to be construed to ascertain whether specification disclosed sufficient structure to perform claimed functions, in determining definiteness of patent claims, since structure was lacking in function description and not found in specification, and construction of functions was given, in effect, by statement that specification contained no algorithm that described or recited claimed functions. 35 U.S.C.A. § 112.

**2. Patents ⬅101(8)**

The point of the requirement, in means-plus-function claiming, that the patentee disclose particular structure in the specification and that the scope of the patent claims be limited to that structure and its equivalents is to avoid pure functional claiming. 35 U.S.C.A. § 112.

**3. Patents ⬅101(8)**

If the specification is not clear as to the structure that the patentee intends to correspond to the claimed function, in means-plus-function claiming, then the patentee has not paid the price but is attempting to claim in functional terms unbounded by any reference to structure in the specification. 35 U.S.C.A. § 112.

**4. Patents ⬅101(8)**

For a patentee to claim a means for performing a particular function and then

---

**ARISTOCRAT TECHNOLOGIES AUSTRALIA PTY LIMITED and Aristocrat Technologies, Inc., Plaintiffs–Appellants,**

**v.**

**INTERNATIONAL GAME TECHNOLOGY and IGT, Defendants–Appellees.**

**No. 2007–1419.**

United States Court of Appeals, Federal Circuit.

March 28, 2008.

Rehearing and Rehearing En Banc Denied May 6, 2008.

**Background:** Patent owner, who was also exclusive licensee, of invention directed to electronic slot machine that allowed game player to select winning combinations of symbol positions, filed infringement action against manufacturer of gaming products. The United States District Court for the District of Nevada, Brian E. Sandoval, J., granted alleged infringer summary judgment, holding all claims of patent invalid for indefiniteness. Patent owner appealed.

**Holdings:** The Court of Appeals, Bryson, Circuit Judge, held that:

to disclose only a general purpose computer as the structure designed to perform that function amounts to pure functional claiming, rather than means-plus-function claiming.  35 U.S.C.A. § 112.

**5. Patents ⇐101(8)**

Because general purpose computers can be programmed to perform very different tasks in very different ways, simply disclosing a computer as the structure designated to perform a particular function does not limit the scope of the patent claim to the corresponding structure, material, or acts that perform the function, as required by means-plus-function claiming. 35 U.S.C.A. § 112.

**6. Patents ⇐101(8)**

In a means-plus-function patent claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm.  35 U.S.C.A. § 112.

**7. Patents ⇐101(8)**

Computer-implemented means-plus-function claims, for patent directed to electronic slot machine that allowed game player to select winning combinations of symbol positions, lacked sufficient disclosure of structure without algorithm used to perform claimed functions, as required for definiteness of patent, where person of ordinary skill in the art would not recognize patent as disclosing necessary algorithm that transformed general purpose microprocessor to special purpose computer programmed to perform disclosed algorithm, and structure was not disclosed by mathematical equation, description of embodiments, or combinations of figures and tables, which merely described claimed function of game control means.  35 U.S.C.A. § 112.

**8. Patents ⇐99, 101(8)**

Enablement of a device requires only the disclosure of sufficient information so that a person of ordinary skill in the art could make and use the device, but a means-plus-function claim disclosure serves the very different purpose of limiting the scope of the claim to the particular structure disclosed, together with equivalents.  35 U.S.C.A. § 112.

**9. Patents ⇐101(8)**

For means-plus-function limitations, it is not enough for the patentee simply to state or later argue that persons of ordinary skill in the art would know what structures to use to accomplish the claimed function.  35 U.S.C.A. § 112.

**10. Patents ⇐101(8)**

For means-plus-function limitations, the inquiry is whether one of skill in the art would understand the patent specification itself to disclose a structure, not simply whether that person would be capable of implementing that structure.  35 U.S.C.A. § 112.

**11. Patents ⇐101(8)**

In computer-implemented means-plus-function claiming for a patent, sufficiency of the disclosure of algorithmic structure must be judged in light of what one of ordinary skill in the art would understand the disclosure to impart; however, such principle has no application where there is no algorithm at all disclosed in the specification.  35 U.S.C.A. § 112.

**Patents ⇐328(2)**

5,885,215.  Cited.

**Patents ⇐328(2)**

6,093,102.  Invalid.

———————

Brian E. Ferguson, McDermott, Will & Emery LLP, of Washington, DC, argued

**1330**          521 FEDERAL REPORTER, 3d SERIES

for plaintiffs-appellants.  With him on the brief was Amalie M. Weber.  Of counsel on the brief were Terrence P. McMahon, Anthony R. De Alcuaz, and Robert J. Blanch, of Palo Alto, CA.

Jeffrey W. Sarles, Mayer Brown LLP, of Chicago, IL, argued for defendants-appellees.  With him on the brief were Melissa A. Anyetei and Andrea C. Hutchison.

Before LOURIE, SCHALL, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

The appellants, referred to collectively as "Aristocrat," are the owner and exclusive licensee of U.S. Patent No. 6,093,102 ("the '102 patent").  The patent is directed to an electronic slot machine that allows a player to select winning combinations of symbol positions.  The appellees, referred to collectively as "IGT," manufacture and sell gaming products that Aristocrat asserts infringe the '102 patent.  In an infringement action brought by Aristocrat against IGT in the United States District Court for the District of Nevada, the district court held all of the claims of the '102 patent invalid for indefiniteness.

The game disclosed in the '102 patent purportedly increases player interest in slot machines by providing the player with greater control over the definition of winning opportunities.  It allows the player to define the winning opportunities based on symbols displayed on the top and side of a multi-line screen representing slot machine reels.  Using the invention on a 3x5 screen, for example, the player can define numerous different arrangements that will allow the player to win for some subset of the 243 possible winning combinations.  The player can do so by selecting symbol positions and thereby activating winning opportunities for combinations in which the symbols are not necessarily aligned with one another.  The only constraint is that the selected combination must contain at least one symbol from each column.  Figure 2 from the '102 patent shows a 3x5 screen with selections, and the figure on the right shows one of the winning combinations for the selection in Figure 2.



A winning combination

On summary judgment, the trial court held all of the claims of the '102 patent invalid.  Aristocrat does not dispute that all of the claims rise and fall together.  Like the parties, we therefore focus on independent claim 1.

Claim 1 reads as follows:

A gaming machine having display means arranged to display a plurality of symbols in a display format having an array of n rows and m columns of symbol positions,

game control means arranged to control images displayed on the display means,

the game control means being arranged to pay a prize when a predetermined combination of symbols is displayed in a predetermined arrangement of symbol positions selected by a player, playing a game, including one and only one symbol position in each column of the array,

the gaming machine being characterized in that selection means are provided to enable the player to control a definition of one or more predetermined arrangements by selecting one or more of the symbol positions and

the control means defining a set of predetermined arrangements for a current game comprising each possible combination of the symbol positions selected by the player which have one and only one symbol position in each column of the display means,

wherein the number of said predetermined arrangements for any one game is a value which is the product $k_1 \ldots X \ldots k_i \ldots X \ldots k_m$ where $k_i$ is a number of symbol positions which have been selected by the player in an $i^{\text{th}}$ column of the n rows by m columns of symbol positions on the display ($0 < i \leq m$ and $k_i \leq n$).

I

The district court observed that the key question in this case is the definiteness of the claim term "game control means" or "control means" that is used several times in claim 1. The court explained that the claim describes the "game control means" as performing three functions: (1) to control images displayed on the display means; (2) to pay a prize when a predetermined combination of symbols matches the symbol positions selected by the player; and (3) to define the pay lines for the game according to each possible combination of the selected symbol positions.

The district court noted that the parties agreed the term "control means" is a means-plus-function term that invokes 35 U.S.C. § 112 ¶ 6. As such, the scope of that claim limitation had to be defined by the structure disclosed in the specification plus any equivalents of that structure; in the absence of structure disclosed in the specification to perform those functions, the claim limitation would lack specificity, rendering the claim as a whole invalid for indefiniteness under 35 U.S.C. § 112 ¶ 2. *See In re Donaldson*, 16 F.3d 1189, 1195 (Fed.Cir.1994) (en banc).

The court noted that there were slight linguistic differences in the parties' characterizations of the functions performed by the "control means," but that the differences were unimportant, because there was no adequate disclosure of structure in the specification to perform those functions, regardless of how they were defined. Although Aristocrat argued that the structure corresponding to the recited functions was a standard microprocessor-based gaming machine with "appropriate programming," the court noted that the specification contained no "guidance to determine the meaning of 'standard microprocessor' or 'appropriate programming.'" The court ruled that "[m]erely stating that a standard microprocessor is the structure without more is not sufficient." In particular, the court noted that the specification did not create any specific structure or new machine because "it does not set forth any specific algorithm" for performing the recited function.

Citing decisions of this court, the trial court explained that in a means-plus-function claim "in which the disclosed structure is a computer or a microprocessor programmed to carry out an algorithm, a corresponding structure must be a specific algorithm disclosed in the specification, rather than merely 'an algorithm executed

by a computer.' " Because the specification of the '102 patent lacks "any specific algorithm" or any "step-by-step process for performing the claimed functions of controlling images on the slot machines [sic] video screen, paying a prize when a predetermined combination of symbols comes up or defining the pay lines for games," the court held the asserted structure to be insufficient to satisfy section 112 paragraph 6. In addition, the district court held that the specification did not link the asserted structure to any of the claimed functions. The court held claim 1 invalid for that reason as well.

## II

On appeal, Aristocrat first argues that the district court erred by failing to construe the disputed term "game control means" or "control means" in claim 1. Aristocrat argues that because the district court did not construe the functions of the "control means" term under 35 U.S.C. § 112 ¶ 6, it could not have properly determined whether the specification recited adequate structure corresponding to those functions.

The district court stated that "[t]he determination as to which function description is the accurate construction is not pertinent to the summary judgment motion because the structure is lacking in description and is not found in the specification." Aristocrat argues that our decision in *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1340 (Fed.Cir.2003), requires that a "determination [of definiteness] requires a construction of the claims according to the familiar canons of claim construction."

[1] The district court committed no error in its analysis of the means-plus-function limitation in this case. The court described the two competing claim constructions proposed by the parties, and the court's description made clear that there was virtually no difference between them. Moreover, the district court, later in its opinion, effectively gave a construction of the functions of the "control means" limitation when it stated that the specification contained no algorithm that described or recited the claimed functions. Describing the claimed functions, the court wrote: "The specification contains no step-by-step process for performing the claimed functions of controlling images on the slot machine's video screen, paying a prize when a predetermined combination of symbols comes up or defining the pay lines for games." That characterization of the claimed functions of the "game control means" is not materially different from the characterization that Aristocrat argues the district court should have adopted in analyzing the means-plus-function limitation. To the extent the court's characterization differs from Aristocrat's, it is only because the court's characterization omits some of the detail found in Aristocrat's characterization. The omission of that detail, however, has no effect on the question whether the specification discloses sufficient structure to perform the claimed functions. In fact, Aristocrat's description of the claimed function would appear to require more by way of specificity in the disclosed structure than would the court's characterization. The district court therefore committed no reversible error with respect to this issue.

## III

Aristocrat's principal contention is that the district court was wrong to hold that the patent's disclosure of a general purpose, programmable microprocessor was not a sufficient disclosure of structure to satisfy section 112 paragraph 6. In particular, Aristocrat argues that computer-implemented means-plus-function claims do not require disclosure of a corresponding algorithm, as held by the district court. Instead, Aristocrat contends that the

structure disclosed in the specification of the '102 patent, which was simply "any standard microprocessor base [sic] gaming machine [with] appropriate programming," was a sufficient disclosure of structure under this court's precedents.

**[2–5]** In cases involving a computer-implemented invention in which the inventor has invoked means-plus-function claiming, this court has consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor. The point of the requirement that the patentee disclose particular structure in the specification and that the scope of the patent claims be limited to that structure and its equivalents is to avoid pure functional claiming. As this court explained in *Medical Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir.2003), "If the specification is not clear as to the structure that the patentee intends to correspond to the claimed function, then the patentee has not paid the price but is attempting to claim in functional terms unbounded by any reference to structure in the specification." *See also Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 948 (Fed.Cir.2007) ("[I]n return for generic claiming ability, the applicant must indicate in the specification what structure constitutes the means."). For a patentee to claim a means for performing a particular function and then to disclose only a general purpose computer as the structure designed to perform that function amounts to pure functional claiming. Because general purpose computers can be programmed to perform very different tasks in very different ways, simply disclosing a computer as the structure designated to perform a particular function does not limit the scope of the claim to "the corresponding structure, material, or acts" that perform the function, as required by section 112 paragraph 6.

**[6]** That was the point made by this court in *WMS Gaming, Inc. v. International Game Technology*, 184 F.3d 1339 (Fed.Cir.1999). In that case, the court criticized the district court, which had determined that the structure disclosed in the specification to perform the claimed function was "an algorithm executed by a computer." The district court erred, this court held, "by failing to limit the claim to the algorithm disclosed in the specification." *Id.* at 1348. The rationale for that decision is equally applicable here: a general purpose computer programmed to carry out a particular algorithm creates a "new machine" because a general purpose computer "in effect becomes a special purpose computer once it is programmed to perform particular functions pursuant to instructions from program software." *Id., quoting In re Alappat*, 33 F.3d 1526, 1545 (Fed.Cir.1994). The instructions of the software program in effect "create a special purpose machine for carrying out the particular algorithm." *WMS Gaming*, 184 F.3d at 1348. Thus, in a means-plus-function claim "in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm." *Id.* at 1349.

In a later case, this court made the same point, stating that a "computer-implemented means-plus-function term is limited to the corresponding structure disclosed in the specification and equivalents thereof, and the corresponding structure is the algorithm." *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1253 (Fed.Cir.2005). The court in that case characterized the rule of *WMS Gaming* as follows: "[T]he corresponding structure for a § 112 ¶ 6 claim for a computer-implemented function is the algorithm disclosed in the specification." 417 F.3d at 1249.

[7] In this case, Aristocrat acknowledges that the only portion of the specification that describes the structure corresponding to the three functions performed by the "control means" is the statement that it is within the capability of a worker in the art "to introduce the methodology on any standard microprocessor base [sic] gaming machine by means of appropriate programming." '102 patent, col. 3, ll. 2–4. That description goes no farther than saying that the claimed functions are performed by a general purpose computer. The reference to "appropriate programming" imposes no limitation whatever, as any general purpose computer must be programmed. The term "appropriate programming" simply references a computer that is programmed so that it performs the function in question, which is to say that the function is performed by a computer that is capable of performing the function.

