1  Luke L. Dauchot (S.B.N. 229829)
   luke.dauchot@kirkland.com
2  Alexander F. MacKinnon (S.B.N. 146883)
   alexander.mackinnon@kirkland.com
3  Erin C. Kolter (S.B.N. 261452)
   erin.kolter@kirkland.com
4  KIRKLAND & ELLIS LLP
   333 South Hope Street
5  Los Angeles, California  90071
   Telephone:   (213) 680-8400
6  Facsimile:   (213) 680-8500

7  Attorneys for Plaintiffs

8
                  **UNITED STATES DISTRICT COURT**
9
                  **CENTRAL DISTRICT OF CALIFORNIA**
10

11
   MEDTRONIC MINIMED INC.;              No. 2:12-cv-04471-RSWL-RZx
12 MEDTRONIC PUERTO RICO
   OPERATIONS CO.; MINIMED              **MINIMED'S OPENING CLAIM**
13 DISTRIBUTION CORP.,                  **CONSTRUCTION BRIEF**

14          *Plaintiffs*,
                                        Hon. Ronald S.W. Lew
15      vs.                             Courtroom: 21
                                        Hearing Date: March 4, 2014
16 ANIMAS CORPORATION,                  Time: 10:00 a.m.

17          *Defendant.*

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................1

II.  FACTUAL BACKGROUND ...............................................................1

    A.   Diabetes and Insulin Therapy ...................................................1

    B.   Insulin Pumps ..........................................................................2

    C.   Blood Glucose Correction .........................................................3

    D.   The '065 Patent .......................................................................4

III. LEGAL PRINCIPLES .........................................................................6

    A.   General Principles of Claim Construction ..................................6

    B.   Construction of Means-Plus-Function Limitations .....................7

    C.   Animas' Section 112 Indefiniteness Contentions ......................8

IV.  THE *SMITHS MEDICAL* LITIGATION .............................................9

V.   CONSTRUCTION OF THE DISPUTED TERMS ...............................9

    A.   "reservoir means for receiving and storing a supply of a selected medication" (claim 1 of '065 patent and all asserted claims in the patent) ...................................................................10

    B.   "delivery means for delivering a selected dosage of the medication from said reservoir means to a patient" (claim 1 of '065 patent and all asserted claims in the patent) ......................................................11

    C.   "controller means for automatically controlling said delivery means to deliver the selected medication dosage to the patient according to a first medication dispensing protocol" (claim 1 of '065 patent and all asserted claims in the patent) .............................12

    D.   "means for inputting blood data to said controller means" (claim 1 of '065 patent and all asserted claims in the patent) .........................14

    E.   "means responsive to said data for recommending a second

i

medication dispensing protocol" (claim 1 of the '065 patent and all asserted claims in the patent) .............................................................. 16

F.   "patient accessible manual set means for enabling said controller means to deliver the medication to the patient according to a selected one of said first and second medication dispensing protocols" (claim 1 of the '065 patent and all asserted claims in the patent) ........................................................................... 20

VI.   CONCLUSION ........................................................................... 21

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abraxis Bioscience, Inc. v. Mayne Pharma (USA) Inc.*
  467 F.3d 1370 (Fed. Cir. 2006) ........................................................ 6

*Aristocrat Techs. Australia Pty. Ltd. v. Multimedia Games, Inc.*,
  266 Fed.Appx. 942 (Fed. Cir. 2008) ............................................. 7, 8

*Asyst Techs., Inc. v. Empak, Inc.*,
  268 F.3d 1364 (Fed. Cir. 2001) ....................................................... 7

*B. Braun Med., Inc. v. Abbott Labs.*,
  124 F.3d 1419 (Fed. Cir. 1997) ................................................... 7, 12

*Biodex Corp. v. Loredan Biomedical, Inc.*,
  946 F.2d 850 (Fed. Cir. 1991) ...................................................... 14

*BJ Servs. Co. v. Halliburton Energy Servs.*,
  338 F.3d 1368 (Fed. Cir. 2003) ....................................................... 8

*Budde v. Harley-Davidson, Inc.*,
  250 F.3d 13690 (Fed. Cir. 2001) .............................................. 7, 8, 12

*Chicago Bd. Options Exchange, Inc. v. Int'l Securities Exchange, LLC*,
  677 F.3d 1361 (Fed. Cir. 2012) ..................................................... 14

*Creative Integrated Systems, Inc. v. Nintendo of America, Inc.*,
  526 Fed. Appx. 927 (Fed. Cir. 2013) ............................................... 9

*DSW, Inc. v. Shoe Pavilion, Inc.*,
  537 F.3d 1342 (Fed. Cir. 2008) ....................................................... 9

*Finisar Corp. v. DirecTV Grp., Inc.*,
  523 F.3d 1323 (Fed. Cir. 2008) ....................................................... 6

*In re Hayes*,
  982 F.2d 1527 (Fed. Cir. 1992) ....................................................... 9

*Intel Corp. v. VIA Techs., Inc.*,
  319 F.3d 1357 (Fed. Cir. 2003) ....................................................... 8

*Laryngeal Mask Co. v. AMBU A/S*
  618 F.3d 1367 (Fed. Cir. 2010) ....................................................... 6

*Lockheed Martin Corp. v. Space Sys. Loral, Inc.*,
  324 F.3d 1308 (Fed. Cir. 2003) ....................................................... 7

*Markman v. Westview Instruments, Inc.*
  517 U.S. 370 (1996) ....................................................................... 6

iii

*Monolithic Power Systems, Inc. v. O2 Micro Int'l Ltd.*,
  476 F. Supp. 2d 1143 (N.D. Cal. 2007) ................................................................ 7

*Northrop Grumman Corp. v. Intel Corp.*,
  325 F.3d 1346 (Fed. Cir. 2003) ............................................................. 13

*Phillips v. AWH Corp.*
  415 F.3d 1303 (Fed. Cir. 2005) .......................................................... 6, 9

