1  Luke L. Dauchot (S.B.N. 229829)
   luke.dauchot@kirkland.com
2  Alexander F. MacKinnon (S.B.N. 146883)
   alexander.mackinnon@kirkland.com
3  Erin C. Kolter (S.B.N. 261452)
   erin.kolter@kirkland.com
4  KIRKLAND & ELLIS LLP
   333 South Hope Street
5  Los Angeles, California  90071
   Telephone:   (213) 680-8400
6  Facsimile:   (213) 680-8500

7  Attorneys for Plaintiffs

8                 UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10

11

12  _____   )
    Medtronic MiniMed Inc.; Medtronic     )
13  Puerto Rico Operations Co.; MiniMed    )
    Distribution Corp.,                    )   **DECLARATION OF DR. ROBERT**
14                                         )   **T. STONE IN SUPPORT OF**
              *Plaintiffs*,                )   **MINIMED'S OPENING CLAIM**
15                                         )   **CONSTRUCTION BRIEF**
          vs.                              )
16                                         )   No. 2:12-cv-04471-RSWL-RZ
    Animas Corporation,                    )
17                                         )
              *Defendant*.                 )
18  _____   )

19

20

21

22

23

24

25

26

27

28

_____

**DECLARATION OF DR. ROBERT T. STONE**

I, Dr. Robert T. Stone, declare:

1.      I received a B.S. in electrical engineering from Virginia Polytechnic Institute and State University in 1977, a M.S. in electrical engineering from Virginia Polytechnic Institute and State University in 1979, and a Ph.D. in electrical engineering from Stanford University in 1981.

2.      I have over thirty years of academic and industry experience in the field of medical electronics systems and instrumentation, including experience in both implantable and external drug delivery systems design.  Examples of my pertinent experience are set forth herein, with additional experience described in my CV.  I am a named inventor on a patent application for a wearable drug delivery system specifically designed for insulin delivery.  The invention was made in response to a request for research by an international drug delivery device manufacturer, and required extensive research into existing insulin delivery systems and analysis of most of the devices on the world market in the 2009-2010 time frame.

3.      In addition, I have served as a technical program manager for design reviews for existing drug delivery systems for various corporations over the last 13 years, including Deltec and Alza.  These reviews included full system design, risk analysis, and collaboration with leading experts in diabetes management. During my doctoral studies at Stanford University, I developed key elements in adaptive intravenous drug delivery systems for management of blood pressure following cardiac surgery.

4.      I am a named inventor on at least twenty U.S. patents relating to a variety of medical devices, including audiometric devices, methods of determining blood constituents, acoustic coupling devices, methods and apparatuses for detecting optical pulses, end-tidal carbon monoxide monitor filters, and methods and apparatuses for calculating arterial oxygen.

1

**DECLARATION OF DR. ROBERT T. STONE**

5.     I am a member of several professional organizations, including the Institute of Electrical and Electronics Engineers (IEEE), the International Society for Optics and Photonics (SPIE), and the American Nuclear Society.

6.     From November 2011 to the present, I have been employed as the Chief Executive Officer by Medical Design Solutions, Inc., a company I founded.  At Medical Design Solutions, I am responsible for all phases of product development, including concept definition, prototyping, design, evaluation, patenting and technology licensing of various types of medical devices.

7.     A summary of my education, experience, and qualifications are set forth in my curriculum vitae, attached hereto as Exhibit 1.  My statements, as expressed in this declaration, are based on my education, career, relevant experience, and review of, among other materials, the '065 patent and its prosecution history.

8.     I have been retained by Plaintiffs in this case regarding the patents and technology at issue.

9.     A person of ordinary skill in the art described in the '065 patent would have a Master of Science degree or the equivalent education and work experience in engineering or computer science, with experience related to medical infusion pump development or research.