Aristocrat offers two responses to the district court's conclusion that the patent did not disclose sufficient structure. First, Aristocrat argues that the specification disclosed algorithms that were sufficient to constitute a qualifying disclosure of structure. Second, Aristocrat argues that no disclosure of specific algorithms was necessary in any event.

### A

As to the first argument, Aristocrat contends that the language of claim 1 referring to "the game control means being arranged to pay a prize when a predetermined combination of symbols is displayed in a predetermined arrangement of symbol positions selected by a player" implicitly discloses an algorithm for the microprocessor. That is, when the winning combination of symbols is displayed, the program should pay a prize. But that language simply describes the function to be performed, not the algorithm by which it is performed. Aristocrat's real point is that devising an algorithm to perform that function would be within the capability of one of skill in the art, and therefore it was not necessary for the patent to designate any particular algorithm to perform the claimed function. As we have noted above, however, that argument is contrary to this court's law.

Aristocrat also points to language in claim 1 that, according to Aristocrat, "sets forth the mathematical equation that describes the result of practicing the third function." The language in question recites "defining a set of predetermined arrangements for a current game comprising each possible combination of the symbol position selected by the player which have one and only one symbol position in each column of the display means." The problem with Aristocrat's argument is underscored by Aristocrat's very characterization of the role of the equation: It describes the result of practicing the third function. That is, the equation is not an algorithm that describes how the function is performed, but is merely a mathematical expression that describes the outcome of performing the function. To be sure, as Aristocrat argues, the equation "restricts 'appropriate programming' to algorithms which result in the specified number of winning opportunities." But that argument simply concedes that the equation describes an outcome, not a means for achieving that outcome. The equation thus does not disclose the structure of the claimed device, but is only another way of describing the claimed function.

Finally, Aristocrat contends that "the written description delineates what constitutes 'appropriate programming' through the disclosed embodiments of the invention." Again, however, the description of the embodiments is simply a description of the outcome of the claimed functions, not a

description of the structure, i.e., the computer programmed to execute a particular algorithm.



FIG. 1

In making this argument, Aristocrat relies on Figure 1 and Table 1 from the patent, which provide examples of how player selections translate to possible winning combinations:

TABLE 1

| LINE NO | DISPLAY POSITIONS USED | | | | |
|---------|------|------|------|------|------|
| 1 | AX | BY | CX | DY | EY |
| 2 | AX | BY | CX | DZ | EY |
| 3 | AX | BY | CY | DY | EY |
| 4 | AX | BY | CY | DZ | EY |

TABLE 1-continued

| LINE NO | DISPLAY POSITIONS USED | | | | |
|---------|------|------|------|------|------|
| 5 | AY | BY | CX | DY | EY |
| 6 | AY | BY | CX | DZ | EY |
| 7 | AY | BY | CY | DY | EY |
| 8 | AY | BY | CY | DZ | EY |
| 9 | AZ | BY | CX | DY | EY |
| 10 | AZ | BY | CX | DZ | EY |
| 11 | AZ | BY | CY | DY | EY |
| 12 | AZ | BY | CY | DZ | EY |

Two other pairs of figures and tables, Figures 3 and 4, and Tables 2 and 3, offer similar examples. The corresponding portion of the written description contains mathematical descriptions of how many winning combinations would be produced. '102 patent, col. 3, line 54, through col. 5, line 21. Aristocrat refers to these examples as "algorithms." The figures, tables, and related discussion, however, are not algorithms. They are simply examples of the results of the operation of an unspecified algorithm. Like the mathematical equation set forth in claim 1, these combinations of figures and tables are, at best, a description of the claimed function of the means-plus-function claim.

Aristocrat has elected to claim using section 112 paragraph 6 and therefore must disclose corresponding structure. It has disclosed, at most, pictorial and mathematical ways of describing the claimed function of the game control means. That is not enough to transform the disclosure of a general-purpose microprocessor into the disclosure of sufficient structure to satisfy section 112 paragraph 6.

B

In support of the contention that it is not necessary to disclose a particular algorithm in order to disclose sufficient structure for a means-plus-function limitation in a computer-implemented invention, Aristocrat relies primarily on *In re Dossel*, 115 F.3d 942 (Fed.Cir.1997). Aristocrat argues that the application in *Dossel* did not disclose a particular algorithm, and that the court held the disclosure sufficient even though the application stated, with respect to the performance of one of the claimed functions, that "[k]nown algorithms can be used for this purpose."

The means-plus-function limitation at issue in *Dossel* was a "means for reconstructing the current distribution" on the surface of an element inside a biological object, such as on the surface of a tumor inside a human brain. The application stated that the reconstruction unit would reconstruct the density of the current at various points on that surface from the values of the magnetic flux density at corresponding pixels at the same time. See U.S. Patent No. 5,885,215, col. 4, ll. 6–10 (the patent that issued from the Dossel

application).    The application explained that "[k]nown algorithms can be used for this purpose."  *Id.,* col. 4, ll. 10–11.  The application then provided the particular equation by which the relationship between the values of magnetic flux density and current density could be described in matrix form, *id.,* col. 4, ll. 12–15, and it described in great detail the components of that equation, *id.,* col. 4, ll. 16–55.  Accordingly, while providing a detailed explanation of how the claimed device would perform the claimed function, the specification left the mathematical techniques used to solve the recited equations to persons of ordinary skill in the art.  That is what this court referred to when it stated that the application stated "that 'known algorithms' can be used to solve standard equations which are known in the art."  *Dossel,* 115 F.3d at 946.

From the context and from reviewing the application, it is clear that the *Dossel* court used the term "algorithm" in a narrow sense, referring to particular well-known mathematical operations that could be used to solve the equations disclosed in the application.    Far from supporting Aristocrat's claim that a reference to a general purpose computer with "appropriate programming" discloses sufficient structure for section 112 paragraph 6, the *Dossel* case provides an example of an extremely detailed disclosure of all information necessary to perform the function, except for basic mathematical techniques that would be known to any person skilled in the pertinent art.

Aristocrat also argues that, even if there is no disclosure of an algorithm in the patent, the disclosure of a microprocessor with "appropriate programming" is a sufficient disclosure of structure for means-plus-function purposes, because the evidence showed that one of ordinary skill in the art could build the device claimed in the '102 patent based on the disclosure in

the specification.   That argument, however, conflates the requirement of enablement under section 112 paragraph 1 and the requirement to disclose the structure that performs the claimed function under section 112 paragraph 6.

Although the examples given in the '102 patent might enable one of ordinary skill to make and use the invention, they do not recite the particular structure that performs the function and to which the means-plus-function claim is necessarily limited.

[8]   Whether the disclosure would enable one of ordinary skill in the art to make and use the invention is not at issue here.   Instead, the pertinent question in this case is whether Aristocrat's patent discloses structure that is used to perform the claimed function.   Enablement of a device requires only the disclosure of sufficient information so that a person of ordinary skill in the art could make and use the device.   A section 112 paragraph 6 disclosure, however, serves the very different purpose of limiting the scope of the claim to the particular structure disclosed, together with equivalents.   The difference between the two is made clear by an exchange at oral argument.   In response to a question from the court, Aristocrat's counsel contended that, in light of the breadth of the disclosure in the specification, any microprocessor, regardless of how it was programmed, would infringe claim 1 if it performed the claimed functions recited in the means-plus-function limitations of that claim.   That response reveals that Aristocrat is in essence arguing for pure functional claiming as long as the function is performed by a general purpose computer. This court's cases flatly reject that position.

[9, 10]   For example, in *Atmel Corp. v. Information Storage Devices, Inc.,* 198 F.3d 1374, 1380 (Fed.Cir.1999), the court

embraced the proposition that "consideration of the understanding of one skilled in the art in no way relieves the patentee of adequately disclosing sufficient structure in the specification." It is not enough for the patentee simply to state or later argue that persons of ordinary skill in the art would know what structures to use to accomplish the claimed function. The court in *Biomedino, LLC v. Waters Technologies Corp.*, 490 F.3d 946, 953 (Fed.Cir.2007), put the point this way: "The inquiry is whether one of skill in the art would understand the specification itself to disclose a structure, not simply whether that person would be capable of implementing that structure." Discussing *Atmel*, the court in *Biomedino* stated:

> In *Atmel*, it was not the fact that one skilled in the art was aware of known circuit techniques that resulted in a conclusion that sufficient structure was recited. Rather, it was the inclusion in the written description of the title of [a technical article] which itself described the structure for a "known circuit technique." Expert testimony was used to show what the title of the article would convey to one skilled in the art—in this case it was the "precise structure of the means recited in the specification." . . . The expert's testimony did not create or infer the structure.

490 F.3d at 952.

Aristocrat relies on a statement from the recent decision of this court in *AllVoice Computing PLC v. Nuance Communs., Inc.*, 504 F.3d 1236, 1245 (Fed.Cir.2007), where the court stated that in software cases "algorithms in the specification need only disclose adequate defining structure to render the bounds of the claim understandable to one of ordinary skill in the art." We similarly stated in *Medical Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1214 (Fed.Cir. 2003), that "there would be no need for a disclosure of the specific program code if

software were linked to the . . . function and one skilled in the art would know the kind of program to use."

**[11]** It is certainly true that the sufficiency of the disclosure of algorithmic structure must be judged in light of what one of ordinary skill in the art would understand the disclosure to impart. *See, e.g., Intel Corp. v. VIA Techs.*, 319 F.3d 1357, 1367 (Fed.Cir.2003) (knowledge of a person of ordinary skill in the art can be used to make clear how to implement a disclosed algorithm); *Atmel Corp.*, 198 F.3d at 1379 ("[T]he 'one skilled in the art' analysis should apply in determining whether sufficient structure has been disclosed to support a means-plus-function limitation."). That principle, however, has no application here, because in this case there was no algorithm at all disclosed in the specification. The question thus is not whether the algorithm that was disclosed was described with sufficient specificity, but whether an algorithm was disclosed at all.

In *Medical Instrumentation*, we held that the proper inquiry for purposes of section 112 paragraph 6 analysis is to "look at the *disclosure* of the patent and determine if one of skill in the art would have understood that *disclosure* to encompass software [to perform the function] and been able to implement such a program, not simply whether one of skill in the art would have been able to write such a software program." 344 F.3d at 1212 (emphasis in original). We then stated that it is "not proper to look to the knowledge of one skilled in the art apart from and unconnected to the disclosure of the patent." *Id.* That is precisely the inquiry the district court performed and that we reviewed above. Here, as in *Medical Instrumentation*, the patent does not disclose the required algorithm or algorithms, and a person of ordinary skill in the art

**1338**          **521 FEDERAL REPORTER, 3d SERIES**

would not recognize the patent as disclosing any algorithm at all. Accordingly, the means-plus-function limitations of claim 1 lacked sufficient disclosure of structure under 35 U.S.C. § 112 ¶ 6 and were therefore indefinite under 35 U.S.C. § 112 ¶ 2.

### IV

Aristocrat was not required to produce a listing of source code or a highly detailed description of the algorithm to be used to achieve the claimed functions in order to satisfy 35 U.S.C. § 112 ¶ 6. It was required, however, to at least disclose the algorithm that transforms the general purpose microprocessor to a "special purpose computer programmed to perform the disclosed algorithm." *WMS Gaming*, 184 F.3d at 1349. Because the district court correctly held that was not done in this case, we uphold the judgment of the district court.

*AFFIRMED.*



# Exhibit K

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MEDTRONIC MINIMED INC.,          )
                                 )
        Plaintiff and            )
        Counter-defendant,       )
                                 )        Civil Action No. 03-776-KAJ
    v.                           )
                                 )
SMITHS MEDICAL MD INC.,          )
                                 )
        Defendant and            )
        Counterclaimant.         )

**MEMORANDUM OPINION**

---

Karen Jacobs Louden, Esq., Julia Heaney, Esq., Kristen Healey, Esq., Philip H. Bangle, Esq., Morris, Nichols, Arsht & Tunnell, 1201 N. Market Street, Wilmington, Delaware 19801; Counsel for Plaintiff.
    Of Counsel: Terrence P. McMahon, Esq., McDermott Will & Emery, 3150 Porter Dr., Palo Alto, CA 94304
    Jon B. Dubrow, Esq., McDermott Will & Emery, 600 13th St., N.W., Washington, DC 20005
    David M. Beckwith, Esq., McDermott Will & Emery, 4370 La Jolla Village Dr., San Diego, CA 92122
    Daniel Floyd, Esq., Gibson Dunn & Crutcher, 333 S. Grand Avenue, Los Angeles, CA 90071

Richard D. Kirk, Esq., Cheryl Siskin, Esq., The Bayard Firm, 222 Delaware Avenue, Wilmington, Delaware 19801; Counsel for Defendant.
    Of Counsel: Anthony C. Roth, Esq., Thomas E. Nelson, Esq., Corinne A. Niosi, Esq., J. Clayton Everett, Jr., Esq., Morgan, Lewis & Bockius LLP, 1111 Pennsylvania Ave., N.W., Washington, DC 20004

---

June 1, 2005
Wilmington, Delaware

**JORDAN, District Judge**

## I.   INTRODUCTION

This is a patent infringement case.  Medtronic MiniMed, Inc. ("MiniMed" or

"Plaintiff") alleges that Smiths Medical MD, Inc. ("Smiths" or "Defendant") infringes two

of its patents, U.S. Patent No. 6,665,065 (issued September 9, 1997) (the "'065 patent")

and U.S. Patent No. 6,241,798 (issued June 5, 2001) (the "'798 patent").  (Docket Item

["D.I."] 25.)  Smiths in turn alleges that MiniMed infringes a patent Smiths owns, U.S.

Patent No. 6,241,704 (issued June 5, 2001) (the "'704 patent").  (D.I. 28 at 27-28.)

Presently before me are the parties' requests for construction of the disputed

claim language in these patents, pursuant to *Markman v. Westview Instruments, Inc.*,

52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  The parties have

fully briefed and argued their positions.  Jurisdiction is proper under 28 U.S.C. § 1338.

## II.   BACKGROUND

### A.   Procedural Background

MiniMed filed a complaint for infringement of the '065 patent and the '798 patent

against Smiths on August 8, 2003.[1]  (D.I. 1.)  MiniMed subsequently filed an amended

complaint on October 13, 2003, alleging that Smiths also directly infringed, induced

infringement, and contributorily infringed the '065 patent and the '798 patent.  (D.I. 25.)