*Telcordia Techs. v. Cisco Sys., Inc.*,
  612 F.3d 1365 (Fed. Cir. 2010) .......................................................... 14

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
  659 F.3d 1376 (Fed. Cir. 2011) ....................................................passim

*WesternGeco LLC v. ION Geophysical Corp.*,
  876 F. Supp. 2d 857 (S.D. Tex. 2012) ................................................. 8

**STATUTES**

35 U.S.C. § 112 ............................................................................passim

# I.   INTRODUCTION

Plaintiffs ("MiniMed") have sued Animas Corporation for infringing seven patents by making and selling the Animas OneTouch Ping external insulin pump system.[1]  Pursuant to the Court's November 8, 2013 Order and the amended case schedule dated January 16, 2014, MiniMed submits this claim construction brief regarding the six terms disputed by the parties.  All of the disputed claim terms are from U.S. Patent No. 5,665,065 (the "'065 patent"), and most were construed in a prior suit by MiniMed against another infringer (Smiths Medical) in the District of Delaware.  Where possible, MiniMed proposes the same constructions as those decided by the *Smiths Medical* court.  Animas proposes new and unfounded constructions—apparently without consideration of the court's analysis in the *Smiths Medical* case.  In the Amended Joint Claim Construction Statement, Animas has also referred to several section 112 issues dealing with the question of indefiniteness.  Animas has stated that it will file a separate summary judgment motion for invalidity—at the same time as the opening claim construction briefs—based on its theory of indefiniteness.  MiniMed disputes Animas' contentions under section 112 both legally and factually, and we will address them in full in our opposition to Animas' summary judgment motion.

# II.   FACTUAL BACKGROUND

## A.   Diabetes and Insulin Therapy

People with Type I diabetes must take insulin to control their blood glucose levels.  Since it cannot be taken orally, insulin has traditionally been injected with a syringe according to a multiple daily injection regimen ("MDI").  MDI typically utilizes both long-acting insulin to provide a user's baseline insulin needs (a "basal" delivery) and rapid-acting insulin to offset the consumption of carbohydrates during meals or to correct a high blood glucose level (a "bolus" delivery).  The external

---

[1] The asserted patents are U.S. Patent Nos. 7,109,878; 6,979,326; 6,936,029; 6,872,200; 6,554,798; 6,551,276; and 5,665,065.  In order to aid in the efficient resolution of this case, MiniMed is dropping its asserted claims under U.S. Patent Nos. 7,819,843 and 6,997,920.

insulin pump inventions of MiniMed's patents offer diabetics a clinically superior and more convenient alternative to MDI. Studies have long shown that pump therapy helps patients better manage blood glucose levels, which in turn lowers the risk of diabetes complications. Yet prior to the inventions of the patents-in-suit, many diabetics did not realize the benefits of pump therapy because of limitations of then-existing pump technology. For example, patients disliked that prior art external pumps needed to be used and programmed in the open. In effect, their disease was on public display through use of a pump. Users also found it difficult to calculate and utilize a precise insulin dosage to address carbohydrates consumed during a meal or to correct a high blood glucose level. The patents-in-suit overcome these and other problems in the prior art.[2]

### B. Insulin Pumps

The "drive mechanism" in an infusion pump is responsible for conveying insulin from the device into the patient and can take a number of forms. (Stone Decl. ¶ 14.) The form disclosed and claimed by the '065 patent consists of a "small drive motor connected to a syringe piston plunger to administer medication to the patient." (Ex. 1 (the '065 patent) at 1:18–20.[3]) This type of pump was well known in the art in the 1990's. (Stone Decl. ¶ 13–15.) Generally, fluid (e.g., insulin) is displaced from a reservoir or syringe in the pump by a plunger that is advanced through the reservoir. (*Id.*) The plunger is connected to a motor that moves the plunger a predetermined distance when it receives a command signal from the pump's controller. (*Id.*) Therefore, to deliver fluid to the patient, a pump controller sends a signal to the motor,

---

[2] The following sections discuss the technology of the '065 patent. The remaining patents-in-suit belong to a common family and generally claim an external infusion pump system with a remote commander. This two-part system allows a user to discreetly control the delivery of insulin by an external pump, which can be concealed under clothing while communicating with the remote. Certain patents from this family also claim an infusion system with a complex, meal-based bolus estimator that allows patients to quickly and safely calculate a precise dosage of insulin prior to a meal, resulting in better controlled insulin pump therapy.
[3] Except where noted, all citations to Exhibits are to the Declaration of Erin C. Kolter in Support of MiniMed's Opening Claim Construction Brief.

which moves the motor and plunger a predetermined distance, expelling a precise amount of fluid from the pump's reservoir. (*Id.*) By way of example, the '751 patent that is incorporated by reference into the '065 patent also describes this type of pump. (*See* '065 patent at 4:7–10; Ex. 2 (U.S. Patent No. 4,562,751); Stone Decl. ¶ 15.)

In these pumps, fluid delivery depends on two variables: total dosage of insulin to be delivered and the time period over which this delivery is to occur. ('065 patent at 2:15–20, 5:9–14; Stone Decl. ¶ 14.) The '065 patent also explains that the controller can "operat[e] the pump drive motor continuously, or at periodic intervals." ('065 patent at 1:21–24.) By controlling the number and frequency of command signals it sends to the drive motor, the controller dictates the total amount of fluid that is delivered over a particular period of time. (Stone Decl. ¶ 14.)