10.    In preparation for writing this declaration, I have considered the following materials:

    1.  U.S. Patent No. 5,665,065 and its file history;

    2.  U.S. Patent No. 4,562,751;

    3.  Joint Claim Construction Statement dated December 20, 2013;

    4.  Revised Joint Claim Construction Statement dated January 22, 2014;

    5.  Deposition of Fredric Colman and exhibits cited therein; and

    6.  Deposition of Peter Lord and exhibits cited therein.

**DECLARATION OF DR. ROBERT T. STONE**

11.     I have been advised concerning the law governing claim construction of means-plus-function limitations.  I understand that the first step in construing a means-plus-function limitation is to identify the function explicitly recited in the claim.  I understand that the second step is to identify the corresponding structure set forth in the written description of the patent that performs the function set forth in the claim.  I understand in determining whether the specification discloses an algorithm for performing a function, an algorithm in this context can be expressed in any understandable terms including but not limited to mathematical formula, prose, flow chart, or any other manner that provides sufficient structure as understood by one of ordinary skill in the art.

12.     The '065 patent describes and claims an infusion system including a blood glucose sensor or meter that directly and electronically inputs blood glucose data into a controller in the system, which recommends a modified dispensing protocol responsive to this blood data.  (*See* '065 patent at 4:11–30.)  Once a new delivery protocol is recommended to the user, this new delivery protocol can be accepted, rejected, or modified by the user using "patient-accessible" buttons.  (*Id.* at 4:51–64.)

13.     The '065 patent describes two different embodiments of the infusion system: an insulin "pen" embodiment and an external infusion pump embodiment.  I understand this litigation involves the latter embodiment, which I discuss below.  As the '065 patent explains, external insulin pumps were generally known in the art at the time the '065 patent was filed with the Patent Office in 1995.  (*Id.* at 1:12–15.)  The pump disclosed and described by the '065 patent has a housing designed to hold and store a compact syringe storing medication (e.g. insulin).  (*Id.* at 1:15–18.)  Fluid is conveyed from the syringe into the patient by actuating a "small drive motor connected to a syringe piston plunger."  (*Id.* at 1:18–20.)  This type of system had been commercially developed and sold for a number of years prior to the filing of the

**DECLARATION OF DR. ROBERT T. STONE**

'065 patent, and I do not understand the inventors of the '065 patent to have claimed the invention of such a system.

14.     Motorized plunger infusion pumps in 1995 were capable of delivering a background rate of insulin (i.e. a "basal" rate) and a basic, one-time immediate delivery of insulin (i.e. a "bolus" dose).  The structure of these devices was well-known to a person of ordinary skill in the art in 1995.  The key components of such a device are a pump controller, a syringe-like reservoir, a plunger that pushes fluid from the reservoir, a lead screw, and a drive motor.  These components represent the "drive mechanism" subsystem in the device.  Typically, the pump controller sends a signal to the drive motor that moves the drive motor a predetermined distance (either linearly or rotationally).  This drive motor is connected to a lead screw, which in turn is connected to a plunger.  As the drive motor moves in response to delivery signals received from the controller's output, the lead screw and plunger also move a predetermined distance, ultimately forcing a precise amount of liquid from the reservoir to the patient.   Therefore, the rate and total amount of fluid delivery is determined by the frequency and total number of delivery signals sent to the pump's drive motor.  It is also possible to design a system in which a delivery signal causes the pump to move at a predetermined speed until the controller sends a signal to the pump telling it to stop.  In either system, the delivery of liquid is determined by the movement of the drive motor, which is controlled by the pump controller.  The software needed to run the delivery of fluid merely dictates when the pump's microprocessor sends out delivery signals to the drive motor.  For example, a typical basal rate might send a delivery signal to the drive motor once every 30 seconds, which will deliver a specific amount of fluid.  The rate of fluid delivery is obviously variable, and depends on the number of signals that are sent to the delivery means.  This type of basal delivery seeks to mimic the natural secretion of insulin by a healthy pancreas with timed pulses of fluid delivery.