Smiths filed an answer to MiniMed's amended complaint on November 17, 2003 and

---

[1]MiniMed originally filed suit against Deltec, Inc., Smiths Medical LTD, and
Smiths Group PLC.  (D.I. 25 at 1.)  In its First Amended Complaint, MiniMed removed
Smiths Medical LTD from the case and replaced it with Smiths Group North America,
Inc.  *Id.*  On February 24, 2004, the parties entered into a stipulation dismissing without
prejudice Smiths Group North America, Inc. and Smiths Group PLC and noting that
Deltec Inc. had changed its corporate name to Smiths Medical MD, Inc., which is now
the sole remaining defendant in this case.  (D.I. 38.)

asserted a counterclaim for direct infringement of the '704 patent. (D.I. 28 at 27-28.)

Smiths also asserted various antitrust counterclaims against MiniMed. (*Id.* at 24-27.)

On December 19, 2003, MiniMed filed a reply to Smiths' counterclaims. (D.I. 30.) On

April 14, 2005, I granted Summary Judgment dismissing all of Smiths' antitrust

counterclaims. (D.I. 271.) MiniMed and Smiths are scheduled to try this case before a

jury beginning on July 7, 2005. (D.I. 47.)

    B.    The Disclosed Technology

        1.    The State of the Art[2]

"Diabetes is a disease that causes the body not to produce or properly use

insulin." (Smiths' *Markman* Presentation at Tab 1, pg 1.) Insulin is used by the body to

"convert sugar, starches and other food into energy ... ." (*Id.*) Currently it is estimated

that around 18.2 million Americans or 6.3% of the population have diabetes, with one

third of that population, 5.2 million people, being unaware that they have the disease.

(*Id.* at 1-2.) Diabetes can lead to serious health consequences such as blindness,

cardiovascular disease, kidney disease, and nerve disease. (*Id.*)

There are two types of diabetes. "Type 1 diabetes results from the body's failure

to produce insulin ... ." (*Id.* at 2.) "Insulin is a hormone, produced in the pancreas, that

is needed to convert sugar, starches and other food in energy ... ." (*Id.* at 1.) As a

result, Type 1 diabetics cannot convert sugar into energy, resulting in high levels of

blood sugar. (*Id.*) In Type 2 diabetes, the patient produces a sufficient amount of

---

    [2]In this section, I have cited to both parties' Markman presentations. There are
no issues in dispute with respect to this section and no inferences should be drawn
from the use of one party's presentation over another party's presentation at any
particular point.

insulin; however, the patient is unable to utilize the insulin to metabolize carbohydrates. (*Id.*) This inability to utilize insulin is referred to as "insulin resistence." (*Id.*)

To treat people with Type 1 diabetes, and some people with Type 2 diabetes, insulin injections are given. ('798 patent, col. 1:21-22.) Ordinarily, insulin is administered by injection because it is not as effectively delivered in an oral form. (*Id.* at 22-23.) There are two main ways in which injection is accomplished. The patient may use a syringe, which is the traditional and most common method. (*Id.* at 22-23, 29-31.) A newer method employs an external infusion pump that delivers the insulin "via a catheter with a percutaneous needle or cannula placed in the subcutaneous tissue." (*Id.* at 26-27.) Most infusion pumps are comprised of a body that houses a reservoir to hold the liquid insulin and a small motor that pushes the insulin into the catheter that delivers it to the body. (Smiths' *Markman* Presentation at Tab 1, pg 7.)

Using the traditional syringe method, the patient must try to predict how much insulin he will need throughout the day and periodically inject the appropriate amount. Too little insulin, and the patient could become hyperglycemic, *i.e.*, have high blood sugar; too much insulin and the patient could become hypoglycemic, *i.e.*, have low blood sugar. Either condition can result in comma, seizures, or even death. (Smiths' *Markman* Presentation at Tab 1, pg 4.) Conversely, administering the proper amount of insulin to avoid such complications can help to prevent many of the long-term negative health consequences of diabetes. (*Id.*)

In order to ensure that they have the proper amount of insulin, patients often take blood glucose readings to see if their blood sugar is too high or too low. (*Id.* at 5.)

3

If a patient's blood glucose level is too high, he will often inject extra insulin to lower his blood sugar. This is referred to as a "correction bolus." (MiniMed's *Markman* Presentation at 8.) Alternatively, if a patient knows he will be eating a large meal, especially one high in carbohydrates, he will inject insulin before eating to prevent high blood sugar. This is referred to as a "meal bolus." (*Id.* at 6.) To calculate a bolus, the patient has to engage in mathematical computations, which are dependent on a number of factors. (*Id.* at 6-9.) For a meal bolus, the patient must know how much insulin is needed to metabolize one gram of carbohydrates, and then divide the number of carbohydrates by that number to arrive at the correct meal bolus. (*Id.* at 6-7.) A correction bolus can be more difficult to calculate because the patient must take into account numerous factors, such as his current blood glucose level, his desired blood glucose level, his insulin sensitivity, and any active insulin in his body. (*Id.* at 8-9.) Electronic bolus calculators can be used to help patients make these calculations. (*Id.*) Patients using insulin pump therapy often use a correction or meal bolus for the same reasons as a patient using the traditional syringe method. (*Id.* at 6-9.)

One of the major differences between these two therapeutic methods is how patients supply their baseline insulin, *i.e.*, insulin needed for normal functioning of the body without food. (*Id.* at 1-2.) Patients using a syringe to periodically inject their insulin use long acting insulin because of the gap in time between injections. (*Id.* at 1.) Patients using insulin pump therapy, on the other hand, use a short acting insulin because it is delivered continuously throughout the day. (*Id.* at 2.)

4

Insulin pump therapy has the advantage of more accurately simulating normal pancreatic insulin delivery. (Id.) The major drawback to insulin pump therapy is the need to always have the pump attached to the patient. ('798 patent, col. 1:45-47.) There has been progress in the miniaturization of insulin pumps so that patients can more readily conceal them under their clothing. (Id.; MiniMed's Markman Presentation at 10-11.) As pumps have become smaller and more easily hidden from view, there has also been an effort to make the controls and communication between the pump and user more convenient. ('798 patent, col. 1:45-54.) This has been accomplished by, among other things, the use of remote control devices and alarms. (Id.)

2.     The '704 Patent[3]

The '704 patent discloses a programmable pump, that contains a communications port to allow the pump to be programmed with therapy protocols for pumping the desired fluid into the patient. ('704 patent, Abstract.) Smiths has asserted Claims 6 and 11 against MiniMed in this litigation. (D.I. 28 at 21-23.) Specifically, Claim 6 is directed to a pump containing a port for communicating with another device. ('704 patent, col. 47:11-25.) Claim 11 is directed to a pump which, inter alia, uses an access code to gain access to the control panel of the pump. (Id., col. 47:40-60.)

3.     The '065 Patent

The '065 patent relates to a medical infusion pump that allows for the input of blood and other data and then recommends a delivery schedule for dispensing of

---

[3]I have found it most convenient to address the counterclaimant's patent first, which implies nothing about the relative importance of the parties' patents or the merits of their positions.

5

medication from the pump. ('065 patent, Abstract.) MiniMed has asserted Claims 1-3, 9-11, 13, and 19-21 against Smiths. (D.I. 25 at 11-12.)

    4.    The '798 Patent

The '798 patent relates, *inter alia*, to an infusion system that can be hidden from view and commanded remotely, and an infusion system that utilizes a bolus estimator. ('798 patent, col. 19:13-35, Abstract.) MiniMed has asserted Claims 1-5, 7, 9, 10, 12, 17, 22-28, and 35-40 against Smiths. (D.I. 25 at 9-10.) All of the claims are also directed to an infusion system that integrates a bolus estimator. ('798 patent, col. 30:26-34:35.)

## III. APPLICABLE LAW

Patent claims are construed as a matter of law. *Markman*, 52 F.3d at 979. A court's objective is to determine the ordinary and customary meaning, if any, that those of skill in the art would apply to the language used in the patent claims. *Waner v. Ford Motor Co.*, 331 F.3d 851, 854 (Fed. Cir. 2003) (citing *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001)). In this regard, pertinent art dictionaries, treatises, and encyclopedias may assist a court. *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202-03 (Fed. Cir. 2002). The intrinsic record, however, is the best source of the meaning of claim language. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Therefore, patent claims are properly construed only after an examination of the claims, the specification, and, if in evidence, the prosecution history of the patent. *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1324 (Fed. Cir. 2003) (citing *Vitronics*, 90 F.3d at 1582).

6

The intrinsic record is also of prime importance when claim language has no ordinary meaning in the pertinent art, *see Bell Atl. Network Servs., Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1269-70 (Fed. Cir. 2001) (determining that claim language could only be construed with reference to the written description) (citation omitted), and where claim language has multiple potentially applicable meanings, *Texas Digital, Inc.*, 308 F.3d at 1203.

If patent claim language has an ordinary and accustomed meaning in the art, there is a heavy presumption that the inventor intended that meaning to apply. *Bell Atl. Network Servs., Inc.*, 262 F.3d at 1268 (citing *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999)). Thus, unless the inventor has manifested an express intent to depart from that meaning, the ordinary meaning applies. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) (citation omitted).

To overcome that presumption, an accused infringer may demonstrate that "a different meaning is clearly set forth in the specification or ... the accustomed meaning would deprive the claim of clarity." *N. Telecom Ltd. v. Samsung Elecs. Co., Ltd.*, 215 F.3d 1281, 1287 (Fed. Cir. 2000). However, the presumption may not be rebutted "simply by pointing to the preferred embodiment...." *Teleflex, Inc.*, 299 F.3d at 1327. It may be rebutted, though, where "the patentee ... deviate[d] from the ordinary and accustomed meaning ... by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Id.*

7

If claim language remains unclear after review of the intrinsic record, a court

"may look to extrinsic evidence to help resolve the lack of clarity." *Interactive Gift*

*Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1332 (Fed. Cir. 2001). The use of

extrinsic evidence in the claim construction process, however, is "proper only when the

claim language remains genuinely ambiguous after consideration of the intrinsic

evidence." *Id.* (citation omitted). A court may not use extrinsic evidence to contradict

the import of the intrinsic record, and if the intrinsic record is unambiguous, extrinsic

evidence is entitled to no weight. *Bell & Howell Document Mgmt. Prods. Co. v. Altek*

*Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997).

## IV. CLAIM CONSTRUCTION

Smiths alleges that MiniMed directly infringes Claims 6 and 11 of the '704 patent.

(D.I. 28 at 27-28.) MiniMed alleges that Smiths directly infringes, induces infringement,

and contributorily infringes Claims 1-3, 9-11, 13, and 19-21 of the '065 patent and

Claims 1-5, 7, 9, 10, 12, 17, 22-28, and 35-40 of the '798 patent. (D.I. 25 at ¶ 14; D.I.

138 at 4.) Each claim will be discussed in turn, according to the claim terms in dispute.

 A. '704 Patent

  1. Claim 6

Claim 6 of the '704 patent reads as follows:

A pump apparatus for pumping fluid to a patient, comprising:
 a pump mechanism for pumping fluid;
 a memory for storing operational data for said pump mechanism;
 processor means electrically connected to said memory for retrieving said
  operational data to control the operation of said pump mechanism;
  and
 at least one port means operable as either a communications port for
  effecting communication with a device external of said pump

8

> mechanism or as an input port for receiving input from the patient
> or a user for specifying the amount of fluid to be pumped by said
> pump mechanism.

('704 patent, col. 47:11-25.)

      a.    The Preamble

          i.    The Parties' Proposed Constructions

Smiths argues that the preamble is limiting and therefore requires construction.

(D.I. 190 at 5-8.) Smiths asserts that the preamble "provides meaning for other terms

recited in the body of each claim and should not be ignored in construing the claims."

(D.I. 190 at 6.) Specifically, Smiths asserts that the preamble serves as an antecedent

basis for the term "patient" used in one of the claim limitations of Claim 6. (*Id.*)

Additionally, Smiths argues that the preamble should be construed to mean "a drug

delivery device external to the patient that pumps fluid to the patient." (D.I. 213 at 2.)

To support its construction, Smiths relies on the specification and the file history of

applications related to the '704 patent. (D.I. 190 at 6-8.)

MiniMed argues that the "mere fact that the preamble may provide antecedent

basis ... does not require the preamble ... to be read as a limitation." (D.I. 214 at 2.)

Further, MiniMed argues that "the inclusion of the word 'patient' in the preamble adds

[nothing] ... to the interpretation of Claim 6. Rather, 'the body of the claim sets out the

complete invention.'" (*Id.* at 2-3 (citing *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363,

1371 (Fed. Cir. 2003).)[4] With respect to the construction of the preamble, if it is

considered limiting, MiniMed argues that the plain meaning should apply. (*Id.*)

---

[4]MiniMed also points out that although Claim 11 has the same preamble it does
not contain any terms that rely on the preamble as an antecedent basis. (D.I. 214 at 3.)

MiniMed asserts that there is no clear disavowal of claim scope" in the "prosecution history or in the specification." (*Id.*)

> ii. The Court's Construction

A preamble is only limiting where "it recites essential structure or steps, or if it is necessary to give 'life, meaning, and vitality' to the claims." *Intertool, Ltd. v. Texar Corp.*, 369 F.3d 1289, 1295 (Fed. Cir. 2004) (internal citations omitted). If deletion of the preamble "does not affect the structure or steps of the ... invention," it should not be considered limiting, unless there is "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art." *Id.* (internal quotations and citations omitted).

In this claim, the preamble's deletion would affect "the structure of the invention," and, therefore, is limiting. *See id.* The body of the claim does not set out the complete invention and as such, the language of the preamble is not superfluous. Specifically, the preamble utilizes the phrase "pumping fluid to a patient." (*Id.*, col. 7:11.) In a later element of the claim, the term "patient" is again referred to when the device is described as "receiving input from the patient or a user." (*Id.*) To understand this later use of the term "patient," it is necessary to know that the "patient" is receiving the fluid from the apparatus. Without the context supplied by the preamble, the use of the term "patient," lacks meaning and the claim terms do not have their intended effect. *See Intertool, Ltd. v. Texar Corp.*, 369 F.3d at 1295.