## C.    Blood Glucose Correction

Insulin is used to reduce or "correct" elevated blood glucose ("BG") levels in diabetics—primarily caused by the ingestion of carbohydrates—to a safe, target level. (Stone Decl. ¶ 30.) A typical target level is around 100 milligrams of glucose per deciliter of blood (100 mg/dl). (*Id.*) When an elevated BG level is detected (e.g. 250 mg/dl) by a blood glucose meter or sensor, one must compare the current BG level to the target BG level to determine the difference that needs to be addressed by the infusion of insulin. In this example, the patient's blood glucose needs to be corrected by a reduction of 150 mg/dl: 250 mg/dl (current BG) minus 100 mg/dl (target BG) equals 150 mg/dl (BG correction). (*Id.*) To determine how much insulin will accomplish this correction, we also need to know how the particular patient's glucose levels will react to each unit of insulin. (*Id.*) In most instances, a physician will assist the patient in determining the amount of change in his or her BG level per unit of insulin as part of the initial programming of the insulin pump. (*See id.*; '065 patent at 1:29–36 ("[i]nitial pump programming [of "patient medication requirements"] is normally performed by the patient's physician or by other medical personnel".) This patient-specific factor—referred to as a "sensitivity factor"—is largely based on the

3

patient's weight.  (Stone Decl. ¶ 30.)  For example, a physician may have determined that the patient's BG level drops approximately 20 mg/dl for every 1 unit of insulin. If that patient's BG level were 150 mg/dl above the target value, he would require 7.5 units of insulin to correct the elevated BG value (150 (BG correction) divided by 20 (patient sensitivity factor) equals 7.5 (insulin correction dose)).  This basic arithmetic model for BG correction was well-known by persons of ordinary skill in the art, doctors, and patients in 1995.  (*Id.*)

### D.    The '065 Patent

The inventors of the '065 patent recognized the risks and inconvenience of manually entering blood glucose data into an infusion system to calculate a correction bolus.  (*See, e.g.*, Ex. 3 at 42:1–17.)  Manual input was cumbersome, and user error could cause serious health consequences, even death.  (*See id.*)  The inventors addressed these problems by conceiving a system in which blood glucose data is directly and electronically input into a controller in the system.  For example, blood data can be input from a glucose sensor or meter on the pump ('065 patent at 4:11–30), or can be sent from a peripheral device (e.g. a subcutaneous glucose sensor) to a receiver via radio telemetry or infrared communications (*id.* at 5:51–60).  Because the glucose test results are directly entered, buttons on the infusion pump housing or another device are not used to enter blood glucose data in the claimed system.  (*Id.* at 4:11–50.)

The blood data received by a controller in the claimed system can be used to calculate a second "medication dispensing protocol."[4]  As explained by the '065 patent specification, the direct entry of glucose data and the recommendation of a new, second delivery protocol (pursuant to the known arithmetic calculations) is critical to the invention of the patented system.  (*See* '065 patent at 2:10–30.) "[V]ariable daily activity such as changing eating schedules, exercising schedules,

---

[4] Although the meaning of the term "medication dispensing protocol" is not disputed between the parties, this term was construed in a prior litigation to mean "a plan or regimen for the delivery of medication."  (*See* Ex. 4 at 24.)

etc., should be taken into account in determining the actual dosage and timing of medication delivery to each individual patient." (*Id.* at 2:15–20.) "Thus, depending on subjective factors such as current patient activity, eating schedules, etc., the [current blood glucose reading]-responsive protocol can be accepted or modified to best suit the individual patient." (*Id.* at 2:42–45; *see also id.* at 5:6–14.)

The '065 patent thus claims an external pump system that provides for the direct, electronic entry of blood glucose data into a controller in the pump system. This data allows the calculation and recommendation of a second "medication dispensing protocol" (*e.g.* a "correction bolus"). The direct transcription of blood data—with a recommendation of a correction bolus responsive to that data—can closely match a user's insulin needs with the pump's actual delivery of insulin, resulting in enhanced therapy and less long-term complications.

The system of claim 1 of the '065 patent includes a reservoir and a delivery mechanism. This delivery mechanism is preferably a "small drive motor connected to a syringe piston plunger to administer the medication to the patient" from the reservoir. (*Id.* at 1:18–20, 2:46–49.) The delivery mechanism is operated by a "controller" via known methods at the time, and receives information both from the user and a blood glucose sensor or meter. (*Id.* at 1:21–25; 2:56–58.) While the blood data from the glucose sensor or meter is sent directly and electronically to the controller, other information is preferably entered into the controller using control buttons. For example, "the patient 12 has an opportunity to accept or reject the recommended modified protocol by appropriate manipulation of buttons 22, as represented by block 36 in Fig. 3." (*Id.* at 4:55–58.)

Finally, the '065 infusion system of independent claim 1 can consist of one or more housings. In several instances, the specification describes an "external infusion device" with multiple housings. The specification describes a "system arrangement" of the "external infusion device" that includes separate housings for the pump and an implanted glucose sensor. (*See id.* at 5:41–60.)

### III.   LEGAL PRINCIPLES

#### A.   General Principles of Claim Construction

The claims of a patent define its scope, and courts interpret patent claims as a matter of law. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). Claim terms usually receive their plain and ordinary meaning "as understood by a person of ordinary skill in the art in question at the time of the invention when read in the context of the specification and prosecution history." *Laryngeal Mask Co. v. AMBU A/S*, 618 F.3d 1367, 1370 (Fed. Cir. 2010).

Claim construction begins with consideration of the intrinsic evidence, *i.e.*, the patent claims, specification, and the prosecution history. *Phillips*, 415 F.3d at 1313–1314. A patent's specification is often the best guide to understanding the meaning of a disputed term and "[t]he construction that stays true to the claim language and most naturally aligns with the patent's [specification] will be, in the end, the correct construction." *Id.* at 1316; *Abraxis Bioscience, Inc. v. Mayne Pharma (USA) Inc.*, 467 F.3d 1370, 1376 (Fed. Cir. 2006). A court may also consider extrinsic evidence, including dictionaries, learned treatises, and expert testimony, in order to assist it in understanding the underlying technology, the meaning of terms to one skilled in the art, and how the invention works. *Phillips*, 415 F.3d at 1318.