4

15.     As one example of such a system, the '065 patent's specification cites U.S. Patent No. 4,562,751 (also assigned to MiniMed).  ('065 patent at 4:7–10.)  The '751 patent describes a system with a fluid reservoir 5, plunger 5', lead screw 292, ratchet wheel 318, solenoid drive means 300, and microprocessor 18 that operate in accordance with the known system described above.  ('751 patent at 4:20–31.)

16.     The '065 patent specification describes an "external infusion device" with multiple housings.  For example, the specification describes a "system arrangement" of the "external infusion device" that includes separate housings for the pump and an implanted glucose sensor.  (*See* '065 patent at 5:41–60.)

17.     I understand that the parties agree that the term "reservoir means for receiving and storing a supply of a selected medication" is a means-plus-function limitation and that the claimed function is "receiving and storing a supply of a selected medication."  The specification of the '065 patent describes the following corresponding structures for this function:  a storage reservoir, a syringe, a syringe carried by the housing of an external pump, or a cartridge.  The specification states that "a pump element 28 . . . delivers the medication to the patient 12 from *a storage reservoir* 30, such as *a syringe carried by the housing* 18." ('065 patent at 4:31–36.) The specification also describes "a compact programmable medication infusion pump adapted to receive and support *a syringe* carrying a prescribed medication such as insulin." ('065 patent at 2:46–49.)  All of these examples describe a structure that is used in a motorized plunger type pump, in which a syringe or similar structure is filled with medication (e.g. insulin) and stores that insulin until delivery to the patient.

18.     The specification further describes an "alternative form of a medication infusion device" which "comprises a medication delivery pen…compris[ing] a barrel 40 of a generally cylindrical shape for receiving *a cartridge* (not shown) charged with a selected medication such as insulin for a diabetic." ('065 patent at 5:15–27.)

**DECLARATION OF DR. ROBERT T. STONE**

Similar to the pump embodiment, the cartridge discussed in this passage holds medication (e.g. insulin) until delivery to the patient.

19.     I understand that the parties agree that the term "delivery means for delivering a selected dosage of the medication from said reservoir means to a patient" is a means-plus-function limitation and that the claimed function is "delivering a selected dosage of the medication from said reservoir means to a patient."  The specification of the '065 patent describes the following corresponding structures for this function:  a drive motor connected to a syringe piston plunger or a manual plunger depression.  The specification states that "the infusion pump operates a small ***drive motor connected to a syringe piston plunger*** to administer the medication to the patient." ('065 patent at 1:18–20.)   Consistent with my discussion above, this drive motor pushes liquid from the pump's syringe (or reservoir means) into the patient.

20.     The '065 patent specification further describes an "alternative form of a medication infusion device" which "comprises a medication delivery pen…[where] a dial or knob 42 on the aft end of the pen is rotatable to mechanically retract a plunger 44 a preselected distance so that a dial-in medication dosage can be administered to a patient upon subsequent ***manual plunger depression***." ('065 patent at 5:15–27.)

21.     I understand Animas argues that the "pump 28" is structure that performs the function of "delivering a selected dosage of the medication from said reservoir means to a patient."  In 1995, there were several types of devices that persons of ordinary skill in the art generally referred to as "pumps."  For example, there were peristaltic pumps (both rotary and linear), bellows pumps, and plunger pumps.  These pumps had very different structures.  A peristaltic pump, for instance, typically uses rollers to compress a tube filled with liquid to expel the liquid from the tube.  A bellows pump often used pressurized gas (e.g. Freon) to slowly force a liquid from an expandable reservoir.  The only type of pump disclosed by the '065 patent is a motorized plunger pump.  (*See* '065 patent at 1:18–20, 3:59–65, 4:31–36.)  Therefore,

6

to the extent Animas argues the '065 patent's reference to a "pump" includes any style of pump beyond the motorized plunger type, I disagree with Animas' contention.