The same preamble is also at issue in Claim 11. (D.I. 213 at 5.) The limitations in that claim do not, however, rely on the preamble to give them "life, meaning, and

10

vitality." See *Intertool, Ltd. v. Texar Corp.*, 369 F.3d at 1295. Unlike Claim 6, none of the claim terms in Claim 11 rely on the preamble as an antecedent basis. Because "the body of the claim sets out the complete invention" in Claim 11, the preamble in that claim is not limiting. *See Altiris*, 318 F.3d at 1371.

Because the preamble of Claim 6 is limiting, I must construe it. The thrust of Smiths' arguments is that the word "to," as in pumping the fluid "to a patient," necessarily means that the pump is external to the patient." (D.I. 190 at 6-8.) However, the relevant dictionary definition of "to" is "used as a function word to indicate movement or an action of condition suggestive of movement toward a place, person or thing reached." Merriam-Webster Dictionary, 1234 (10th ed. 2001). This definition includes implanted pumps that pump fluid from within a reservoir toward the tissue surrounding it. The use of the word "to" in this fashion is similar to its use in a sentence such as "I am walking from the confines of my home 'to' the outside environment." Smiths has not cited anything that would overcome the general rule that "terms in the claim are to be given their ordinary and accustomed meaning." *See K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1362 (Fed. Cir. 1999). I construe the preamble to have its plain meaning. Therefore, the preamble does not limit the invention to an external infusion device.

11

b.    "processor means electronically connected to said memory
      for retrieving said operational data to control the operation of
      said pump mechanism"

         i.    The Parties' Proposed Constructions

Smiths argues that "processor means" should be construed according to its plain

meaning. (D.I. 220 at 8.) It is unclear if Smiths is disputing that this is a means-plus-

function limitation or if Smiths is arguing that it is a means-plus-function limitation

whose terms should be construed to have their plain meaning. Smiths entire argument

amounts to four sentences wherein it cites MiniMed's brief. (*Id.*) The relied on

language states, "Smiths approach is to analyze the term 'processor means' under a

plain meaning approach. It is anticipated that no real dispute exists with respect to the

construction of this term." (*Id.* (citing D.I. 167 at 11, n. 2.) MiniMed argues that "[t]he

use of the term 'processor means' invokes the presumption that 35 U.S.C. §112, ¶6

applies when construing this claim" and that the presumption stands unrebutted. (D.I.

167 at 11.)

         ii.   The Court's Construction

The patent statute allows for a claim limitation to be drafted in means-plus-

function format. 35 U.S.C. § 112 ¶ 6.[5] A means-plus-function claim recites a function

to be performed rather than a definite structure or the materials required to perform that

function. *See id*. Such a claim limitation is typically identified by the presence of the

_____

[5] 35 U.S.C. § 112 ¶ 6 provides that "[a]n element in a claim for a combination
may be expressed as a means or step for performing a specified function without the
recital of structure, material, or acts in support thereof, and such claim shall be
construed to cover the corresponding structure, material, or acts described in the
specification and equivalents thereof."

12

introductory term "means," *Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 194 F.3d 1250, 1257 (Fed. Cir. 1999), which creates a presumption that section 112, paragraph 6 applies. *York Prods., Inc. v. Cent. Tractor Farm & Family Center*, 99 F.3d 1568, 1574 (Fed. Cir. 1996). That presumption is rebuttable, however, "where a claim uses the word 'means,' but specifies no corresponding function for the 'means'... [or] where a claim recites a function, but then goes on to elaborate sufficient structure, material, or acts within the claim itself to perform entirely the recited function... ." *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1427 (Fed. Cir. 1997) (internal citations omitted).

Once a means-plus-function term is identified, its interpretation by the court is a two-step process. *Sage Prods.*, 126 F.3d at 1428. First, the court must identify the function recited by the claim. *See id.* Second, the court must identify the structure(s) in the specification of the patent necessary to perform the recited function. *Id.* Structure, material, or acts are deemed "corresponding" where the "specification or prosecution history clearly links or associates that structure to the function recited in the claim." *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). The court, however, "may not import functional limitations that are not recited in the claim, or structural limitations from the written description that are unnecessary to perform the claimed function." *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) (citing *Mico Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999)).

If Smiths is arguing that this is not a means-plus-function limitation it has done nothing to rebut the presumption that the use of hte word "means" creates a means-

13

plus-function limitation, and I find nothing in the claim to rebut that presumption either.

Consequently, the claim term is a means-plus-function limitation. The function is

"retrieving said operations data to control the operation of said pump mechanism." The

corresponding structure is microprocessor 182. (*See*, *e.g.*, '704 patent, col. 5:21-22.)

    c. "at least one port means operable as either a
      communications port for effecting communication with a
      device external of said pump mechanism or as an input for
      receiving input from the patient or a user for specifying the
      amount of fluid to be pumped by said pump mechanism."

     i. The Parties' Proposed Constructions

Smiths asserts that this claim element is not a means-plus-function limitation and

that I should give it its plain meaning. (D.I. 190 at 9-12.) Specifically, Smiths argues

that this limitation is not a means-plus-function limitation because "it does not recite a

function for the 'means'" and because the "clause recites sufficient structures." (*Id*. at

9.) With respect to the argument that the limitation does not recite a function for the

"means," Smiths notes that the "word 'operable' as used after the noun 'means' is an

adjective, not a verb denoting a function for the 'means.'" (*Id*.) Furthermore, Smiths

argues the two functions recited in the claim, "'for effecting communication' and 'for

receiving input,' refer to the 'communication port' and 'input port' structures,

respectively, not the term 'port means.'" (*Id*.) With respect to its second argument,

Smiths states that the term port "connotes a particular electronic interface structure"

that is sufficient to rebut the presumption that 35 U.S.C. 112 ¶ 6 applies. (*Id*. at 9-10.)

MiniMed argues, in essence, that the assertion that the word "operable" cannot

be functional language is semantic misdirection. (D.I. 214 at 4.) MiniMed argues that

14

"operable as" could have been replaced by a verb such as "operates as" and the meaning would not have changed. (*Id.*) Furthermore, MiniMed argues that it is clear that "port means" has two alternative functions clearly linked through the term "operable as." (*Id.*) As to the sufficiency of the structure disclosed in "port means," MiniMed argues that "port" is not a sufficient statement of a structure because "port" is defined "by the way the device is used and not by its structure alone." (*Id.* at 6 (citing Authoritative Dictionary of IEEE Standards Terms, 844 (7th ed. 2000) (emphasis added by MiniMed)).)

## ii. The Court's Construction

I agree with MiniMed that this claim term is governed by 35 U.S.C. § 112 ¶ 6 and is a means-plus-function limitation. Smiths' argument that "operable as" is simply an adjective and cannot act as functional language is unpersuasive. "Operable as" denotes what the "port means" is used for and, therefore, is functional in nature. Moreover, in each of the alternative limitations, the term "for" reinforces the conclusion that the language following the term "port means" is functional in nature. The claim states two functional limitations. The first function is "operable as a communications port for effecting communication with a device external of said pump mechanism." The second function is "operable as an input for receiving input from the patient or a user for specifying the amount of fluid to be pumped by said pump mechanism."

Smiths is also unpersuasive in its argument that this is not a means-plus-function claim because the claim contains sufficient structure. "The recitation of some structure ... does not preclude the applicability of section 112(6) [when it] merely serves to further specify the function of the means." *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533,

15

1536 (Fed. Cir. 1991); *see also Unidynamics Corp. v. Automatic Prods. Int'l*, 157 F.3d 1311, 1318-19 (Fed. Cir. 1998) (holding that the addition of the word "spring" to a means-plus-function limitation did not add sufficient structure to overcome the presumption that 112 ¶ 6 applied).

Here, the addition of the term "port" and the additional structure contained in each of the alternative functions for the "port means," are insufficient to overcome the means-plus-function presumption. The term "port" merely acts to further describe how the means communicates or receives data. The terms "communications" and "input" only restate what is already contained in their respective functions, namely to communicate and receive. Consequently, the "port means" limitation does not contain sufficient structure to overcome the presumption that this is a means-plus-function limitation.

As to the corresponding structures, the specification describes the communications port 132 as a structure that "allows for communication with pump 100 from an eternal device located either locally or remotely relative to pump 100." ('704 patent, col. 4:30-34.) This structure corresponds with one of the functions of the "port means," which is "operable as a communications port for effecting communication with a device external of said pump mechanism." Consequently, this is a corresponding structure for the "port means."

In the specification, the remote dose port 234 is described as permitting the patient to "remotely press or simulate pressing a key on keyboard 122, such as the key which manually operates the pumping mechanism, via a signal from a remote switch sent through remote dose cord port 234 to processor 182." (*Id.*, col. 7:51-55.) This

16

structure corresponds to the "input port" function which is "operable as an input for receiving input from the patient or a user for specifying the amount of fluid to be pumped by said pump mechanism." Consequently, remote dose port 234 is a corresponding structure of the "port means" limitation.



FIG. 1B

FIG. 1A

FIG. 1

The parties also dispute whether the term "or" as used in this limitation is

conjunctive or disjunctive. In this limitation the term "or" is used with "either" in an

"either ... or" fashion, and thus is clearly meant to be disjunctive. *See In re Hyatt*, 708

F.2d 712, 714 (Fed. Cir. 1983) (stating that "[a] claim must be read in accordance with

the precepts of English grammar").

        2.     Claim 11

Claim 11 of the '704 patent reads as follows:

A pump apparatus for pumping fluid to a patient, comprising:
     a pump mechanism for pumping fluid;
     a memory;
     at least one operations program for controlling the operation of said pump
          mechanism and an access code program stored in said memory;
     controller means utilizing said operations program for controlling the
          operation of said pump, said controller means having a locked
          state and an unlocked state, wherein, to prevent any tampering
          with the operation of said pump mechanism, an access code is
          required to place said controller means in the unlocked state from
          the locked state before the operations controlled by said operations
          program could be altered;
     a keyboard, wherein said access code required for altering the operations
          of said operations program is entered via said keyboard, wherein
          said access code program places said controller means in the
          locked state after the operations controlled by said operations
          program has been altered.

('704 patent, col. 47:41-56.)

        a.     "controller means utilizing said operations program for
             controlling the operation of said pump"

Both parties agree that this claim limitation must be interpreted under § 112 ¶ 6

as a means-plus-function limitation. (D.I. 213 at 6.) They disagree, however, on the

function associated with the "controller means." MiniMed argues that the function of the

"controller means" is "controlling the operation of the pump utilizing said operations

19

program," whereas Smiths argues that the function of the "controller means" is "utilizing the operations program and controlling the operation of the pump." (*Id.*)

As previously stated, a means-plus-function claim recites a function to be performed rather than a definite structure or the materials required to perform that function. *See* 35 U.S.C. § 112 ¶ 6. The "controller means" by definition "controls." The function of that means is "controlling the operation of said pump." "Utilizing said operations program" does not further describe the function of controlling. Instead, "utilizing said operations program" describes how the "controller means" accomplishes that function. As the function of a means-plus-function limitation does not include the structure required to perform the function,[6] "utilizing said operations program" is not part of the function. Consequently, the full function is "controlling the operation of said pump."

The specification states that "[m]icroprocessor 182 and a memory 184 programmable with selected functions [are used] for controlling operation of pump mechanism 140 and the other features of pump 100." ('704 patent, col. 5:22-24.) Therefore, the corresponding structure is microprocessor 182 used in conjunction with memory 184.

---

[6]Instead, the corresponding structure is a separate aspect of the limitation and is found in the specification. *Sage Prods.*, 126 F.3d at 1428 (stating that "[a]fter identifying the "specified function" of the unrecited means, a court must consult the specification to define the structure, material or acts corresponding to this claimed function").

b.  "access code"

i.  The Parties' Proposed Constructions

MiniMed argues that the term "access code" should be construed to mean "a secret sequence of characters including a password which an authorized user must enter to gain access to the controller means."  MiniMed cites the dictionary definitions of "access" and "code," to support what it contends is a common usage of the term "access code."  Specifically, MiniMed states that access is defined as "to get at: gain access to" and code is defined as a "system of symbols (as letters or numbers) to represent assigned and often secret meanings." (D.I. 167 at 32 (citing Merriam-Webster Dictionary, 6, 221 (10th ed. 2001)).)  Moreover, MiniMed argues that the term "access code" and the term "password" are used consistently in the specification. (Id.)

Smiths argues that "access code" should be given its plain meaning and argues that MiniMed selectively chooses definitions to support its proposed construction. Smiths also notes that the same dictionary also defines "code" as "a system of principals or rules ... a system of signals or symbols for communication." (D.I. 220 at 13-14 (citing Merriam-Webster Dictionary, 6 (10th ed. 2001)).)

ii.  The Court's Construction

I have concluded that MiniMed's definition of the term "access code" is correct. An additional dictionary definition, not cited by either party, captures the common and ordinary meaning of the phrase: "[a]n alphanumeric sequence that permits access to an electronic network, such as a telephone network or an automated teller machine."  The American Heritage Dictionary of the English Language (4th ed. 2000).  Although this definition refers to gaining access to a network, it supports the idea that preventing use

21

by unauthorized people is integral to the meaning of the term "access code."

Consequently, I construe the term "access code" to mean "a sequence of characters

used as a password which an authorized user must enter to gain access to the

controller means."

The rest of the disputed terms[7] have their plain and ordinary meaning and

require no further construction.

     B.    '065 Patent

          1.    Claim 1

Claim 1 of the '065 patent reads as follows:

A medication infusion device, comprising:
> reservoir means for receiving and storing a supply of a selected
> medication;
> delivery means for delivering a selected dosage of the medication from
> said reservoir means to a patient;
> controller means for automatically controlling said delivery means to
> deliver the selected medication dosage to the patient according to
> a first medication dispensing protocol; and
> means for inputting blood data to said controller means, said data being
> representative of a current patient condition parameter, said
> controller means including means responsive to said data for
> recommending a second medication dispensing protocol;
> said controller means including patient accessible manual set means for
> enabling said controller means to deliver the medication to the
> patient according to a selected one of said first and second
> medication dispensing protocols.

('065 patent, col. 6:2-21.)

---

[7]The remaining disputed terms are "locked state," "unlocked state," "wherein said access code required for altering the operations of said operations program is entered via said keyboard," and "wherein said access code program places said controller means in the locked state after the operations controlled by said operations program has been altered."