The Supreme Court in *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), emphasized the "importance of uniformity in the treatment of a given patent." *Id.* at 390. The patent system fails when the same claims are treated differently: "the limits of a patent must be known for the protection of the patentee, the encouragement of the inventive genius of others and the assurance that the subject of the patent will be dedicated ultimately to the public." *Id.* (internal citations omitted). Thus, it would be "remiss to overlook another district court's construction of the same claim terms in the same patent." *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1329 (Fed. Cir. 2008). And district courts often give deference to prior adjudications of claim construction. *See, e.g.*, *Monolithic Power Systems, Inc. v. O2 Micro Int'l Ltd.*, 476 F.

Supp. 2d 1143, 1148 (N.D. Cal. 2007) (adopting prior courts' construction of terms in actions involving different defendants because "[d]efendants provide no good cause to alter the construction of these phrases at this date").

### B.    Construction of Means-Plus-Function Limitations

The Patent Act allows claim elements to be expressed as a means (or step) for performing a specified function without reciting the structure required to accomplish that function. 35 U.S.C. § 112, ¶ 6. These "means-plus-function" elements are limited to the corresponding structures set forth in the written description of the patent that perform the specified function. As provided in the statute, means-plus-function elements "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." (*Id.*)

The first step in construing a means-plus-function limitation "is to identify the function explicitly recited in the claim." *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1369 (Fed. Cir. 2001). In determining the claimed function, ordinary claim construction principles should be applied. *See Lockheed Martin Corp. v. Space Sys. Loral, Inc.*, 324 F.3d 1308, 1319 (Fed. Cir. 2003). The second step "is to identify the corresponding structure set forth in the written description that performs the particular function set forth in the claim." *Asyst Techs.*, 268 F.3d at 1369. In identifying corresponding structure, "it is necessary to consider the specification as a whole, and to read all portions of the written description." *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1379–1380 (Fed. Cir. 2001). "[S]tructure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). "Whether or not the specification adequately sets forth structure corresponding to the claimed function necessitates consideration of that disclosure from the viewpoint of one skilled in the art." *Budde*, 250 F.3d at 1376; *Aristocrat Techs. Australia Pty. Ltd. v. Multimedia Games, Inc.*, 266 Fed.Appx. 942, 946 (Fed. Cir. 2008).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## C.    Animas' Section 112 Indefiniteness Contentions

For certain limitations of the '065 patent, Animas' portion of the Amended Joint Claim Construction Statement refers not only to claim construction issues, but also to indefiniteness contentions under Section 112, ¶ 2.[5]   Animas includes these as claim construction matters even though it is filing a separate summary judgment motion based on indefiniteness on the same date as its initial claim construction brief. (*See* Dkt. 67.)  Indefiniteness contentions are challenges to the validity of a patent, and Animas must therefore prove indefiniteness by clear and convincing evidence. *See Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1366 (Fed. Cir. 2003).  Although the ultimate question of indefiniteness is a legal one, "it requires a factual determination as to what one skilled in the art would have understood by looking at the patent." *WesternGeco LLC v. ION Geophysical Corp.*, 876 F. Supp. 2d 857, 871–872 (S.D. Tex. 2012).  "[D]efiniteness, too, is amenable to resolution by the jury where the issues are factual in nature." *BJ Servs. Co. v. Halliburton Energy Servs.*, 338 F.3d 1368, 1372 (Fed. Cir. 2003).  To the extent this invalidity defense can be addressed by pre-trial motion, it should be done via summary judgment proceedings.  In reviewing such motions, courts "approach the indefiniteness question from the position of one skilled in the art . . . [and] look[] to the positions taken by the parties' experts, bearing in mind that the burden is on Defendants to establish indefiniteness by clear and convincing evidence." *WesternGeco*, 876 F. Supp. 2d at 871.

Because Animas is filing a concurrent summary judgment motion on indefiniteness, MiniMed will brief that issue and present law and facts showing the claims are definite—or that material factual disputes prevent summary judgment—in its summary judgment opposition. For clarity and efficiency, we will not repeat our

---

[5]    A means-plus-function element is definite under Section 112 ¶ 2 if the patent specification discloses "adequate structure corresponding to [the] . . . limitation . . . from the viewpoint of one of ordinary skill in the art." *Aristocrat Techs.*, 266 Fed.Appx. at 946; *Budde*, 250 F.3d at 1376.  The "amount of detail that must be included in the specification depends on the subject matter that is described and its role in the invention as a whole, in view of the existing knowledge in the field of the invention." *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1385 (Fed. Cir. 2011).

8

summary judgment positions in this claim construction brief.  Nevertheless, the pendency of Animas' summary judgment motion may have an impact on claim construction issues.  In several instances, Animas argues that claim terms require disclosure of an implementing algorithm in the '065 specification.  Based on the alleged failure to find such an algorithm in the specification, Animas will likely seek a finding of invalidity in its summary judgment motion.  From a claim construction perspective, with all else being equal, this Court should address any ambiguities and construe the claims in a way that preserves their validity, including issues regarding disclosures under section 112.  *See DSW, Inc. v. Shoe Pavilion, Inc.*, 537 F.3d 1342, 1347 (Fed. Cir. 2008); *Phillips*, 415 F.3d at 1327.

**IV.    THE *SMITHS MEDICAL* LITIGATION**

In the prior *Smiths Medical* lawsuit, MiniMed asserted the '065 and '798 patents, and the court construed a number of the same claim terms from the '065 patent that are now disputed in the present case. (*See* Exs. 4–6.) The *Smiths Medical* court issued a 65 page claim construction opinion, which it later supplemented in another opinion granting summary judgment in favor of MiniMed. (*Id.*) All together, the court dedicated more than 20 pages of analysis to the pertinent limitations of the '065 patent.  Here, where possible, MiniMed proposes the same constructions of the '065 patent as those decided by the *Smiths Medical* court.