22.    I understand that the parties agree that the term "controller means for automatically controlling said delivery means to deliver the selected medication dosage to the patient according to a first medication dispensing protocol" is a means-plus-function limitation and that the claimed function is "automatically controlling said delivery means to deliver the selected medication dosage to the patient according to a first medication dispensing protocol."  An example of such a function is the delivery of a basal or background rate of insulin by an insulin pump.  Basal rates are typically automatically delivered by a pump and run in the background of other pump activity unless stopped or modified by the user.  The corresponding structure for this function is a controller or microcontroller.  (*See* '065 patent at 1:21–25, 2:49–53.) That is, the '065 patent clearly links the controller to the function of "automatically controlling" the pump's delivery means to deliver a first medication dispensing protocol.  The '065 patent explains that control switches or buttons can be used to "program a ***pump controller*** for delivering the medication to the patient in accordance with a predetermined dispensing protocol."  (*Id.* at 2:49–53.)  In my opinion, a person of ordinary skill in the art would understand a "pump controller" has a known and specific structure.   A pump controller, or any microcontroller used in infusion pumps at the time the '065 patent was filed (1995), was capable of administering a basal rate. In the type of device described by the '065 patent—e.g. an infusion device with a "small drive motor connected to a syringe piston plunger" (*id.* at 1:19–21)—such a controller would enable the drive motor to advance a piston plunger by sending an electrical signal to the drive motor.  Each signal sent out by the controller results in a specified amount of fluid delivered to the patient.  These controllers can either send a signal to the motor representing a fixed amount of liquid delivery or send a signal to the motor to enable its movement until a certain volume of liquid has been conveyed

7

to the patient.  By controlling the frequency at which these signals are sent to the motor, a pump controller controls the rate of fluid delivery.  The '065 patent specification explains this type of pump controller: "Programmable control means are normally provided for operating the pump drive motor continuously, or at periodic intervals, to obtain a closely controlled and accurate delivery of medication over an extended time period."  ('065 patent at 1:21–24.)   Therefore, a person of ordinary skill in the art would know the "pump controller" contains this known structure with an output connected to a drive motor to run the pump's delivery means.  Components of the controller—e.g. a microprocessor, real time clock, and electronic switches found in virtually all medication infusion systems at the time—control the output of current to the drive motor per user instructions.

23.     The algorithm implemented by the controller to automatically control the delivery means to deliver the selected medication according to the first medication dispensing protocol (i.e. a basal rate) is simple and a person of ordinary skill in the art in 1995 could have readily built such a controller after considering the specification of the '065 patent.  As noted above, the '065 patent explains that the controller means can operate the "drive motor continuously . . . or at periodic intervals." (*Id.*)  The '065 patent explains to a person of ordinary skill in the art that the basal delivery algorithm is a simple function based on two variables: actual dosage and timing. (*See* '065 patent at 1:35–40, 2:15–20, 5:1–5.)  Depending on the desired dose and timing of the delivery, the controller will send a specified number of signals to the drive motor to effect the delivery of insulin by the device.  For example, the larger the dosage and the higher the rate, the more signals will be sent by the controller to drive the pump's motor.  Persons of ordinary skill in the art had been designing and using such a basal algorithm based on dosage size and a rate for years prior to 1995.  Therefore, in my opinion, a person of ordinary skill in the art would be more than equipped to develop a

8

software program to deliver a basal rate in light of the '065 patent's algorithm based on dosage and timing.

24.     The basic arithmetic involved in a basal delivery algorithm can be illustrated with a simple example.  Suppose a user needs 24 units of insulin per day and each signal sent to the drive motor causes 0.1 units of insulin to be delivered to the patient.  This means that a user needs 1 unit of insulin every hour.  In order to accomplish this, the controller would send one signal to the motor every six minutes (0.1 units multiplied by 10 equals one unit per hour).  A person of ordinary skill in the art would know how to write a basal delivery software program based on these variables and the disclosure of the '065 patent.