22

a. "dispensing protocol"[8]

i. The Parties Proposed Constructions

Smiths argues that I should construe "dispensing protocol" to mean "dosage rate." (D.I. 190 at 17.) To support its argument, Smiths cites the specification of the '065 patent, which notes the timing of the dosage as one of the critical characteristics of the dispensing protocol. (Id. at 16 (citing '065 patent, col. 1:54-56, col. 2:14-20, col. 5:1-14).) Smiths also argues that the prosecution history of the '065 patent supports the construction it proposes. (Id.) Smiths cites an office action in which the patentee argued that a piece of prior art is distinguishable from his invention because the prior art does not teach a "response to a patient parameter to alter or to recommend alteration of a preexisting dosage rate." (Id. 16-17 (citing D.I. 192, Ex. 26 at 6 (emphasis added by Smiths)).) Smiths further notes that the patentee pointed out to the examiner that the "range" taught by the prior art was "not a dispensing rate or dispensing protocol." (Id. 17 (citing D.I. 192, Ex. 26 at 7).) Lastly, Smiths argues that MiniMed's own expert bolsters their construction of the term. (Id. 17 (citing D.I. 193, Ex. 44 at 44, 55).)

MiniMed counters that "dispensing protocol" has a plain and ordinary meaning. It argues that the plain meaning of "dispensing protocol" is "a regimen of therapy." (D.I. 214 at 13 (citing PDR Medical Dictionary, 1446 (1st ed. 1995).) MiniMed further argues that the specification of the '065 patent support this construction. (Id. at 14.) It cites

---

[8]This discussion is applicable to three claim terms "first medication dispensing protocol," "second medication dispensing protocol," and "third manually inputted medication dispensing protocol."

many of the same portions of the specification cited by Smiths. It argues that frequency and timing are discussed with respect to a "dispensing protocol," thus demonstrating that "dispensing protocol" is not merely a dosage rate. (Id. at 14 (citing '065 patent, col. 1:37-41, col. 1:54-56 col. 2:15-20, col. 5:3-14).) Further, MiniMed argues that the prosecution history relied upon by Smiths was taken out of context. (Id.)

ii.    The Court's Construction

I construe the term "dispensing protocol" in this context to mean "a plan or regimen for the delivery of medication." The general rule is that terms in the claim are to be given their ordinary and accustomed meaning." K-2 Corp., 191 F.3d at 1362. To overcome this presumption, the patentee must "clearly and deliberately set forth [an alternate meaning] in the intrinsic materials." (Id.) Further, in order to narrow a claim term from its ordinary meaning the patentee must have "demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed. Cir. 2004) (internal citation omitted).

Although Smiths argues that MiniMed has offered a "myriad" of conflicting definitions for the term "dispensing protocol," the definition appears straightforward. The PDR Medical Dictionary lists only one definition for "protocol": "a precise and detailed plan for the study of a biomedical problem or for a regimen of therapy." PDR Medical Dictionary, 1446 (1st ed. 1995). Further, Merriam-Webster's Dictionary lists only one definition of protocol applicable to the medical field; "a detailed plan of ... treatment, or procedure." Merriam-Webster's Collegiate Dictionary, 936 (10th ed.

24

2002). The ordinary meaning of "dispensing protocol" in this context is a "a plan or regimen for the delivery of medication."

Smiths' argument that the intrinsic evidence supports its more narrow construction is unconvincing. Nowhere in the specification has the patentee "demonstrated a clear intention to limit the claim scope." *Liebel-Flarsheim*, 358 F.3d at 906. Smiths relies on a statement in the specification, that "[t]he medication dosage and frequency are, of course, developed according to a dispensing protocol to meet the needs of each patient" to show that the patentee narrowed the scope of "dispensing protocol" to "dosage rate." (D.I. 190 at 16 (citing '065 patent, col. 1:54-56, col. 2:14-20, col. 5:1-14).) Frequency and dosage are apparently two of the factors considered when creating a dispensing protocol. Therefore, such language is consistent with the plain meaning of "dispensing protocol."

With respect to the prosecution history, the one excerpt on which Smiths relies is taken out of context and is inconsequential. In the office action in question, the patentee distinguished the prior art by noting that it did not recommend a dosage rate. (D.I. 192, Ex 26, at 6.) As a "dispensing protocol" is made up of a series of "dosage rates" and could presumably be just one "dosage rate," in some instances, it is axiomatic that if the prior art did not suggest a "dosage rate" it also could not suggest a "dispensing protocol" because "dispensing protocol" encompasses "dosage rate." Therefore, the patentee was not limiting the definition of "dispensing protocol."

As to Smiths' last argument, that MiniMed's own expert supported Smiths' construction of the term in question, the quote relied on again appears to be taken out of context. During a deposition, the expert was asked the question "what did the

25

algorithms recommend? Did they recommend a pattern?" (D.I. 193, Ex. 44 at 44.) In

response, he answered "No. They recommend a rate." (*Id.*) It appears, however, that

the expert was addressing one embodiment of the invention where the invention is

continually changing the dosage rate throughout the day in response to blood glucose

readings and not the meaning of "dispensing protocol" as used in Claim 1. (*Id.* at 44-

45, 54-55.)

              b.     "automatically control"[9]

                    i.     The Parties' Proposed Constructions

Smiths argues that "automatically control" means "to automatically control in

response to a blood glucose reading." (D.I. 165 at 2.) Smiths states that:

> [i]n each initial usage of the term "automatic" or
> "automatically," it is used in the context of operating the
> infusion pump in response to a blood glucose reading. As
> such, the term 'automatically controlling' as recited in claims
> 1 and 19 means to 'automatically control' in response to a
> blood glucose reading.

(D.I. 190 at 19.) Smiths further argues that where I to construe "automatically

controlling" without reference to a blood glucose reading such construction would

constitute new matter not disclosed in the '065 patent application. (*Id.*) Therefore,

Smiths argues, its construction is necessary to avoid invalidity of the patent.

MiniMed contends that the term "automatically control" is part of the function of

the "controller means" limitation. (D.I. 214 at 17.) Consequently, it contends, adding

the "responding to a blood glucose reading" limitation impermissibly adds a functional

---

[9]This line of reasoning also applies to the term "automatically operate" found in
Claim 10. Therefore, it also carries its plain meaning.

limitation to the term "control means." (D.I. 214 at 17 (citing *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) (holding "a court may not import functional limitations that are not recited in the claim")).)

              ii.      The Court's Construction

Contrary to MiniMed's assertion, Smiths is not arguing for the importation of functional limitations into the claim. Smiths is arguing that one of ordinary skill in the art would understand "automatically controlling" to mean "automatically controlling in response to a blood glucose reading." (D.I. 218 at 3.) That being said, I nevertheless reject the argument that one of ordinary skill in the art would understand "automatically controlling" to have that meaning.

"The general rule is that terms in the claim are to be given their ordinary and accustomed meaning." *K-2 Corp.*, 191 F.3d at 1362. Neither party has argued that there is any ambiguity as to the meaning of "automatically controlling." The fact that "automatically" was used in a different context in the prosecution history is of little significance. Smiths does not even argue that the patentee acted as his own lexicographer and redefined the word "automatic" or the phrase "automatically controlling." (D.I. 190 at 18-19.)

I also find unpersuasive Smiths' argument that giving "automatically controlling" its plain meaning would raise issues of invalidity. "Claims can only be construed to preserve their validity where the proposed claim construction is 'practicable,' is based on sound claim construction principles, and does not revise or ignore the explicit language of the claims." *Generation II Orthotics, Inc. v. Medical Tech., Inc.*, 263 F.3d

27

1356, 1365 (Fed. Cir. 2001). Smiths' proposed construction of "automatically controlling" is not based on "sound claim construction principals," and must be rejected. *See id.* Consequently, I find the term has its plain meaning.

          c.    "controller means for automatically controlling said delivery means to deliver the selected medication dosage to the patient according to a first medication dispensing protocol"

              i.    The Parties' Proposed Constructions

The parties agree that this is a means-plus-function limitation governed by 35 U.S.C. 112 ¶ 6. They also agree on the language in the claim that comprises the function and that the structure corresponding to the function is controller 24.[10] (D.I. 190 at 22; D.I. 169 at 7.) The parties disagree, however, as to what the corresponding structure in the specification encompasses. (*Id.*)

Smiths argues that controller 24 "is limited by its disclosed algorithm." (D.I. 190 at 22 (quoting *WMS Gaming Inc. v. International Game Tech.*, 184 F.3d 1339, 1348 (Fed. Cir. 1999) (stating "[t]he structure of a microprocessor programmed to carry out an algorithm is limited by the disclosed algorithm)).) Specifically, Smiths argues that "[t]he algorithm of controller 24 is clearly illustrated in Figure 3, which is described in the '065 patent specification as 'a flow chart illustrating operation of the pump controller and recommended dispensing protocol in response to a current patient parameter.'" (*Id.* (citing '065 patent, col. 3:37-39).) Smiths asserts that block 32 shows the only automatic operation contemplated for controller 24. (D.I. 218 at 15. (citing '065 patent,

_____

[10]The parties do not agree as to the proper construction of "dispensing protocol," "first medication dispensing protocol," and "automatically controlling." (D.I. 165 at 2-3.) I have already construed these disputed terms, however, *see supra*, Part IV.B.1.a-b, and they have those same meanings here.

28

col. 4:51-60).) Smiths proceeds to note that block 34 only recommends a protocol and block 38, by definition, requires manual implementation of the protocol. (*Id.* (citing '065 patent, col. 4:44-49, 4:65-5:5).) Therefore, it argues that "automatically controlling" is limited to block 32. (*Id.* (citing '065 patent, col. 4:41-49).) MiniMed responds that Figure 3 shows other algorithms that can be used for "automatically controlling said delivery means." (D.I. 214 at 23-25.) Therefore, it contends that the corresponding structure, controller 24, is not limited to block 32 as Smiths asserts. (*Id.*)

ii.     The Court's Construction

At the heart of Smiths' argument is the assumption that the "automatically controlling" part of the "controller means" function must be completed at the second step of Figure 3, *i.e.*, at the stage when the decision is made by the user or the machine to implement the "medication dispensing protocol." This is clear because Smiths restricts its discussion of "automatically controlling" to blocks 32, 34, and 38, all of which represent the second step in Figure 3. (D.I. 190 at 22-23.) I have already rejected Smiths argument that "automatically controlling" means "automatically controlling in response to a blood glucose reading." *See supra*, Part IV.B.1.b. Therefore, there is nothing in the function that dictates that "automatically controlling" occur at the second step of Figure 3 as opposed to the last step, where controller 24 actually controls the pump.

29



FIG. 1

FIG. 2

FIG. 3

30

The next question is whether controller 24 is clearly linked to the function of

"automatically controlling" the pump. *See B. Braun Medical v. Abbott Lab.*, 124 F.3d

1419, 1424 (Fed. Cir. 1997) (structures are only corresponding "if the specification or

prosecution history clearly links or associates that structure to the function recited in the

claim"). The specification does not use the phrase "automatically controlling" when

describing how controller 24 operates the pump. The specification does, however,

state that "control means are normally provided for operating the pump drive motor

continuously, or at periodic intervals, to obtain a closely controlled and accurate delivery

of medication over an extended time period." ('065 patent, col. 1:21-24.) This excerpt

clearly implies that the "controller means" described in the specification is controlling the

pump in an automatic fashion. Further, the only controller means in the specification

that uses a pump to control the delivery means is controller 24. (*Id.*, col. 4:11-49.)

Therefore, controller 24 is clearly linked to the function of "automatically controlling" the

pump. Consequently, the corresponding structure for the "controller means" limitation is

controller 24 and it is not restricted to the algorithm depicted in Figure 3 that uses block

32.

        d.      "means for inputting blood data to said controller means"

            i.      The Parties' Proposed Constructions

The parties agree that this claim element is a means-plus-function limitation.

(D.I. 165 at 4.) Further, the parties essentially agree that the function claimed is

"inputting blood data to said controller means." (*Id.*) The dispute between the parties

focuses on what structures in the patent specification correspond to the claimed

function. (*Id.*) Smiths argues that the only corresponding structure is the "glucose

31

sensor 16." (*Id.*) MiniMed argues that switches or buttons, an RF telemetry receiver, an infrared receiver, and an integrated wire connection are all corresponding structures. (*Id.*)

ii.    The Court's Construction

I agree that this limitation is in means-plus-function format and that the claimed function is "inputting blood data to said controller means." Thus, it is necessary to identify the structure corresponding to the function. Structure is deemed "corresponding" when the "specification or prosecution history clearly links or associates that structure to the function recited in the claim." *B. Braun Med.*, 124 F.3d at 1424.

The specification identifies a "glucose sensor or meter" used subcutaneously or adapted to receive and read a glucose test strip as being used to input blood data to said controller 24 ('065 patent, col. 4:11-30), which has already been defined as a corresponding structure for "controller means," *see supra*, Part IV.B.1.c. A receiver using radio telemetry or infrared is also identified as a structure used for "inputting blood data to said controller means." (*Id.*, col. 5:51-60.) The switches and buttons that MiniMed argues are structures, however, are not clearly linked to the claimed function.[11] "Buttons" are mentioned in the same sentence that describes a "glucose sensor or meter" being used to input blood data. ('065, col. 4:11-14.) "Buttons," however, are described as being used to enter instructions, not blood data. (*Id.*) Nowhere else in the specification are "switches or buttons" linked to the "inputting of blood data."

---

[11]Although MiniMed argues in the Joint Claim Construction Chart that an "integrated wire connection" is a corresponding structure, it abandoned that position in its briefs. (D.I. 165 at 4; D.I. 169 at 13-14; D.I. 214 at 26-29.) Rightly so, since the specification does not support MiniMed's earlier position.

Consequently, the only corresponding structures are a "glucose sensor or meter," used either subcutaneously or adapted to receive and read a glucose test strip, and a radio telemetry or infrared receiver.

         e.     "current patient condition parameter"

MiniMed argues that the term "current patient condition parameter" means "a recent patient condition parameter, such as a patient's recently measured glucose level using a test strip in a glucose meter." (D.I. 214 at 29.) Smiths argues that during the prosecution of the '065 patent, the patentee made clear that the "current patient condition parameter" was a real time glucose reading because the patentee used such language to distinguish prior art. (D.I. 190 at 25-26.) The office action that Smiths cites to support this argument, however, does not require that conclusion.