**V.    CONSTRUCTION OF THE DISPUTED TERMS**

Six claim terms are in dispute, each from the claims of the '065 patent.  In addition to intrinsic evidence from the patent, MiniMed submits the declaration of Dr. Robert T. Stone ("Stone Decl.").  As is appropriate under the law, the declaration identifies and explains the structures corresponding to the functions of the means-plus-function limitations at issue. *In re Hayes*, 982 F.2d 1527, 1543 (Fed. Cir. 1992); *Creative Integrated Systems, Inc. v. Nintendo of America, Inc.*, 526 Fed. Appx. 927, 936 (Fed. Cir. 2013).  A patent specification's disclosure of structure is viewed in light of the knowledge of one of ordinary skill in the art, as Dr. Stone does in his

declaration.  *Id.*; *see also Typhoon Touch,* 659 F.3d at 1385.  Dr. Stone received a Ph.D. in electrical engineering from Stanford University and has over thirty years of experience in the field of medical electronics systems and instrumentation, including extensive experience in the design of drug delivery systems generally and insulin pumps specifically.

### A.     "reservoir means for receiving and storing a supply of a selected medication" (claim 1 of '065 patent and all asserted claims in the patent)

The parties agree that this term is a means-plus-function limitation and that the claimed function is "receiving and storing a supply of a selected medication."  The parties disagree on the identification of the structure that accomplishes the claimed function.

| MiniMed's Construction | Animas' Construction |
| --- | --- |
| The corresponding structures are a storage reservoir, a syringe, a syringe carried by the housing of an external pump, or a cartridge. | The following structure, located on the pump (or insulin pen): the block 30 identified as "reservoir" in Fig. 2; and the cartridge of medication received in barrel 40 in Fig. 4 (see col. 5:20-23). |

Both sides propose that a storage reservoir and cartridge are corresponding structures (albeit with different levels of specificity), but disagree as to what other structure from the specification should be included in the construction.[6]  MiniMed contends that a "syringe" and "a syringe carried by the housing of an external pump" need to be included as corresponding structures, which Animas disputes.  This limitation was not construed by the *Smiths Medical* court.

Besides a storage reservoir and a cartridge, the '065 specification includes a "syringe" and "a syringe carried by the housing of an external pump" as additional corresponding structures that perform the function of "receiving and storing a supply of a selected medication."  For example, the specification states that "a pump element 28 . . . delivers the medication to the patient 12 from a storage reservoir 30, ***such as a***

---

[6] 35 U.S.C. § 112, ¶ 6 specifies that means-plus-function limitations "shall be construed to cover the corresponding structure, material, or acts described in the specification and ***equivalents thereof***." (emphasis added.) To the extent the parties' proposed constructions for these terms are not identical, they are equivalent.

*syringe carried by the housing 18*." ('065 patent at 4:31–36; emphasis added.) The specification also describes "a compact programmable medication infusion pump adapted to receive and support *a syringe carrying a prescribed medication* such as insulin." (*Id.* at 2:46–49; emphasis added.) Thus, the specification expressly associates these structures with the function of receiving and storing a supply of selected medication, and they are corresponding structures that should be included in the construction. (Stone Decl. ¶ 17.)

**B.** **"delivery means for delivering a selected dosage of the medication from said reservoir means to a patient"** (claim 1 of '065 patent and all asserted claims in the patent)

The parties agree that this term is a means-plus-function limitation, and that the claimed function is "delivering a selected dosage of the medication from said reservoir means to a patient." The parties disagree on the identification of the structure that accomplishes the claimed function. This limitation was not construed by the *Smiths Medical* court.

| MiniMed's Construction | Animas' Construction |
| --- | --- |
| The corresponding structures are a drive motor connected to a syringe piston plunger and a manual plunger depression. | The following structure: the pump 28 and catheter tubing 14 in Fig. 1; and the plunger 44 and syringe in Fig. 4. |

Both sides assert that the plunger described in relation to Figure 4 of the '065 patent is a corresponding structure, but disagree as to what other structure from the specification should be included in the construction. MiniMed contends that the corresponding structure must include a "drive motor." The '065 patent provides that "a drive motor connected to a syringe piston plunger" is a corresponding structure that performs the function of "delivering a selected dosage of the medication from said reservoir means to a patient." The specification states that "[t]he infusion pump operates a small *drive motor connected to a syringe piston plunger to administer the medication to the patient*." ('065 patent at 1:18–20; emphasis added.) This drive motor is directly associated with the claimed function of delivering medication to a

11

patient and, thus, is corresponding structure. *See B. Braun Med.*, 124 F.3d at 1424. (Stone Decl. ¶ 19.)  The fact that this disclosure is made in the "Background of the Invention" section is of no consequence to this analysis. *See Budde*, 250 F.3d at 1379–1380 (holding the entire written description of the patent must be considered).

Animas contends that "pump 28" is also corresponding structure.  To the extent Animas contends that this "pump" is anything other than a pump with "a small drive motor connected to a syringe piston plunger to administer the medication to the patient," it is not corresponding structure identified by the patent. (*See* '065 patent at 5:54–57 ("medication infusion device 10″, which may be constructed generally in accordance with the pump 10 shown in FIG. 1"); Stone Decl. ¶ 21.)

**C.    "controller means for automatically controlling said delivery means to deliver the selected medication dosage to the patient according to a first medication dispensing protocol"** (claim 1 of '065 patent and all asserted claims in the patent)

The parties agree that this term is a means-plus-function limitation and that the claimed function is "automatically controlling said delivery means to deliver the selected medication dosage to the patient according to a first medication dispensing protocol." The parties disagree on the identification of the structure that accomplishes the claimed function.

| MiniMed's Construction | Animas' Construction |
| --- | --- |
| The corresponding structure is a controller. | This claim element is indefinite under § 112, ¶ 2 because there is no specific algorithm or other disclosure for carrying out the function of "automatically controlling said delivery means to deliver the selected medication dosage to the patient according to a first medication dispensing protocol."<br><br>If the claim is not found indefinite, then it should be construed as follows:<br><br>The following structures, located on the pump (or insulin pen): the controller 24 internal to pump 10 that responds to buttons 22 in Fig. 1 (col. 4:31); the controller block 24 shown in Fig. 2; and the "internal controller" (not shown) in Fig. 4 (col. 5:32); and the controller (not shown) |