25.     I note that pump controllers of this type existed before 1995, and I do not understand the inventors of the '065 patent to have invented a pump controller to deliver a background or basal rate.  In discussing prior infusion pumps, the specification states that "[p]rogrammable control means are normally provided for operating the pump drive motor continuously, or at periodic intervals."  ('065 patent at 1:21–24.)  Controllers of this type were commercially sold as part of prior MiniMed pumps for a number of years before the invention of the '065 patent.

26.     I understand that Animas argues the structure that performs the "automatically controlling" function is: (a) "the controller 24 internal to the pump 10 that responds to buttons 22 in Fig. 1," (b) "the controller block 24 shown in Fig. 2," (c) "the 'internal controller' (not shown) in Fig. 4," and (d) "the controller (not shown) internal to pump 10″ in Fig. 5."  I disagree with Animas' proposal that the corresponding structure is "the controller 24 internal to the pump 10 that responds to buttons 22 in Fig. 1."  The function at issue in this term is "automatically controlling said delivery means to deliver the selected medication dosage to the patient according to a first medication dispensing protocol."  The structure in the specification that accomplishes this is the controller 24.  The additional language and structure

DECLARATION OF DR. ROBERT T. STONE

identified in Animas' proposed construction ("internal to pump 10" and "buttons 22")
do not perform the function of automatically controlling the delivery means.  As I
described above, the controller automatically controls the delivery means by sending
electrical signals to the drive motor.   Therefore, the buttons and additional language
in Animas' proposed structure do not perform the "automatically controlling"
function.

27.     In addition, I disagree that the "controller (not shown) internal to pump
10"" is corresponding structure to the "automatically controlling" function to the
extent it is any different than the controller identified in Figure 1.  (*See* '065 patent at
5:52–56.)

28.     I understand that the parties agree that the term "means for inputting
blood data to said controller means" is a means-plus-function limitation and that the
claimed function is "inputting blood data to said controller means."  The specification
of the '065 patent describes the following structures that perform this function:  a
glucose sensor or meter used either subcutaneously or adapted to receive and read a
glucose test strip and a radio telemetry or infrared receiver.  The specification states:

> In accordance with one aspect of the invention, the pump
> controller 24 responds to a data input from the glucose
> sensor or meter 16, in addition to manually inputted
> instructions by means of the buttons 22. The glucose sensor
> or meter 16 is conveniently mounted directly onto the pump
> housing 18 in a readily accessible position, depending upon
> the type of glucose sensor or meter used. In one form, a
> sensor adapted for receiving and reading a glucose test strip
> can be incorporated into the pump 10, such as a built-in
> sensor of the type generally available from Miles Inc., of
> Elkhart, Ind., under the name Glucometer. Alternately, the
> sensor or meter 16 may be coupled in a suitable manner to
> an implantable or subcutaneous glucose sensor of the type
> described, for example, in U.S. Pat. Nos. 4,650,547;
> 4,671,288; 4,781,798; 4,703,745; and 4,890,620. In either
> case, data input is provided to the controller 24, as depicted
> in FIG. 2, so that pump operation may be regulated in
> accordance with controller programming and in response to
> a current patient condition parameter such as blood glucose

10

**DECLARATION OF DR. ROBERT T. STONE**

level.

('065 patent at 4:11–31). The specification also states:

> A glucose sensor or meter 16' of the type previously described, such as a built-in sensor for receiving and reading a glucose test strip, provides a data input to the delivery pen 10'.

(*Id.* at 5:29–32.) Further, the specification states:

> The sensor 16" is associated with a transmitter 46 used to send an appropriate glucose data signal via radio telemetry or infrared transmission to an appropriate receiver provided as part of the medication infusion device 10", which may be constructed generally in accordance with the pump 10 shown in FIG. 1. In this system arrangement, the radio telemetered glucose data signal is inputted to the pump 10", which then operates a pump controller (not shown) in accordance with the protocol flow paths described previously with respect to FIG. 3.