In that office action, the patentee wrote that the reference "does not contemplate automatic or substantially continuous blood glucose readings, for example, by means of an implanted sensor. Instead ... the blood glucose readings are taken manually by enzyme test strips or the like." (D.I. 192, Ex. 24 at 6.) A further examination of that paragraph reveals, however, that the patentee was distinguishing the reference because the reference contemplated "a recommendation with regard to timing for taking the next blood glucose reading," not with respect to recommending a modified dispensing protocol. (*Id.* at 6-7.) Thus the reference to "manually" taking a blood glucose reading was to highlight the fact that the prior art reference alerted the user to take such a reading. It was not to highlight that the invention used real time glucose monitoring. Read in context, the office action cited by Smiths provides no reason to

33

limit "current patient condition parameter" to a real time reading. Consequently, I hold

that the meaning of the term is "a recent patient condition parameter."

> f.  "means responsive to said data for recommending a second
>     medication dispensing protocol that is responsive to said
>     data"
>
> i.  The Parties' Proposed Constructions

The parties agree that this claim element is a means-plus-function limitation.

(D.I. 165 at 5.) The parties disagree as to the function of the limitation. MiniMed

believes that the function is "recommending a second medication dispensing protocol

that is responsive to said data," while Smiths believes that the function is merely

"recommending a second medication dispensing protocol." (Id.) There is no discussion

by either party as to why one or the other construction is correct. The parties do agree

that the corresponding structure is a controller. (Id. at 5-6.) Smiths believes, however,

that this structure should be further limited to controllers that "automatically respond to

blood data to select and recommend a second from a plurality of dosage rates

preprogrammed into the medication infusion device." (Id.)

The parties also disagree as to the proper construction of the terms

"recommending" and "responsive to said data" contained in the claim limitation.[12] (Id.)

Smiths believes that the proper construction for the term "responsive to said data" is "to

select from any one of a plurality of pre-programmed dosage rates based on blood

---

[12]The parties also dispute the term "second medication dispensing protocol."
(D.I. 165 at 5.) I have already construed this term, however, and it retains that meaning
here. See supra, Part IV.B.1.a.

34

data," and that "recommending" means "automatically recommending." (*Id.*) MiniMed, however, believes both of these terms should carry their plain meaning. (*Id.*)

To support its argument that "recommending" means "automatically recommending," Smiths cites an alternative embodiment in the specification where the recommended medication dispensing protocol is automatically implemented. (D.I. 190 at 20 (citing '065 patent, col. 4:43-54).) Smiths further cites to the prosecution history of the '065 patent to show that the "applicant clearly limited the recommendation function to an 'automatic recommendation' rather than one that was user initiated." (*Id.*) Specifically, Smiths cites an office action where the patentee stated that "[t]his concept of automatically recommending but not automatically implementing an alternative dispensing protocol, i.e., one that is different form the originally set dispensing protocol, is still not disclosed or suggested in the references of record." (*Id.* (citing D.I. 192, Ex 26 at 5) (emphasis added by Smiths).) Lastly, Smiths argues that the notion of automatically recommending "makes sense only in the context of ... real-time continuous glucose sensing ... ." (*Id.* at 20-21.)

MiniMed replies that it is legal error to limit the claim to an alternative embodiment contained in the specification. (D.I. 214 at 20-21.) MiniMed further contends that Smiths cites the prosecution history out of context and that the quoted language is not a clear disavowal of the claim language. (*Id.*)

As to the claim term "responsive to said data," Smiths argues that "one of ordinary skill [in] the art would have been at a loss as to exactly how the '065 controller algorithm responds to the inputted blood glucose data." (D.I. 190 at 21.) Therefore,

Smiths argues it is proper to look to the prosecution history where it contends the "applicants made clear that the method by which recommendations are made involve something akin to a simple lookup table programmed into the controller ... ." (*Id*. (citing D.I. 192 at 21, Ex. 24 at 4-5).) MiniMed argues that there is sufficient structure contained in the specification to accomplish this function and, therefore, it is improper to look to the prosecution history. (D.I. 214 at 21-23.)

        ii.  The Court's Construction

  I agree that this limitation is in means-plus-function format and thus it is necessary to identify the function recited by the claim. *Sage Prods.*, 126 F.3d at 1428. When identifying the function, it is improper to broaden it "by ignoring the clear limitations contained in the claim language." *Lockheed Martin*, 249 F.3d at 1324. As the "responsive to said data" limitation acts as a marker for when the "means" recommends a second medication dispensing protocol, it limits the function. Consequently, I agree with MiniMed that the function is "recommending a second medication dispensing protocol that is responsive to said data."

  With respect to the construction of the term "recommend" contained in the function, I find that it carries its plain meaning. It is improper to limit a claim term to one of the embodiments in the specification, as Smiths attempts here. *Comark Communs. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998) (stating that "limitations from the specification are not to be read into the claims"). Further, Smiths' citation of the prosecution history shows nothing but one potentially inconsistent use of the word "automatically" in an office action. (D.I. 192, Ex. 26 at 5.) In the sentence prior to the

36

one cited by Smiths, the patentee describes his invention as one that responds to a

"blood glucose level to <u>recommend</u> a different dispensing protocol ... ." (*Id.* (emphasis

original).)  The word "automatically" is not used.  The passing use of the word

"automatically" in the later sentence is not the type of "clear and unmistakable"

disavowal required to limit the claim term.  *See Omega*, 334 F.3d at 1325-26.

Smiths' final argument is that in the "context of ... real-time continuous glucose

sensing," "recommend" only makes sense if understood to mean "automatically

recommend."  (D.I. 190 at 20-21.)  I have already determined, however, that this

invention is not limited to real-time continuous glucose sensing.  *See supra*, Part

IV.B.1.e.  Consequently, I hold that "recommend" has its plain meaning.

As to the limitation "responsive to said data," I also find that it has its plain

meaning.  Smiths argues that because the specification does not explain how the

structure should respond to the data, I should look to the prosecution history to

determine how it responds.  (*Id.* at 21-22.)  That argument is not about the construction

of the term "responsive to said data," however.  Rather, Smiths argues to add a

limitation to the function of the corresponding structure, which is impermissible.  *See*

*Micro Chem.*, 194 F.3d at 1258 ("incorporating unrecited functional limitations into the

claims" is impermissible).

After the function is identified and construed, the court must identify the

structure(s) in the specification of the patent necessary to perform the recited function.

*Sage Prods.*, 126 F.3d at 1428.  I agree with the parties that the corresponding

structure is controller 24, as the specification "clearly links" that structure to the function. ('065 patent, col. 4:1-14.)

Smith also states that there is "[v]ery little, if anything, ... disclosed in the '065 patent regarding the methods used by the '065 controller software to select the recommended dosage rate." (D.I. 190 at 21.) Consequently, it argues, "one of ordinary skill [in] the art would have been at a loss as to exactly how the '065 controller algorithm responds to the inputted blood data." (Id.) "Whether or not the specification adequately sets forth structure corresponding to the claimed function necessitates consideration of that disclosure from the viewpoint of one skilled in the art." Budde v. Harley-Davidson, Inc., 250 F.3d 1369, 1376 (Fed. Cir. 2001). Smiths does not, however, address what one of ordinary skill in the art would have known at that time.

Although extrinsic evidence should not be used "for the purpose of varying or contradicting the terms of the claims," it is proper to use extrinsic evidence to assist "the court's understanding of the patent." Markman, 52 F.3d at 981. MiniMed has cited its expert report to show that "[o]ne of ordinary skill in the art would know that such algorithms are readily available in a variety of public documents." (D.I. 170, Ex. E at 14-15.) In that report, its expert lists many sources that contain suitable algorithms that could have been used by the controller in the specification. (Id.) Finally, its expert stated that "I do not find it the least bit unusual that specific algorithms are not disclosed in the '065 patent." (Id.) In light of the specification and the expert report, it seems clear to me that one of ordinary skill in the art could have easily supplied through general knowledge or from a third party sources the algorithm needed to use the

controller. Consequently, I hold that the controller structure is not limited to any specific algorithm.

> g. "patient accessible manual set means for enabling said controller means to deliver the medication to the patient according to a selected one of said first and second medication dispensing protocols"
>
> i. The Parties' Proposed Constructions

The parties agree that this is a means-plus-function limitation governed by 35 U.S.C. 112 ¶ 6. (D.I. 165 at 6.) They also agree that the function of the limitation is "enabling said controller means to deliver the medication to the patient according to a selected one of said first and second medication dispensing protocols." (Id.)

The parties disagree as to which structure(s) in the specification correspond to the function. (Id.) Smiths argues that buttons 22 are the only structures that correspond to the function. (D.I. 190 at 24-25.) Smiths further argues that buttons 22 "must be operated to enable the controller means to reset for purposes of implementing the 'second medication dispensing protocol.'" (Id.) To support this argument, Smiths cites to the prosecution history, where the patentee described the switch to the second protocol from the first as one in which the second protocol is "implemented in substitution for the 'first' protocol" (Id. (citing D.I. 192, Ex. 24 at 4).)

MiniMed argues that the corresponding structures include not only the buttons 22, but also the controller buttons, manually adjustable dials or plungers, and externally exposed key switches. (D.I. 169 at 16.) MiniMed further argues that "Smiths' construction improperly adds additional functions for the manual set means not recited in the claim ... ." (Id.)

## ii.     The Court's Construction

Again this limitation is in means-plus-function format and it is necessary to identify the function recited by the claim. I agree with the parties that the function is "enabling said controller means to deliver the medication to the patient according to a selected one of said first and second medication dispensing protocols."

Looking to the specification for the corresponding structures, control buttons ('065 patent, col. 2:58-64), buttons 22 (*id.*, col. 4:55-57), and a dial 42 and plunger 44 (*id.*, col. 5:34-36) are explicitly described as being used to select one of the recommended protocols. As these structures are clearly linked to the function, they are corresponding structures.[13]   *B. Braun Med.*, 124 F.3d at 1424.

---

[13]Again, Smiths seizes on one word or sentence in the prosecution history and argues that the patentee disavowed certain subject matter. (D.I. 190 at 24-25 (citing D.I. 192, Ex. 24 at 4).)  The language cited by Smiths, however, is not a "clear and unmistakable" disavowal of subject matter and thus does not limit the claim. *Omega*, 334 F.3d at 1325-26.

40

C. '798 Patent

1. Claim 1[14]

Claim 1 of the '798 patent reads as follows:

An external infusion device for infusion of a liquid into a body from a reservoir, the external infusion device comprising:

  a drive mechanism to operatively couple with a reservoir to infuse a liquid into a body;

  a housing adapted for use on an exterior of the body, wherein the housing is sized to contain at least a portion of a reservoir, wherein the drive mechanism is contained within the housing, wherein the drive mechanism operatively couples with the at least a portion of a reservoir within the housing, and wherein the housing is sized to fit in a clothing pocket;

  a processor coupled to the housing;

  a bolus estimator used in conjunction with the processor and externally supplied values to estimate an amount of liquid to be infused based upon an estimate of a material to be ingested by the body; and

  an indication device, providing at least one of a visual indication, an audible indication or a tactile indication, to indicate when an amount of fluid to be infused has been calculated.

('798 patent, col. 30:25-46.)

  a. "liquid"

  i. The Parties' Proposed Constructions

MiniMed proposes that I construe "liquid" to have its plain meaning. (D.I. 169 at

22.) MiniMed argues that although the specification teaches that "liquid" can be a

medication, it is improper to limit it to a specific embodiment. (*Id.* at 22-23 (citing

*Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001)).)

---

[14]The term "codes" in dependant Claim 7 is also in dispute. (D.I. 165 at 33.) Smiths has not addressed it in its briefing, however. Consequently, I adopt MiniMed's position, which is that it has its plain meaning.

41

Smiths argues that liquid should be construed to mean "a dose of medication, such as insulin, measured in units." (D.I. 190 at 27.) Smiths argues that the terms "liquid" and "fluid," both used in Claim 1, should be construed differently. (*Id.*) Moreover, it argues that "[c]onsidering the claim language in context and definition of 'liquid' as used throughout the specification, one of ordinary skill in the art would understand that the applicants acted as their own lexicographer and redefined the term 'liquid' ... ." (*Id.*) Specifically, Claims 4 and 5 also state that the "liquid to be infused is insulin." (*Id.* (citing '798 patent, col. 30:55-60).) As to the construction of the phrase "measured in units," Smiths points out that one of the preferred embodiments states that the insulin is delivered in units ('798 patent, col. 6:14-18) and that the amount delivered is usually delivered in terms on "units" (D.I. 192, Ex. 34 at 11).

ii.     The Court's Construction

"Although words in a claim are generally given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

I agree with Smiths that the patentee has acted as his own lexicographer with respect to the term "liquid," but I do not agree that the term has the meaning Smiths suggests. In the specification, the patentee describes possible liquids as things such as "medication, chemicals, enzymes, antigens, hormones, vitamins or the like." ('798 patent, col. 6:13-17.) While some of these substances may be liquid in nature, others

42

are not liquids but are rather dissolved in a liquid. Moreover, all of these substances

have or can have an effect on the human body. The idea that the liquid is active in the

human body is reinforced by dependent Claim 3, wherein the bolus estimator uses the

patient sensitivity to the "liquid" to determine the proper amount of liquid to be infused.

(*Id.*, col. 30:51-54.) Further, Claim 9 states that the "liquid will remain active in the

body." (*Id.*, col. 31:4-7.) If "liquid" was not defined by the patentee to be a substance

that is active in the human body, then the idea that a person would have a sensitivity to

it or that it would remain active in the body is illogical. Consequently, I construe "liquid"

to mean "a substance, such as insulin, that is active within the human body."[15]

      b.     "an amount of fluid to be infused"

          i.     The Parties' Proposed Constructions

Smiths proposes that I construe this limitation to mean "a volume of solution to

be expelled from the reservoir." (D.I. 190 at 29.) Smiths argues that because "liquid"

means a "dose of medication (*e.g.*, insulin) measured in units, one of ordinary skill in

the art would understand the claims to require 'fluid' to mean a 'volume of solution.'"

(*Id.*) Specifically, Smiths cites the specification which makes clear that in certain

preferred embodiments the concentration of the insulin will affect how much is pumped

into the body with every pump stroke. (*Id.* (citing '798 patent, col. 28:60-63, 29:12-14,

---

[15]I find no support in the specification or prosecution history for the assertion that
"liquid" be limited to a medication measured in units. The fact that a substance is
ordinarily measured in a certain way or is disclosed in the specification as being
measured in a certain way does not limit the claim limitation. *See Rexnord Corp. v.
Laitram Corp.*, 274 F.3d at 1344 (holding that a court should not limit a claim term to a
preferred embodiment).