12

| internal to pump 10" in Fig. 5 (col. 5:56-60). |
| --- |

The parties generally agree that a "controller" is the corresponding structure that performs the "automatically controlling" function. This limitation was construed by the *Smiths Medical* court, which held the corresponding structure was "controller 24":

> The specification does not use the phrase "automatically controlling" when describing how controller 24 operates the pump. The specification does, however, state that "control means are normally provided for operating the pump drive motor continuously, or at periodic intervals, to obtain a closely controlled and accurate delivery of medication over an extended time period." ('065 patent, col. 1:21-24.) This excerpt clearly implies that the "controller means" described in the specification is controlling the pump in an automatic fashion. Further, the only controller means in the specification that uses a pump to control the delivery means is controller 24. (id., col. 4:11-49.) Therefore, controller 24 is clearly linked to the function of "automatically controlling" the pump. Consequently, the corresponding structure for the "controller means" limitation is controller 24 and it is not restricted to the algorithm depicted in Figure 3 that uses block 32.

(Ex. 4 at 31; Stone Decl. ¶ 22.)  MiniMed agrees and proposes that the Court should adopt the *Smiths Medical* construction.

Animas argues, however, that this controller should be construed to be (a) "the controller 24 internal to the pump 10 that responds to buttons 22 in Fig. 1," (b) "the controller block 24 shown in Fig. 2," (c) "the 'internal controller' (not shown) in Fig. 4," and (d) "the controller (not shown) internal to pump 10″ in Fig. 5." Animas' construction lacks support and is incorrect.

*First*, Animas' contention that the corresponding structure is "controller 24 internal to the pump 10 that responds to buttons 22 in Fig. 1" is improper because it attempts to incorporate structural features—i.e. pump element 10, buttons 22, and the word "internal"—that are not necessary to perform the claimed function. (Stone Decl. ¶ 26.)  *See Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1352 (Fed. Cir. 2003) ("A court may not import into the claim features that are unnecessary to perform the claimed function"); *Chicago Bd. Options Exchange, Inc. v. Int'l*

---

13

*Securities Exchange, LLC*, 677 F.3d 1361, 1366 (Fed. Cir. 2012).  Here, the only structure necessary to control the delivery means to deliver medication to a patient according to a first medication dispensing protocol is the controller, not the buttons or "pump element."  (Stone Decl. ¶ 26.)  ***Second***, for the different controllers that Animas admits are "not shown," there is (by definition) no corresponding structure shown in the specification for these controllers, and they should not be included in the construction.  (*Id.* ¶ 27.)  *Biodex Corp. v. Loredan Biomedical, Inc.*, 946 F.2d 850, 863 (Fed. Cir. 1991) (holding a means-plus-function limitation "may encompass only the ***disclosed*** structure and its equivalents) (emphasis added).  The *Smiths Medical* court properly construed this claim, and this Court should adopt that construction.

Consistent with the *Smiths Medical* court's construction, MiniMed proposes that the structure that controls the pump's basal rate delivery is a controller.  The specification refers to this controller as a "***pump*** controller."  (*See, e.g.*, '065 patent at 2:49–53.)  Dr. Stone further explains that a skilled artisan would understand that a "pump controller" is an electronic device with a known structure.  (Stone Decl. ¶ 22.)  Pump controllers in an infusion system with a motorized piston plunger—like the pump disclosed by the '065 patent and several prior art pumps, including the commercial pumps sold by MiniMed in the 1980's and 1990's—have a specific structure and output a signal that causes a predetermined action by the pump's motor.  (*Id.*)  Pump controllers send a signal to the pump motor using specific and known components, including a microprocessor, a clock, and switches.  (*Id.*)  Thus, the pump controller in the '065 patent is "an electronic device with a known structure" to persons of ordinary skill in the art.[7]  *Telcordia Techs. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1377 (Fed. Cir. 2010).

**D.**     **"means for inputting blood data to said controller means"** (claim 1 of '065 patent and all asserted claims in the patent)

The parties agree that this term is a means-plus-function limitation, and that the

---

[7] The '065 patent also discloses an algorithm to automatically control the delivery means.  (*See* Stone Decl. ¶¶ 23–24.)

claimed function is "inputting blood data to said controller means." The parties disagree on the identification of the structure that accomplishes the claimed function.

| MiniMed's Construction | Animas' Construction |
|---|---|
| The corresponding structures are a glucose sensor or meter used either subcutaneously or adapted to receive and read a glucose test trip and a radio telemetry or infrared receiver. | The following structures, located either on the pump (or insulin pen) or on a remote sensor: the "glucose sensor/meter" block 16 shown in Fig. 2; the glucose sensor 16 shown in Fig. 1; and, the glucose/sensor meters 16', 16" shown in Figs. 4 and 5. |

Both sides propose that a glucose sensor or meter is corresponding structure, but with different levels of specificity. MiniMed proposes a construction that expressly recites a glucose sensor or meter that can be used either subcutaneously or adapted to receive and read a glucose test strip. Animas' proposed construction is not so detailed. [8] The principal disagreement between the parties relates to whether a radio telemetry or infrared receiver is corresponding structure. The *Smiths Medical* court construed this claim to include "a radio telemetry or infrared receiver" as corresponding structure (in addition to the other structure identified in MiniMed's proposed construction), and that construction should likewise be made here. (*See* Ex. 4 at 32–33.)

The '065 specification states that a radio telemetry or infrared receiver is structure that performs the claimed function of inputting blood data to said controller means:

> The sensor 16" is associated with a transmitter 46 used to send an appropriate glucose data signal via radio telemetry or infrared transmission to an appropriate receiver provided as part of the medication infusion device 10", which may be constructed generally in accordance with the pump 10 shown in Fig. 1. ***In this system arrangement, the radio telemetered glucose data signal is inputted to the pump 10", which then operates a pump controller*** . . . ."