(*Id.* 5:51–60.) These passages describe sensors and meters that can receive and read a glucose test strip and receivers connected to a controller (both radio telemetry and infrared receivers) that wirelessly receive information from a peripheral device. In both of these instances, the meters, sensors, or receivers input blood glucose data into a controller. These structures are clearly associated with the function of inputting blood data to the controller means.

29. I understand that the parties agree that the term "means responsive to said data for recommending a second medication dispensing protocol" is a means-plus-function limitation and that the claimed function is "recommending a second medication dispensing protocol that is responsive to the blood data." The corresponding structure for this function is a controller. (*See, e.g.*, '065 patent at 2:56–64, 4:11–14, 4:31–36, 4:43–55.) For example, the specification states that "the controller software can be set to provide a recommended dispensing protocol which can be visually displayed to the patient by means of the display 26." (*Id.* at 4:51–54.)

11

**DECLARATION OF DR. ROBERT T. STONE**

30.     The notion of "correcting" an elevated blood glucose level with insulin
was well-known in the field of insulin pumps, and insulin therapy in general, in 1995.
Elevated blood glucose levels are dangerous and insulin reduces a diabetic's blood
glucose level to a safe, target level.  There are three variables that are needed to
calculate a correction dosage: (1) a current blood glucose level, (2) a target blood
glucose level, and (3) a patient-specific insulin sensitivity factor.  A patient will
usually determine a target glucose value by consulting with a physician, and the target
value is usually close to 100 mg/dl.[1]  The sensitivity factor is largely determined by a
patient's weight, and represents the amount the patient's blood glucose concentration
is reduced per unit of insulin delivered to the patient.  For example, one unit of insulin
may cause a 20 mg/dl drop in a patient's blood glucose level.  The arithmetic
necessary to calculate a new insulin dosage is simple: the patient's current blood
glucose value is compared against a target blood glucose value to determine the size
of the correction needed.  For example, a patient with a current blood glucose value of
250 mg/dl and a target blood glucose value of 100 mg/dl would need to take the
amount of insulin needed to offset 150 mg/dl.  The insulin sensitivity factor tells us
how much insulin we would need to administer to reduce the patient's blood glucose
by 150 mg/dl.  In this example, 7.5 units of insulin (150 divided by 20 equals 7.5)
would need to be administered in order to correct the patient's blood glucose level.
This type of basic calculation was known by persons skilled in the art of insulin
infusion systems and pumps in 1995.

31.     In my opinion, the '065 patent specification discloses an algorithm
performed by a controller to recommend a second medication dispensing protocol that
is responsive to blood data.  A person of ordinary skill in the art would recognize that
this algorithm consists of the following steps: (1) receiving blood glucose data; (2)
comparing this blood glucose data with a patient's target blood glucose value to

---

[1]     In the United States, blood glucose concentrations are measured in milligrams
per deciliter of blood (mg/dl).

**DECLARATION OF DR. ROBERT T. STONE**

determine by how much the blood glucose needs to be corrected and then using a patient-specific sensitivity factor to determine the amount of insulin necessary to reduce the current blood glucose level to the target blood glucose level; and (3) sending a signal to the display representing the recommended dosage of insulin (i.e. the product of the calculation).  Consistent with such algorithms at the time, this is a simple algorithm based on basic arithmetic.

32.    The '065 patent describes several ways a controller can receive blood data.  For example, this information can be input into a controller via "a sensor adapted for receiving and reading a glucose test strip" or "an implantable or subcutaneous glucose sensor" coupled to a radio telemetry or infrared receiver  ('065 patent at 4:17–25, 4:41–44 ("the controller 24 responds to . . . the glucose reading"), 5:51–60 ("the radio telemetered glucose data signal is inputted to the pump 10'"").) This information is input into the controller directly from the sensor, meter, or receiver.  (*Id.*)