29:17-20).) Smiths argues that one of ordinary skill in the art would understand that the amount of insulin must be converted to a volumetric amount before infusion. (*Id*.) Smiths also points out that if the terms "fluid" and "liquid" were construed to have the same meaning, the construction would violate the general rule that different words in a claim should be given different meanings. (D.I. 190 at 28 (citing *CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000)).)

MiniMed argues that the terms "liquid" and "fluid" are used interchangeably throughout the specification and prosecution history. (*Id*. at 29-31.) Specifically, MiniMed points to numerous instances in the specification where it claims the two are used interchangeably. (*Id*. at 30 (citing 2:47-54, 3:37-43, 3:53-55, 3:56-57, 3:61-4:5, 4:6-7, 4:12-15, 4:19-20, 4:27-28, 4:41-42, 6:5-54, 6:63-65, 7:3, 11:7-11, 13:24-28, 16:56-60, 23:42-45, 23:64-24:8, 24:13-14, 29:25).) MiniMed asserts that, comparing all of these uses, it is clear that the two words were intended to mean the same thing. Additionally, MiniMed cites to the prosecution history to support its argument that the two terms were used interchangeably. (*Id*. at 30.) For example, it cites an office action response where the patentee stated that "[b]olus generally refers to an amount of liquid provided ... [and] may be provided as the sole source of fluid." (*Id*. at 30 (citing D.I. 207 at 19 (emphasis added by MiniMed)).) Finally, MiniMed argues that "an amount of fluid to be infused" should not include a volumetric requirement.

ii.    The Court's Construction

It is important to remember that "the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually

44

invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) (internal citations omitted). Additionally, "[a] patent claim should be construed to encompass at least one disclosed embodiment in the written description portion of the patent specification." *Johns Hopkins Univ. v. Cellpro, Inc.*, 152 F.3d 1342, 1355 (Fed. Cir. 1998). "A claim construction that does not encompass a disclosed embodiment is thus rarely, if ever, correct and would require highly persuasive evidentiary support." *Id.* (internal citation and quotations omitted).

At the *Markman* hearing, both parties agreed that patients do not care about the volume of solution that is pumped into their body; rather, it is the amount of insulin that the patient wants to know about. (D.I. 269 at 31-32.) Smiths concedes that the preferred embodiment of claim 1 would calculate units of insulin to be delivered and indicate that amount to the patient. (*Id.* at 21-22.) It also argues, however, that the invention calls for another indication, when "the number of units ... has been converted into the solution that needs to be pumped." (*Id.* at 22.) To understand how Smiths' construction impacts the functioning of Claim 1 it is helpful to examine how the invention would operate under Smiths' construction. If the patient was entering a meal bolus, he would enter his current blood glucose and the "number of carbohydrates to be consumed." ('798 patent, col. 19:24-34.) The bolus estimator would then calculate the number of units of insulin that should be infused into the patient and display that suggestion to the patient. (*Id.*, col. 19:42-45.) The user could then accept the

45

suggestion or change the number of units. (*Id.*, col. 19:39-41.) Smiths argues that the invention would then indicate to the patient that it had converted units of insulin into volume of fluid. (D.I. 269 at 21-22.) Smiths states that this second indication is "important to the user ... because one of the primary objectives of this patent is to be able to program and operate the pump while it's concealed." (*Id.* at 22.) Presumably, this means that the user would instruct the machine to inject the fluid after receiving the second indication that informed him that the conversion from units to volume had been completed.

The operation of the pump, according to Smiths' claim construction, does not comport with common sense. Smiths seems to concede that the user does not care to know the volumetric amount of fluid that is pumped into him. (*See* D.I. 269 at 31-32.) If this is so, why would the user want to know when the computer has made a simple arithmetic computation, if not to check its validity? This construction does not "naturally align[] with the patent's description of the invention" and therefore is unpersuasive. *See Renishaw*, 158 F.3d at 1250.

More importantly, however, Claim 1, under Smiths' construction of this term, does not encompass any of the preferred embodiments of the invention. None of the embodiments that are directed to a bolus estimator indicate that there is a "second indication."[16] In fact, the preferred embodiments appear to suggest just the opposite.

---

[16]During oral argument, counsel for Smiths argued that two portions of the specification support the argument that there is a "second indication." First, he cited to the preferred embodiments, wherein the patentee stated that "[t]he amount of insulin delivered per pump stroke depends upon the concentration. If the concentration is changed, the constant factors which convert pump strokes into units of insulin are changed accordingly." (D.I. 269 at 26 (citing '798 patent, col. 29:18-21).) This cite,

46

The preferred embodiments directed to a "bolus estimator" state that once the user selects the units to be infused, he presses the "ACT key" which "starts the bolus." ('798 patent, col. 19:42-45.) The preferred embodiment does not contemplate the argument that a "second indication" occurs after pressing the "ACT key" and before the infusing of the liquid. Consequently, under Smiths' construction of this term, Claim 1 would not "encompass a disclosed embodiment." *See Johns Hopkins Univ.*, 152 F.3d at 1355.

An alternative construction of this term that is both logical and in accordance with the disclosures in the specification is one that does not limit the term "an amount of fluid to be infused" to a volumetric amount. Because "an amount of fluid to be infused" can be measured in units, Claim 1 comports with the written description of the specification because no second indication is necessary. The visual indication of the "an amount of fluid to be infused" would simply be the number of units of insulin to be infused. Moreover, although fluid is not normally measured in units, the invention contemplates that the concentration of the insulin is a "constant factor[]." Therefore, a specific number of units of insulin corresponds to a volumetric measurement of the fluid.[17] In

_____

however, does not reference a second indication, only that units must be converted to volume before being infused. Second, counsel for Smiths cited to the summary of the invention, which states that "[t]he indication device indicates when a command has been received and indicates when the command is being utilized to control the external infusion device." (*Id.* at 29 (citing '798 patent, col. 2:66-69).) This section does not refer to a second indication of a completed calculation either. Rather, this indication is used to tell the user when "the command is being utilized to control the external infusion device." Consequently, neither of the sections of the '798 patent specification cited by Smiths' counsel appears to stand for the proposition asserted.

[17]An appropriate analogy is that of converting a particular number of moles of a substance to grams, which occurs through a simple mathematical calculation using a known constant (*i.e.*, the number of moles per gram of a substance). Thus, in such a situation, the number of moles of a substance is appropriately described as an

47

short, read in light of the specification, the claim language "amount of fluid to be infused" embraces amounts quantifiable in terms which can include measurements other than strictly volumetric measurements. Consequently, the term "an amount of fluid to be infused" means "a quantity of fluid to be infused in the patient."[18]

c. "bolus estimator"

Smiths argues that "bolus estimator" is "a device separate from the processor that estimates the amount of medication to be infused" (D.I. 190 at 32), while MiniMed argues that the term should have its ordinary meaning (D.I. 214 at 33). I reject Smiths' argument. The claim itself reads as follows: "bolus estimator used in conjunction with the processor ... to estimate an amount of liquid ... ." ('798 patent, col. 30:39-41.) Consequently, I construe the term to mean "a device that estimates the amount of liquid to be infused."

d. "indication device"

i. The Parties' Proposed Construction

Smiths argues that the meaning of "indication device" is "a device located in a remote commander, providing at least one of a visual indication, an audible indication or a tactile indication." (D.I. 165 at 28.) Smiths argues that the claim language, specification, and prosecution history support this construction. (D.I. 190 at 33-36.) It

---

"amount" of that substance, just as here, with a known concentration, the number of units of insulin can be described as "an amount of fluid."

[18]I have already construed "liquid" to mean, in the context of this case, "a substance, such as insulin, that is active within the human body." See supra, Part IV.C.1.a. Consequently, to give "fluid" its plain meaning would not raise any of the problems associated with different words in the same claim having the same meanings, as argued by Smiths.

48

argues that the term "indication device" has "no stated physical relationship to any other elements in the claim." (*Id.* at 33.) Smiths also argues that the purpose of this invention is to conceal the pump, specifically noting that the specification states that "one of the objectives of this invention is to provide an external pump 'capable of being concealed from view when being remotely commanded.'" (*Id.* (citing '798 patent, Abstract).) Further, Smiths argues that the specification lists multiple uses of an RF (radio frequency) programer or indicator. (*Id.* at 34 (citing '798 patent, col. 5:38-40, 6:54-58, 8:18-21).) Smiths also argues that, during the prosecution of the patent, the patentee "disclaimed coverage of embodiments in which the indication device is located in or on the infusion pump." (*Id.*)

MiniMed argues in response that nothing in the claims requires a remote "indication device." (D.I. 214 at 34.) In addition, it argues that the specification lists many preferred embodiments that do not use a remote "indication device." (*Id.* at 35.) Lastly, MiniMed argues that the portions of the prosecution history cited by Smiths were either cited out of context or do not apply to the claims at issue. (*Id.* at 35-38.)

    ii.  The Court's Construction

The plain meaning of "indication device" in this case is "a device providing at least one of a visual indication, an audible indication or a tactile indication."[19] Looking to the rest of Claim 1, I see nothing that warrants the inclusion of Smiths' proposed additional limitation. Other elements of the claim are required to be located on the

---

[19]Smiths' proposed meaning strays from the plain meaning of "indication device." This is supported by their repeated attempts to show how the patentee redefined the term in the specification or disclaimed certain subject matter during the prosecution of the patent. (*See* D.I. 190 at 33-36.)

49

housing, such as "a processor coupled to the housing." ('798 patent, col. 30:38.) There is nothing in the claim, however, that prevents the indicator from being connected to the housing. (*Id.,* col. 30:38-47.) Contrary to what Smiths argues, all this proves is that the processor must be attached to the housing and the indicator may or may not be attached to the housing.

With respect to the specification, it is important to remember that although "examples disclosed in the preferred embodiment may aid in the proper interpretation of a claim term, the scope of a claim is not necessarily limited by such examples." *Ekchian v. Home Depot*, 104 F.3d 1299, 1303 (Fed. Cir. 1997) (internal citation omitted). In the '798 patent specification, in addition to numerous examples of the invention using a remote indication device, there are also numerous instances of the indication device being attached to the housing of the pump. ('798 patent, col. 4:6-18, 6:25-58, 11:52-12:4, 13:1-34, 15:1-3, 15:53-58, 28:11-12.) Smiths itself states that it is only "one of the objectives" of the invention to use a remote "indication device;" it is not the sole objective. (D.I. 190 at 33.)

Additionally, the prosecution history does not show "both [a] clear and unmistakable" disavowal of claim scope. *Omega*, 334 F.3d at 1325-26. Two of the sections cited by Smiths discuss how the invention uses a remote programmer, while the prior art does not. (D.I. 190 at 34-35 (citing D.I. 193, Ex. 41 at 4-)5.) These two cited sections point to the invention as a whole, however, and not the specific claims at issue. (*See* D.I. 193 at 5 (beginning the discussion of specific claims at the bottom of page 5).) It is true that, the cited document, the patentee discusses a claim that is not

at issue in this case that explicitly requires "remotely generated commands."[20]  But it is reasonable to understand that the mention of a remote programmer related to the specific claim in connection with which it was discussed, and not a later claim that made no reference to such a capability.

Lastly, Smiths cites an office action where the patentee stated that the pump can be concealed from view "when being remotely commanded."  (D.I. 190 at 35-36 (citing D.I. 193, Ex. 37 at 26-27).)  This passage, however, is aimed directly at overcoming the rejection of claims not at issue in this case. (*See* D.I. 193, Ex. 37 at 26-27.)[21]  These cites provided by Smiths do not show both a "clear and unmistakable" action on the part of the patentee to limit the definition of the term "indication device."  *See Omega*, 334 F.3d at 1325-26.  Consequently, I hold that "indication device" means "a device connected to the infusion device or in a remote, providing at least one of a visual indication, an audible indication or a tactile indication."[22]

---

[20]Both parties agree that during prosecution Claims 1, 10, and 12 were labeled as 35, 52, and 54, respectively.  (D.I. 190 at 34; D.I. 214 at 35.)

[21]That passage refers to Claim 1.  Smiths, however, made it clear that Claims 1, 10, and 12 were labeled as 35, 52, and 54 during prosecution.  (D.I. 190 at 34.)  Consequently, Claim 1 in that document refers to a claim not at issue in this litigation.

[22]The term "externally supplied values" is listed in the Joint Claim Construction Chart as disputed.  (D.I. 165 at 27.)  In the parties' briefing, however, there is no discussion of this term.  Therefore, I presume that the parties no longer have a dispute as to the meaning of this term.

51

    2.    Claim 12[23]

Claim 12 of the '798 patent reads as follows:

An external infusion device for infusion of a liquid into a body from a reservoir, the external infusion device comprising:

    a drive mechanism to operatively couple with a reservoir to infuse a liquid into a body;

    a housing adapted for use on an exterior of the body, wherein the housing is sized to contain at least a portion of a reservoir, wherein the drive mechanism is contained within the housing, wherein the drive mechanism operatively couples with the at least a portion of a reservoir within the housing, and wherein the housing is sized to fit in a clothing pocket;

    a processor coupled to the housing;

    a memory coupled to and used in conjunction with the processor to store at least two basal rate profiles;

    a keypad coupled to the housing and used in conjunction with the processor to program the at least two basal rate profiles; and

    an indication device to indicate the basal rate profiles during programming,

    wherein the processor controls the external infusion device in accordance with the programmed at least two basal rate profiles.

('798 patent, col. 31:65-32:21.)

---

[23]Smiths has argued that the disputed claim terms in Claims 10 and 12 should be construed differently to avoid the two claims having the same meaning. *See Comark Communs. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (stating that "[t]here is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims. To the extent that the absence of such difference in meaning and scope would make a claim superfluous, the doctrine of claim differentiation states the presumption that the difference between claims is significant"). For convenience, I have chosen to construe the term "basal rate profile" in Claim 12 before construing the term "personal delivery pattern" in Claim 10.

a.      "basal rate profile"

i.      The Parties' Proposed Construction

In the Joint Claim Construction Chart, Smiths asserts that I should construe "basal rate profile" to mean "an infusion rate with a start and stop time." (D.I. 165 at 39.) At oral argument, Smiths amended its position somewhat, stating that "basal rate profile" is a "basal rate with a start and stop time." (D.I. 269 at 42.) MiniMed argues that I should construe "basal rate profile" to mean "a series of variable liquid infusion rates." (Id.)