('065 patent at 5:51–60; emphasis added.) The specification, therefore, clearly links

---

[8] The "glucose sensor 16 shown in Fig. 1" identified by Animas is adapted to receive and read a test strip and the glucose sensor 16" is used subcutaneously. ('065 patent at 4:17–21, 5:42–46.)

the radio telemetry or infrared receiver to the function of inputting blood data to the controller means. (Stone Decl. ¶ 28.) This is how the *Smiths Medical* court construed this limitation, and there is no reason to deviate from that construction. (*See* Ex. 4 at 32–33.)

Finally, Animas argues that the structure it identifies for this limitation must be "located either on the pump (or insulin pen)." However, nothing in the specification limits the location of "means for inputting blood data" to the pump or insulin pump. In fact, in several instances the "means for inputting blood data" is located on an entirely separate device (e.g. a subcutaneous sensor). (*See* '065 patent at 4:11–30, 5:51–60.)

**E.     "means responsive to said data for recommending a second medication dispensing protocol"** (claim 1 of the '065 patent and all asserted claims in the patent)

The parties agree that this term is a means-plus-function limitation, and that the claimed function is "recommending a second medication dispensing protocol that is responsive to the blood data." The parties disagree on the identification of the structure that accomplishes the claimed function.

| MiniMed's Construction | Animas' Construction |
|---|---|
| The corresponding structure is a controller. | This claim element is indefinite under § 112, ¶ 2 because there is no specific algorithm or other disclosure of a controller means for carrying out the function of "recommending a second medication dispensing protocol." |
| | If the claim is not found indefinite, then it should be construed as follows: |
| | The following structure, located on the pump (or insulin pen): the "recommend modified protocol" in block 34 of Fig. 3 (col. 4:50-57). |

The '065 patent states that a controller is the corresponding structure that recommends a second medication dispensing protocol:

In one mode of operation, the controller 24 can be set to operate the

16

pump element 28 automatically, by implementing any dispensing protocol modification which is recommended by the controller software, in response to the glucose reading data input. Such automatic implementation of a modified dispensing protocol is depicted by block 32 in FIG. 3. . . As one import alternative, ***the controller software can be set to provide a recommended dispensing protocol*** which can be visually displayed to the patient by means of the display 26. This recommended protocol step is illustrated in FIG. 3 by block 34.

('065 patent at 4:43–55; emphasis added.) This passage clearly links the controller 24 to the function of recommending a second medication dispensing protocol that is responsive to blood data. (Stone Decl. ¶ 29.) MiniMed and the court in *Smiths Medical* agree that the corresponding structure for this limitation is controller 24. (*See* Ex. 4 at 36–39.) Animas deviates, arguing that the corresponding structure is the "'recommend modified protocol' in block 34 of Fig. 3." But block 34 does not convey structure—it merely recites a function. (Stone Decl. ¶ 38.) As explained above, this function is performed by controller 24, which is the proper corresponding ***structure*** for the claimed function. Animas also argues that the structure corresponding to this limitation must be "located either on the pump (or insulin pen)." However, as discussed above, the specification of the '065 patent is not so limited, and this language should not be added to the corresponding structure.

Based on the disclosure of the '065 patent and as further shown by the declaration of Dr. Stone, a person of ordinary skill would understand the '065 patent to disclose a three-step algorithm performed by the controller for carrying out the function of recommending a second medication dispensing protocol responsive to blood data. (Stone Decl. ¶ 31–37.) Such an algorithm can be expressed in "any . . . manner that provides sufficient structure" to a person of ordinary skill in the art. *Typhoon Touch*, 659 F.3d at 1385.

First, the controller receives blood glucose data. (Stone Decl. ¶ 33; *see, e.g.*, '065 patent at 4:25–36, 4:41–44 ("the controller 24 responds to . . . the glucose reading").) The '065 patent describes a number of ways the controller can receive the blood data. For example, the controller can receive blood data from a "sensor adapted

for receiving and reading a glucose test strip" or from a radio telemetry or infrared receiver coupled to an implantable or subcutaneous glucose sensor. (Stone Decl. ¶ 32; '065 patent at 3:12–20; 4:17–25, 5:51–60.)

Second, the controller compares this current blood glucose data against a target blood glucose value and uses a patient-specific factor to recommend a dosage of insulin needed to reduce the blood glucose level to the target level. (Stone Decl. ¶ 33–35; '065 patent at 1:34–36, 4:31–35, 4:41–44.) The '065 patent states that "the controller 24 responds to [1] the initial programming and [2] the glucose reading to provide the patient with one of three different protocol alternatives." ('065 patent at 4:41–44.) As Dr. Stone explains, a person of ordinary skill in the art would be familiar with correction of blood glucose levels that takes into account actual and target blood glucose levels, in addition to a patient-specific factor. (Stone Decl. ¶ 30.) The '065 patent further states that "blood glucose readings represent key data that can be used to determine current insulin requirements of a diabetic patient." ('065 patent at 1:65–67.) According to the knowledge of those in the art, when "blood glucose readings" are used to calculate a patient's "current insulin requirements," those readings must be compared to a target BG level to determine the current insulin requirements. (Stone Decl. ¶ 34.) The patent further provides that "[i]nitial pump programming is normally performed by a physician" and includes "patient medication requirements." ('065 patent 1:30–36, 4:41–44.) According to Dr. Stone, a person of ordinary skill would understand these "patient medication requirements" to include a patient-specific insulin sensitivity factor that quantifies the reduction in a patient's BG level per unit of insulin. (Stone Decl. ¶ 33.)

Thus, the '065 patent teaches that the difference between current BG and target BG, as well as a patient-specific factor, are used to calculate a new proposed dosage of insulin. As explained by Dr. Stone, that is all that is needed to recommend a modified protocol responsive to BG data. (Id. ¶¶ 30, 34.) A person of ordinary skill would have no difficulty writing the software code to implement this basic arithmetic

18

calculation.[9] (*Id.* ¶ 36.) *Typhoon Touch,* 659 F.3d at 1385.