33.    The '065 patent specification then explains that the "controller 24 responds to the initial programming and the glucose reading to provide the patient with one of three different protocol alternatives."  (*Id.* at 4:41–44; *see also id.* at 4:31–35 ("the controller 24 responds to manipulation of the buttons 22 in addition to the glucose reading data input to operate a pump element 28 which delivers the medication to the patient 12 from a storage reservoir 30"), 5:6–10 ("the present invention provides the patient with a high degree of flexibility in adapting and/or modifying a medication dispensing protocol as a function of current glucose blood level readings").)  This "initial pump programming" is performed by a physician or medical provider "in accordance with patient medication requirements."  (*Id.* at 1:34–36.)  A person of ordinary skill in the art in 1995 would readily understand that these "patient medication requirements" would include setting a target glucose value and a patient-specific factor that represents the reduction of a patient's blood glucose level

**DECLARATION OF DR. ROBERT T. STONE**

in response to a specified amount of insulin.  (*See id; see also id.* at 2:33–37 ("an improved medication infusion device includes data input pertaining to a current patient condition parameter, such as a current blood glucose reading, and responds thereto to provide *appropriate medication delivery for the patient*"), 4:41–44 ("the controller 24 responds to the *initial programming* and the glucose reading to provide the patient with one of three different protocol alternatives").).

34.     The '065 patent also states that "blood glucose readings represent key data that can be used to determine current insulin requirements of a diabetic patient." (*Id.* at 1:65–67.)  In order to use a current blood glucose reading to determine current insulin requirements, a target blood glucose level must be known.  In other words, one must have in mind the desirable blood glucose level (e.g. 100 mg/dl) to determine how much a user's blood glucose content needs to be adjusted via the administration of insulin.  Thus, a person of ordinary skill in the art would understand the '065 patent is necessarily  disclosing the use of a target blood glucose value.  A person of ordinary skill in the art would also know the application of a patient-specific factor to the difference between a current and a target blood glucose reading would provide a viable and simple algorithm to correct a high blood glucose value.

35.     Articles available in 1995 show that this type of algorithm was known in the art.  For example, an article written by Paul Davidson, M.D. and Dennis Streed, M.D. entitled, "Therapeutic Strategies in the Patient with Uncontrolled Diabetes Mellitus" describes a basic algorithm using a reference blood glucose value, a current blood glucose value, and a "multiplier" that represents "the amount of change of insulin delivered per hour per mg/dl change in blood glucose concentration" (i.e. a patient-specific insulin sensitivity factor).  (Attached as Exhibit 2.)

36.     Once this calculation is made, the '065 patent specification provides that this new insulin dosage is "displayed to the patient by means of the display."  ('065 patent at 2:37–41 ("This medication delivery protocol can be implemented

**DECLARATION OF DR. ROBERT T. STONE**

automatically, ***recommended via a visual display*** for convenient acceptance or rejection by the patient, or otherwise overridden in favor of a different or modified medication delivery protocol."), 2:58–64 ("the altered protocol can be automatically implemented, but may in the alternative be ***recommended to the patient by means of the visual display*** for convenient acceptance or rejection by manipulation of one or more of the control buttons"), 3:2–6 ("The delivery pen includes a manually adjustable dial or the like for retracting a syringe plunger through a predetermined stroke, ***in association with a visual display*** which indicates the medication dosage to be delivered upon subsequent plunger advancement."), 4:36–40 ("the ***controller 24 functions in combination with the display 26*** and the buttons 22 to provide the patient with important alternatives before actual medication delivery"), 4:51–54 ("the controller software can be set to provide ***a recommended dispensing protocol which can be visually displayed to the patient by means of the display 26***"), 5:32–34 ("An internal controller (not shown in FIG. 4) responds to the data input to ***provide a recommended medication dispensing protocol via the display 26′***.").)  A person of ordinary skill would understand that this information is displayed after the display receives a signal (or set of signals) from the controller representing a command to display this information.  Thus, the final step in the algorithm consists of sending a signal to a display representing the recommended protocol.  In my opinion, a person of ordinary skill in the art could easily design a software program to implement the algorithm described by the '065 patent.