Smiths argues that the specification supports its construction of the term "basal rate profile." Specifically, Smiths points to a paragraph in the specification where the term "profile segment," which is described as being programmed with a "start time and a basal rate," and the term "profile" are, says Smiths, used interchangeably. ('798 patent, col. 27:1-6.) Smiths also notes that the two terms are used interchangeably throughout the '798 patent. (D.I. 218 at 39, n. 22.) This, Smiths argues, supports the construction of the term "profile" as a single rate. (Id. at 39.) Lastly, Smiths argues that MiniMed's product literature uses the term "profile" to mean a "basal rate with a start and a stop time." (D.I. 193, Ex. 35 at 136.)

MiniMed argues that, in the part of the specification cited by Smiths, the patentee merely left out the word "segment" after the word "profile." (D.I. 169 at 37, n. 3.) MiniMed further argues that, in the prosecution history, the patentee clearly indicated that the meaning of "basal rate profile" does not mean a constant basal rate. (D.I. 214 at 38-39.) Lastly, MiniMed argues that it is improper for the court to look at MiniMed's product literature in order to construe the claims. (Id.)

ii.   The Court's Construction

The definition of "profile" is "a set of data ... portraying the significant features of

something ... ." Merriam-Webster Dictionary, 928 (10th ed. 2001). The word "set" in

this definition supports the construction that "basal rate profile" means multiple rates.

The prosecution history of the patent also supports this construction. In

attempting to overcome the examiner's objection to Claim 12, labeled as Claim 54 in

the application, the patentee stated that:

> the [prior art] references only describe and disclose storing
> basal and bolus rates in the memory of the pump. Thus ...
> [the] references do not disclose, teach or suggest an
> external infusion device including a memory to store at least
> two basal rate profiles, as recited in Claim 54.

(D.I. 207, Ex. J at 35 (emphasis added).) In this excerpt, the patentee distinguished

storing "basal and bolus rates" from storing "at least two basal rate profiles." (Id.) This

supports the argument that a "basal rate profile" is more than a simple "basal rate."

The section of the patent cited by Smiths is unconvincing. In that paragraph, the

patentee continually uses the term "profile segments" to refer to a single basal rate.

('798 patent, col. 27:1-16.) In the last sentence, however, the patentee uses the term

"profile" instead of the term "profile segment." (Id. at 27:13-16.) The fact that the

patentee chose the term "profile segment" leads me to believe that, the patentee

intended that the term "profile" encompasses multiple segments and that the single use

of the term "profile" as opposed to "profile segment" was merely an inadvertent

dropping of the word "segment."[24]

---

[24]Smiths' statement that the terms "profile" and "profile segment" are used
interchangeably throughout the specification is incorrect, as this appears to be the only

Lastly, it is improper for Smiths to argue that literature from MiniMed's commercial embodiment of the invention should be used to construe the terms. *See Vitronics, Inc.*, 90 F.3d at 1584 (stating that "[o]nly if there were still some genuine ambiguity in the claims, after consideration of all available intrinsic evidence, should the trial court have resorted to extrinsic evidence").

With respect to the construction of the term "basal rate," I hold that it has a plain meaning that does not include a bolus rate. Neither side has cited, nor have I have found anything in the specification or prosecution history that would lead me to expand the definition to include a bolus rate. The term "basal rate profile" means "a series of variable basal rates."

b. "processor controls"

Smiths argues that "processor controls" means "the processor causes the infusion device to sequentially infuse the at least two basal rate profiles." (D.I. 165 at 41.) MiniMed argues that "processor controls" means "the processor causes the infusion device to deliver the liquid in accordance with one of the at least two basal rate profiles." (*Id.*) There is nothing to support Smiths' argument that the term should be restricted to "sequentially" infusing the "basal rate profiles." Additionally, common sense says that two profiles cannot be implemented at the same time. Consequently, I hold "processor controls" to mean "the processor causes the infusion device to deliver the liquid in accordance with one of the at least two basal rate profiles."

_____

instance of the two terms being used in such a manner.

55

3.  Claim 10

Claim 10 of the '798 patent reads as follows:

An external infusion device for infusion of a liquid into a body from a reservoir, the external infusion device comprising:
  a drive mechanism to operatively couple with a reservoir to infuse a liquid into a body;
  a housing adapted for use on an exterior of the body, wherein the housing is sized to contain at least a portion of a reservoir, wherein the drive mechanism is contained within the housing, wherein the drive mechanism operatively couples with the at least a portion of a reservoir within the housing, and wherein the housing is sized to fit in a clothing pocket;
  a processor coupled to the housing;
  a memory coupled to and used in conjunction with the processor to store at least two personal delivery patterns;
  a keypad coupled to the housing and used in conjunction with the processor to select one of the at least two personal delivery patterns; and
  an indication device to indicate the selected personal delivery pattern, wherein the processor controls the external infusion device in accordance with the selected one of the at least two personal delivery patterns.

('798 patent, col. 31:8-32.)

a.  "personal delivery pattern"

i.  The Parties' Proposed Construction

Smiths argues that I should construe the term "personal delivery pattern" to

mean "an individual pattern of multiple infusion rates." (D.I. 165 at 36.) MiniMed

argues that I should construe the term to mean an "individual pattern of multiple basal

rates to be infused into a user over a 24 hour period." (*Id.*)

Smiths argues that MiniMed's construction imports limitations, specifically the "24

hour" and "basal rate" requirements, found nowhere in Claim 10 and unsupported by

the specification. (D.I. 218 at 38.) MiniMed argues that the specification and

prosecution history support this construction. Specifically, one of the preferred

56

embodiments describes a "delivery pattern" as being programed to operate over 24 hours. ('798 patent, col. 27:1-16.) To support its argument that the term be construed to cover only basal rates, MiniMed cites to a response to an office action. (D.I. 169 at 35.) In that response, the patentee overcame the prior art by pointing out that "the ability to switch between bolus and basal rates is not the same as the at least two personal delivery patterns ... [and that] there is no pattern since one merely switches between two rates." (D.I. 207, Ex. J at 35.) MiniMed argues that the patentee "overcame prior art rejections specifically by distinguishing between basal delivery and bolus delivery." (D.I. 169 at 36.)

ii.    The Court's Construction

"Personal delivery pattern" means "an individual pattern of multiple infusion rates." "Personal delivery pattern" contains no durational limitation nor is it restricted to only basal rates, as opposed to bolus rates. With respect to limiting "personal delivery pattern" to just basal rates, MiniMed's arguments are unconvincing. In the cited text, there is nothing singling out basal rates as being connected to "personal delivery pattern." (D.I. 207, Ex. J at 35.) The patentee merely states that "the ability to switch between bolus and basal rates is not the same as the at least two personal delivery patterns ... ." (*Id.*) Moreover, the specification describes a bolus that is programmed ahead of time with a variable delivery pattern. ('798 patent, col. 10:48-62.) In describing such a bolus, the specification states that "the user may program a profiled bolus that uniquely matches the needs of the individual user (for instance it may contain square, ramp, pulse or curved portions that make up the profile to be delivered over a

57

period of time)." (*Id.* at 10:53-57.) This supports the argument that a "personal delivery pattern" could be used to supply a bolus as well as a basal rate.[25]

The intrinsic evidence does not support adding the "24 hour" limitation. The part of the specification cited by MiniMed to support adding this limitation represents only one of the preferred embodiments of the invention. ('798 patent, col. 6:10-12, 27:1-16.) It is improper to limit the claim to one of its preferred embodiments. Thus, I construe "personal delivery pattern" to mean "an individual pattern of multiple infusion rates."

      4.    Claim 16

Claim 16 of the '798 patent is as follows:

> An external infusion device according to claim 10, wherein the selected one of the at least two personal delivery patterns repeats daily.

('798 patent, col. 32:51-53.)

I do find that dependant Claim 16 adds a durational limitation to the "personal delivery pattern" limitation. It does not, however, limit the "personal delivery pattern" to a series of infusion rates over a 24 hour period. In dependent Claim 16, at least one of the "personal delivery patterns repeats daily." ('798 patent, col. 32:51-53.) Therefore, at least one of the "personal delivery patterns" contained in dependant Claim 16 must be limited in duration to no more than 24 hours. This limitation is not inherent in the term "personal delivery pattern," but rather, is added to dependant Claim 16 through the

---

[25]Because I have construed "personal delivery pattern" to include both basal and bolus rates and I have construed "basal rate profile" to be limited to basal rates, *see supra*, Part IV.C.2.a, I am not confronted with a problem under the doctrine of claim differentiation. *See Comark Communs. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (stating that "[t]here is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims"). The doctrine of claim differentiation supports this construction of "personal delivery pattern."

addition of the term "repeats daily." Consequently, this durational limitation is included

in dependant Claim 16 but is not included in independent Claim 10.[26]

## V.  CONCLUSION

For the reasons stated, the terms in dispute are construed as follows:

| CLAIM TERM/PHRASE | THE COURT'S CONSTRUCTION |
| --- | --- |
| The '704 Patent | |
| Claim 6 | |
| "A pump apparatus for pumping fluid to a patient" | This preamble is limiting and has its plain meaning. |
| "processor means electronically connected to said memory for retrieving said operational data to control the operation of said pump mechanism" | The claim term is a means-plus-function limitation, the claimed function being "retrieving said operations data to control the operation of said pump mechanism" and the corresponding structure is microprocessor 182. |

---

[26]The terms "characteristic values," "current characteristic value," and "target characteristic values" are in dispute.  (D.I. 165 at 29-30.)  MiniMed addresses these terms briefly in its briefing, while Smiths does not address them at all in its briefing.  MiniMed argues that "characteristic value" means "a physiological characteristic value that is particular to the user."  (D.I. 169 at 31.)  In the Joint Claim Construction Chart, Smiths states that this term means "physiological attributes that are known to influence the well being of a diabetic such as body weight, body fat index, metabolic rate, level of exercise, and growth rate."  (D.I. 165 at 29-30.)  Smiths supplies no reason to limit the term in the manner it advocates.  Therefore, I agree with MiniMed that "characteristic values" means "a physiological characteristic value that is particular to the user."  The remaining words, "current" and "target" have their plain meaning.

| "at least one port means operable as either a communications port for effecting communication with a device external of said pump mechanism or as an input port for receiving input from the patient or a user for specifying the amount of fluid to be pumped by said pump mechanism." | The claim term is a means-plus-function limitation with two separate functions. The first function is "operable as a communications port for effecting communication with a device external of said pump mechanism" and the corresponding structure is communications port 132. The second function is "operable as an input for receiving input from the patient or a user for specifying the amount of fluid to be pumped by said pump mechanism" and the corresponding structure is remote dose port 234. |
|---|---|
| Claim 11 | |
| "controller means utilizing said operations program for controlling the operation of said pump" | The claim term is a means-plus-function limitation, the claimed function being "controlling the operation of said pump" and the corresponding structure to be microprocessor 182 used in conjunction with memory 184. |
| "access code" | The claim term means "a sequence of characters used as a password which an authorized user must enter to gain access to the controller means." |
| "locked state" | The claim term has its plain meaning. |
| "unlocked state" | The claim term has its plain meaning. |
| "wherein said access code required for altering the operations of said operations program is entered via said keyboard" | The claim term has its plain meaning. |
| "wherein said access code program places said controller means in the locked state after the operations controlled by said operations program has been altered" | The claim term has its plain meaning. |
| The '065 Patent | |
| Claim 1 | |

| "dispensing protocol" | The claim term means "a plan or regimen for the delivery of medication." |
|---|---|
| "first medication dispensing protocol," "second medication dispensing protocol," and "third manually inputted medication dispensing protocol." | These claim terms are consistent with the meaning of "dispensing protocol." |
| "automatically control" | The claim term has its plain meaning. |
| "controller means for automatically controlling said delivery means to deliver the selected medication dosage to the patient according to a first medication dispensing protocol" | The claim term is a means-plus-function limitation, the claimed function being "automatically controlling said delivery means to deliver the selected medication dosage to the patient according to a first medication dispensing protocol" and the corresponding structure is controller 24. |
| "means for inputting blood data to said controller means" | The claim term is a means-plus-function limitation, the claimed function being "inputting blood data to said controller means" and the corresponding structures are a "glucose sensor or meter" used either subcutaneously or adapted to receive and read a glucose test strip and a radio telemetry or infrared receiver. |
| "current patient condition parameter" | The claim term means "a recent patient condition parameter." |
| "means responsive to said data for recommending a second medication dispensing protocol that is responsive to said data" | The claim term is a means-plus-function limitation, the claimed function being "recommending a second medication dispensing protocol that is responsive to said data" and the corresponding structure is a controller. |
| "patient accessible manual set means for enabling said controller means to deliver the medication to the patient according to a selected one of said first and second medication dispensing protocols" | The claim term is a means-plus-function limitation, the claimed function being "enabling said controller means to deliver the medication to the patient according to a selected one of said first and second medication dispensing protocols" and the corresponding structures are control buttons, buttons 22, and a dial 42 and plunger 44. |

61

| Claim 10 | |
|---|---|
| "automatically operate" | The claim term has its plain meaning. |
| The '798 Patent | |
| Claim 1 | |
| "characteristic values," "current characteristic value," and "target characteristic values" | "Characteristic value" means "a physiological characteristic value that is particular to the user."  The remaining words, "current" and "target," have their plain meaning. |
| "liquid" | The claim term means "a substance, such as insulin, that is active within the human body." |
| "an amount of fluid to be infused" | The claim term embraces amounts quantifiable in terms which can include measurements other than strictly volumetric measurements, and means "a quantity of fluid to be infused in the patient." |
| "bolus estimator" | The claim term means "a device that estimates the amount of liquid to be infused." |
| "indication device" | The claim term means "a device connected to the infusion device or in a remote, providing at least one of a visual indication, an audible indication or a tactile indication." |
| "externally supplied values" | The claim term has its plain meaning. |
| Claim 7 | |
| "codes" | The claim term has its plain meaning. |
| Claim 12 | |
| "basal rate profile" | The claim term means "a series of variable basal rates." |

| "processor controls" | The claim term means "the processor causes the infusion device to deliver the liquid in accordance with one of the at least two basal rate profiles." |
|---|---|
| Claim 10 | |
| "personal delivery pattern" | The claim term means "an individual pattern of multiple infusion rates." |
| Claim 16 | |
| "An external infusion device according to claim 10, wherein the selected one of the at least two personal delivery patterns repeats daily." | The claim requires that at least one of the "personal delivery patterns" is limited in duration to no more than 24 hours. |

An appropriate order will issue.