As a third step, the algorithm of the '065 patent causes the controller to send a signal to a display to recommend the new protocol to the user. ('065 patent at 2:37–41, 2:58–64, 3:2–6, 4:36–40, 4:51–54, 5:32–34; Stone Decl. ¶ 36.) For example, the '065 patent states that "the controller software can be set to provide a recommended dispensing protocol which can be visually displayed to the patient by means of the display 26." ('065 patent at 4:51–54.) A person of ordinary skill in the art would understand that this displayed recommendation results from a signal sent from the controller to the display. (Stone Decl. ¶ 36.)

Animas has indicated that it will point to the testimony of the inventors of the '065 patent for its assertion that the patent fails to state a "specific algorithm" or "software." (*See, e.g.,* Ex. 7 at 42:4-43:5 ("I don't know that this specifies a particular algorithm. But it didn't, as far as I recall…"); Ex. 3 at 53:23–54:3 ("I did not make any invention or description of the software."). The Federal Circuit's definition of "algorithm" is much broader. As explained by the inventors, they were not claiming to invent a new or particular algorithm beyond those being used at the time of their invention. (Ex. 7 at 42:14–20 ("Q: So at the time you had the idea, had other algorithms been developed that influence the -- that relied on glucose amount to change the dosage of insulin that's delivered to a patient? A: Yes, there were other algorithms, I believe."); Ex. 3 at 54:2–3.) Mr. Colman testified that the patent "put the two together into a controller, putting the algorithm into an insulin delivery mechanism." (Ex. 7 at 42:21-43:5.) The record here shows that the '065 patent—as understood by one of ordinary skill—discloses a general "algorithm" that the controller uses to recommend a second medication dispensing protocol. *See Typhoon*

---

[9] The '065 patent also expressly teaches that the algorithm used to calculate a correction bolus under its disclosure does not include other factors, such as a user's activity level or the ingestion of carbohydrates. (*See* '065 patent at 2:15–20 ("variable daily activity such as changing eating schedules, exercising, etc., should be taken into account [by the patient after receiving a recommend dosage] in determining the actual dosage and timing of medication delivery.")

*Touch*, 659 F.3d at 1385 (explaining that an algorithm can be expressed "in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure").

**F.   "patient accessible manual set means for enabling said controller means to deliver the medication to the patient according to a selected one of said first and second medication dispensing protocols"** (claim 1 of the '065 patent and all asserted claims in the patent)

The parties agree that this term is a means-plus-function limitation and that the claimed function is "enabling said controller means to deliver the medication to the patient according to a selected one of said first and second medication dispensing protocols." The parties disagree on the structure that accomplishes the claimed function. Neither party argues that a controller is the structure that performs the function of "enabling said controller means to deliver the medication to the patient according to a selected one of said first and second medication dispensing protocols." Nor could they—the plain language of the claim differentiates between the "controller means" and the "patient accessible manual set means." (*See* '065 patent at 6:16–20.)

| MiniMed's Construction | Animas' Construction |
|---|---|
| The corresponding structures are control buttons, buttons, and a dial and plunger. | This claim element is indefinite under § 112, ¶ 2 because there is no specific algorithm or other disclosure of a controller means for carrying out the function of "enabling said controller means to deliver the medication to the patient according to a selected one of said first and second medication dispensing protocols." |
| | If the claim is not found indefinite, then it should be construed as follows: |
| | The following structure, located on the pump (or insulin pen): the "accept/reject modified protocol" in block 36 of Fig. 3. The patient may accept or reject the recommended second protocol by pressing buttons 22, and the controller delivers either the first medication dispensing protocol or the second medication dispensing protocol. |

As the *Smiths Medical* court found, the '065 patent describes the corresponding

20

structure for the recited function to be control buttons ('065 patent at 2:58–64), buttons 22 (*id.* at 4:55–57), and a dial 42 and plunger 44 (*id.* at 5:24–36). These structures are clearly linked to the claimed function. (*See* Ex. 4 at 40; Stone Decl. ¶¶ 39–40.) For example, the specification provides that "[i]n accordance with the invention, the altered protocol can be automatically implemented, but may in the alternative be recommended to the patient by means of the visual display for convenient acceptance or rejection ***by manipulation of one or more of the control buttons,*** or otherwise overridden entirely by the patient in favor of a different or modified delivery protocol." ('065 patent at 2:58–64; emphasis added.)

Animas argues that the "accept/reject modified protocol" in block 36 of Fig. 3 is corresponding structure. But block 36 does not disclose any structure—it merely recites a function. (Stone Decl. ¶ 41.) As explained in the specification, the function of block 36 is performed using the buttons 22: "the patient 12 has an opportunity to ***accept or reject the recommended modified protocol by appropriate manipulation of buttons 22***, as represented by block 36 in Fig. 3." ('065 patent at 4:55–58; emphasis added.) Animas also argues that the "patient accessible manual set means" must be "located either on the pump (or insulin pen)." But as discussed above, the specification of the '065 patent is not so limited, and this language should not be added to the corresponding structure.

## VI.    CONCLUSION

For the reasons discussed above, the Court should adopt MiniMed's proposed constructions.

DATED:  January 22, 2014

Respectfully submitted,

KIRKLAND & ELLIS LLP

By:  /s/ Alexander F. MacKinnon

Luke L. Dauchot (S.B.N. 229829)
luke.dauchot@kirkland.com
Alexander F. MacKinnon (S.B.N. 146883)
alexander.mackinnon@kirkland.com
Erin C. Kolter (S.B.N. 261452)
erin.kolter@kirkland.com
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, California  90071
Telephone:  (213) 680-8400
Facsimile:   (213) 680-8500

*Attorneys for Plaintiffs*