37.     A person of ordinary skill in the art would understand that the algorithm implemented by the controller is limited to the variables discussed above.  For example, the ingestion of carbohydrates is not directly accounted for in the algorithm disclosed by the '065 patent specification.  (*See id.* at 2:14–20 ("variable daily activity such as changing eating schedules, exercising schedules, etc., should be taken into account" by the user), 2:42–43("depending upon subjective factors such as current

DECLARATION OF DR. ROBERT T. STONE

patient activity, eating schedules, etc., the parameter-responsive protocol can be accepted or modified to best suit the individual patient"), 5:1–5 ("implementation of a modified manually inputted protocol would normally occur after rejection of the proposed modified protocol, per block 36, so that the precise dosage and/or timing thereof can be varied according to actual patient activity, eating schedules, etc.").) Such algorithms at the time of the invention did not account for the intake of carbohydrates.  (*See, e.g.*, Exhibit 2 (Streed et al.) at 10 ("The algorithm in its present form cannot deal with post prandial blood glucoses.").  The '065 patent teaches a simple blood correction function consistent with the algorithm discussed above and other considerations, including eating habits and exercise (both of which affect a user's blood glucose level), are not part of the algorithm.  (*See* '065 patent at 2:14–20, 2:42–43, 5:1–5.)

38.    I also understand Animas argues the "recommend modified protocol" in block 34 of Figure 3 is structure that performs the function of "recommending a second medication dispensing protocol."  I disagree.  "[B]lock 34" does not convey any structure that accomplishes the function at issue.  Instead, "block 34" merely states the function that is being accomplished—i.e., "recommend modified protocol."

39.    I understand that the parties agree that the term "patient accessible manual set means for enabling said controller means to deliver the medication to the patient according to a selected one of said first and second medication dispensing protocols" is a means-plus-function limitation and that the claimed function is "enabling said controller means to deliver the medication to the patient according to a selected one of said first and second medication dispensing protocols."  The specification of the '065 patent describes the following structures that are clearly associated with the function of "enabling said controller means to deliver the medication to the patient according to a selected one of said first and second medication dispensing protocols": control buttons, buttons, and a dial and plunger.

16

**DECLARATION OF DR. ROBERT T. STONE**

The specification states:  "the altered protocol can be automatically implemented, but may in the alternative be recommended to the patient by means of the visual display for convenient acceptance or rejection by manipulation of one or more of the control buttons…"  ('065 patent at 2:58–64.)  The specification also states "the patient 12 has an opportunity to accept or reject the recommended modified protocol by appropriate manipulation of the buttons 22, as represented by block 36 in FIG. 3."  (*Id.* at 4:55–57.)  As these passages indicate, the "control buttons" and "buttons" are accessible to the patient and enable the controller to deliver the medication to the patient according to a first or second medication dispensing protocol.  In other words, after the recommended protocol is displayed to the user, the user can use the buttons or control buttons to command the pump's delivery.

40.     In addition, the specification states that "the patient may operate the dial 42 and plunger 44 to deliver the recommended dosage, or a modified dosage in accordance with current patient activity and requirements."  (*Id.* at 5:34–36.)  In this "pen" embodiment, the dial is manually adjusted by the patient to set the syringe to deliver the recommended dosage or a modified dosage.

41.     I understand Animas argues the "accept/reject modified protocol" in block 36 of Figure 3 is structure that performs the function of "enabling said controller means to deliver the medication to the patient according to a selected one of said first and second medication dispensing protocols."  I disagree.  Block 36 alone does not convey any structure to a person of ordinary skill in the art.  Instead, it describes the function that is performed by manipulating the buttons 22.

**DECLARATION OF DR. ROBERT T. STONE**

Executed this 22nd day of January 2014 in Myrtle Beach, South Carolina.

Robert T. Stone

DECLARATION OF DR. ROBERT T. STONE