1

2

3

4

5

6

7

8                **UNITED STATES DISTRICT COURT**

9               **CENTRAL DISTRICT OF CALIFORNIA**

10

11

12   Medtronic Minimed Inc.;        )   CV 12-04471 RSWL (RZx)
     Medtronic Puerto Rico          )
13   Operations Co.; Minimed        )   **ORDER RE: DEFENDANT'S**
     Distribution Corp.             )   **MOTION FOR PARTIAL**
14                                  )   **SUMMARY JUDGMENT OF**
                                    )   **INVALIDITY OF THE**
15              Plaintiffs,         )   **ASSERTED CLAIMS OF U.S.**
                                    )   **PATENT NO. 5,665,065**
16        v.                        )   [69]
                                    )
17                                  )
     Animas Corporation,            )
18                                  )
                                    )
19              Defendant.          )
                                    )
20                                  )
                                    )
21                                  )
                                    )
22   _____ )

23        Currently before the Court is Defendant Animas

24   Corporation's ("Defendant") Motion for Partial Summary

25   Judgment of Invalidity of the Asserted Claims of U.S.

26   Patent No. 5,665,065 [69].  Plaintiffs Medtronic

27   Minimed Inc., Medtronic Puerto Rico Operations Co., and

28   Minimed Distribution Corp. (collectively,

1   "Plaintiffs"), filed their Opposition on February 6,
2   2014 [83].  Defendant filed its Reply on February 18,
3   2014 [90].  The Court heard arguments on this matter on
4   April 16, 2014 [103].  The Court, having reviewed all
5   papers and arguments submitted pertaining to this
6   Motion, **NOW FINDS AND RULES AS FOLLOWS:** The Court
7   **DENIES** Defendant's Motion.

8                          **I. BACKGROUND**

9        Plaintiffs design, manufacture, and distribute
10  portable insulin delivery systems for use by
11  individuals with diabetes.  In relation thereto,
12  Plaintiff Medtronic MiniMed Inc. owns eight separate
13  United States patents, all of which are titled
14  "External Infusion Device with Remote Programming,
15  Bolus Estimator and/or Vibration Alarm Capabilities."
16  First Am. Compl. ("FAC") ¶¶ 10, 15, 20, 25, 30, 36, 41,
17  48.  These patents were issued on varying dates between
18  April 22, 2003, and October 26, 2010.  _Id._  Medtronic
19  Minimed Inc. also owns United States Patent No.
20  5,665,065 (the "'065 patent") titled "Medication
21  Infusion Device with Blood Glucose Data Input," which
22  was issued on September 9, 1997.  _Id._ at ¶ 53.
23  Medtronic Puerto Rico and MiniMed Distribution are each
24  exclusive licensees of these nine patents.  _Id._ at ¶¶
25  10, 15, 20, 25, 30, 36, 41, 48, 53.

26       Similarly to Plaintiffs, Defendant manufactures and
27  sells portable insulin delivery systems, including the
28  Animas OneTouch Ping Glucose Management System

1  ("OneTouch System"), which was released in 2005.  Am.

2  Answer ¶¶ 4, 11.  According to Plaintiffs, Defendant's

3  manufacture and sale of the OneTouch System infringes

4  upon each of Plaintiffs' aforementioned patents.  FAC

5  ¶¶ 11, 16, 21, 26, 31, 37, 42, 49, 54.

6       The only patent at issue in this Motion is the '065

7  patent.  Plaintiffs claim that Defendant is infringing

8  on claims 3 and 9 of the '065 patent.  Id. at ¶ 54.

9       Type I diabetes is caused by the pancreas'

10  inability to produce sufficient insulin.  Stone Decl.

11  (Dkt. # 83-11) ¶ 12.  Insulin cannot be taken orally so

12  it is traditionally injected with a syringe according

13  to a multiple daily injection regimen ("MDI").  Id.

14  This typically utilizes long-acting insulin to provide

15  a user's baseline insulin needs (a "basal" delivery)

16  and rapid-acting insulin to provide a user's immediate

17  insulin needs (a "bolus" delivery), such as to

18  counteract carbohydrates consumed in a meal or to

19  correct an elevated blood glucose level.  Id.  Insulin

20  pumps can provide both basal and bolus deliveries.  Id.

21  Such pumps work by operating a mechanized system that

22  infuses insulin into the patient from a reservoir.  Id.

23       The '065 patent discloses and claims a medication

24  infusion device that is usable with either an insulin

25  pump or an insulin pen.  See '065 patent.  This device

26  receives blood glucose data (such as from an attached

27  glucose sensor or meter or from a peripheral device)

28  and recommends a new dispensing protocol responsive to

this data.   <u>Id.</u> at 4:11-30.



The '065 patent describes a device which receives the blood glucose data, responds to manually inputted instructions, and ultimately regulates and operates an insulin pump to administer insulin to the patient.   <u>Id.</u> at 4:11-49.   The device responds to its initial programming and to the glucose reading to provide the patient with three options with respect to control of the insulin dosage rate.   <u>Id.</u> at 4:41-43.



In the first option, the device is set to automatically implement any protocol modification "recommended by the controller software, in response to the glucose reading data input."   <u>Id.</u> at 4:47-48.   In

4

short, the device uses the glucose reading to calculate and administer a new insulin dosage rate.  This option corresponds with block 32 in Figure 3.



In the second option, the device software is set to provide a recommended dispensing protocol.  _Id._ at 4:51-54.  The patient is then given the opportunity to accept or reject the recommended modified protocol through manual input.  _Id._ at 4:55-58.  This option corresponds with block 34 of Figure 3.

In the third option, the device software allows the patient to manually input a dosage rate entirely different from the controller-recommended protocol.  _Id._ at 4:65-67.  This option corresponds with block 38 of Figure 3.

## II. LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is "material" for purposes of summary judgment if it might affect the outcome of the suit,

1   and a "genuine issue" exists if the evidence is such
2   that a reasonable fact-finder could return a verdict
3   for the non-moving party.  <u>Anderson v. Liberty Lobby,</u>
4   <u>Inc.</u>, 477 U.S. 242, 248 (1986).  The evidence, and any
5   inferences based on underlying facts, must be viewed in
6   the light most favorable to the opposing party.
7   <u>Twentieth Century-Fox Film Corp. v. MCA, Inc.</u>, 715 F.2d
8   1327, 1329 (9th Cir. 1983).

9       Where the moving party does not have the burden of
10  proof at trial on a dispositive issue, the moving party
11  may meet its burden for summary judgment by showing an
12  "absence of evidence" to support the non-moving party's
13  case.  <u>Celotex v. Catrett</u>, 477 U.S. 317, 325 (1986).

14      The non-moving party, on the other hand, is
15  required by Fed. R. Civ. P. 56(c) to go beyond the
16  pleadings and designate specific facts showing that
17  there is a genuine issue for trial.  <u>Id.</u> at 324.
18  Conclusory allegations unsupported by factual
19  allegations are insufficient to create a triable issue
20  of fact so as to preclude summary judgment.  <u>Hansen v.</u>
21  <u>United States</u>, 7 F.3d 137, 138 (9th Cir. 1993).  A non-
22  moving party who has the burden of proof at trial must
23  present enough evidence that a "fair-minded jury could
24  return a verdict for the [non-moving party] on the
25  evidence presented."  <u>Anderson</u>, 477 U.S. at 255.  Where
26  a motion for summary judgment is grounded on the
27  assertion that the non-moving party has no evidence,
28  the non-moving party may defeat the motion by "calling

the Court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party." Celotex, 477 U.S. at 332.

Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. See Falls Riverway Realty, Inc. v. Niagara Falls, 754 F.2d 49 (2d Cir. 1985); Thornhill Pub. Co., Inc. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979). The party who will have the burden of proof must persuade the Court that it will have sufficient admissible evidence to justify going to trial. Notmeyer v. Stryker Corp., 502 F. Supp. 2d 1051, 1054 (N.D. Cal. 2007).

In ruling on a motion for summary judgment, the Court's function is not to weigh the evidence, but only to determine if a genuine issue of material fact exists. Anderson, 477 U.S. at 255.

Partial summary judgment is authorized by Federal Rule of Civil Procedure 56. A partial summary judgment is not a final judgment but rather an interlocutory summary adjudication or a pre-trial order. Wynn v. Reconstr. Fin. Corp., 212 F.2d 953, 956 (9th Cir. 1954). Neither is appealable prior to the entry of a final judgment in the case in the absence of a specific statute authorizing an appeal. Id. Rule 56 allows a court to grant partial summary judgment, thereby reducing the number of facts at issue in a trial. State Farm Fire & Cas. Co. v. Geary, 699 F. Supp. 756,

1 759 (N.D. Cal. 1987).

2                    **III. ANALYSIS**

3 **A.   Means-Plus-Function Claiming and Indefiniteness**

4      The Parties do not dispute that the language in

5 claim 1 of the '065 patent involves a means-plus-

6 function limitation.  See Dkt. # 68 p.2.

7      Under 35 U.S.C. § 112(f), applicants are permitted

8 to make use of means-plus-function language - i.e., "to

9 express a claim limitation as a means or step for

10 performing a specified function without claiming the

11 structure that performs the function." Biomedino, LLC

12 v. Waters Techs. Corp., 490 F.3d 946, 947 (Fed. Cir.

13 2007).  In other words, a means-plus-function claim

14 describes a function to be performed rather than a

15 structure or the materials necessary to perform that

16 function.  35 U.S.C. § 112(f) is still limited,

17 however, by the definiteness requirement of 35 U.S.C. §

18 112(b), which provides that a patent's claims must

19 "particularly point[] out and distinctly claim[] the

20 subject matter which the applicant regards as his

21 invention."  See S3 Inc. v. NVIDIA Corp., 259 F.3d

22 1364, 1367-68 (Fed. Cir. 2001).

23      If an applicant makes use of means-plus-function

24 language, she "must describe in the patent

25 specification some structure which performs the

26 specified function." Valmont Indus., Inc. v. Reinke

27 Mfg. Co., Inc., 983 F.2d 1039, 1042 (Fed. Cir. 1993).

28 "A structure disclosed in the specification qualifies

as a 'corresponding structure' if the specification or the prosecution history 'clearly links or associates that structure to the function recited in the claim.'" Noah Sys., Inc. v. Intuit Inc., 675 F.3d 1302, 1311 (Fed. Cir. 2012) (quoting B. Braun Med., Inc. v. Abbott Labs, 124 F.3d 1419, 1424 (Fed. Cir. 1997)). "Even if the specification discloses a 'corresponding structure,'" however, the specification still must adequately disclose what is meant by the claim language. Id. at 1311-12 (quoting In re Donaldson Co., 16 F.3d 1189, 1195 (Fed. Cir. 1994) (en banc)).

Specifically, "the specification must contain sufficient descriptive text by which a person of skill in the field of invention would 'know and understand what structure corresponds to the means limitation.'" Typhoon Touch Techs., Inc. v. Dell, Inc., 659 F.3d 1376, 1383-84 (Fed. Cir. 2011). "Under 35 U.S.C. § 112 ¶ 2 and ¶ 6, therefore, 'a means-plus-function clause is indefinite if a person of ordinary skill in the art would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim.'" Noah Sys., 675 F.3d at 1312 (quoting AllVoice Computing PLC v. Nuance Commc'ns, Inc., 504 F.3d 1236, 1241 (Fed. Cir. 2007)). "The question is not whether one of skill in the art would be capable of implementing a structure to perform the function, but whether that person would understand the written description itself to disclose such a

structure." <u>Tech. Licensing Corp. v. Videotek, Inc.</u>, 545 F.3d 1316, 1338 (Fed. Cir. 2008) (citing <u>Biomedino</u>, 490 F.3d at 953). However, "[w]hile corresponding structure need not include all things necessary to enable the claimed invention to work, it must include all structure that actually performs the recited function." <u>Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc. (d/b/a The Home Depot)</u>, 412 F.3d 1291, 1298 (Fed. Cir. 2005) (citing <u>Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.</u>, 296 F.3d 1106, 1119 (Fed. Cir. 2002)).

Put another way, "[t]he duty of a patentee to clearly link or associate structure with the claimed function is the quid pro quo for allowing the patentee to express the claim in terms of function under section 112, paragraph 6." <u>Med. Instrumentation & Diagnostics Corp. v. Elekta AB</u>, 344 F.3d 1205, 1211 (Fed. Cir. 2003) (citing <u>Budde v. Harley-Davidson, Inc.</u>, 250 F.3d 1369, 1377 (Fed. Cir. 2001)). However, "if the specification is not clear as to the structure that the patentee intends to correspond to the claimed function, then the patentee has not paid that price." <u>Id.</u>

"In cases involving a computer-implemented invention in which the inventor has invoked means-plus-function claiming, [the Federal Circuit] has consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor." <u>Aristocrat Techs.</u>

Australia Pty Ltd. v. Int'l Game Tech., 521 F.3d 1328, 1333 (Fed. Cir. 2008).  This is "[b]ecause general purpose computers can be programmed to perform very different tasks in different ways" so "simply disclosing a computer as the structure designated to perform a particular function does not limit the scope of the claim to 'the corresponding structure, material, or acts' that perform the function, as required by section 112 paragraph 6."  Id.  In these situations, while the patentee is "not required to produce a listing of source code or a highly detailed description of the algorithm to be used to achieve the claimed functions to satisfy 35 U.S.C. § 112 ¶ 6," they are required "to at least disclose the algorithm that transforms the general purpose microprocessor to a 'special purpose computer programmed to perform the disclosed algorithm.'"  Id. at 1338 (quoting WMS Gaming, Inc. v. Int'l Game Tech., 184 F.3d 1339, 1349 (Fed. Cir. 1999)).

"For computer-implemented means-plus-function claims where the disclosed structure is a computer programmed to implement an algorithm, 'the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm.'"  Finisar Corp. v. DirecTV Grp., Inc., 523 F.3d 1323, 1340 (Fed. Cir. 2008) (quoting WMS Gaming, 184 F.3d at 1349). Accordingly, "the patent must disclose, at least to the

satisfaction of one of ordinary skill in the art,
enough of an algorithm to provide the necessary
structure under § 112, ¶ 6." Id.  The patentee is
allowed "to express that algorithm in any
understandable terms including as a mathematical
formula, in prose, or as a flow chart, or in any other
manner that provides sufficient structure." Id.
(internal citations omitted).

The indefiniteness analysis for a means-plus-
function limitation requires the Court to: (1) identify
the claimed function, and (2) look to the specification
to identify the corresponding structure for that
function. Biomedino, 490 F.3d at 950 (citing Med.
Instrumentation, 344 F.3d at 1210).  "If there is no
structure in the specification corresponding to the
means-plus-function limitation in the claims, the claim
will be found invalid as indefinite." Id. (citing
Atmel Corp. v. Info. Storage Devices, Inc., 198 F.3d
1374, 1378 (Fed. Cir. 1999)).

Defendant challenges three limitations in claim 1
of the '065 patent, arguing that the claim is
indefinite because the '065 patent specification does
not contain an algorithm or other description of the
software that could be used to perform the claimed
functions.[1]  Mot. 8:14-9:6; Reply 1:24-2:2; Dkt. # 68

_____

[1]  Claim 1 of the '065 patent reads:

1. A medication infusion device, comprising:

12

p.2-4.  Specifically, Defendant argues that all three limitations refer to the same "controller means" that is able to perform the functions described by all three limitations.  Mot. 8:14-28.

Defendant further argues that the asserted '065 patent claims, claims 3 and 9, depend on claim 1 and are thereby invalid for indefiniteness.  Defendant bears the burden of proving "by clear and convincing evidence, that the specification lacks adequate

<hr>

> reservoir means for receiving and storing a
>     supply of a selected medication;
> delivery means for delivering a selected dosage
>     of the medication from said reservoir means
>     to a patient;
> **controller means for automatically controlling
>     said delivery means to deliver the selected
>     medication dosage to the patient according
>     to a first medication dispensing protocol**; and
> means for inputting blood data to said
>     controller means, said data being
>     representative of a current patient
>     condition parameter, said **controller means
>     including means responsive to said data for
>     recommending a second medication dispensing
>     protocol**;
> said controller means including **patient
>     accessible manual set means for enabling
>     said controller means to deliver the
>     medication to the patient according to a
>     selected one of the first and second
>     medication dispensing protocols.**

'065 patent at 6:1-21.  The challenged limitations are in bold.

disclosure of structure to be understood by one skilled in the art as able to perform the recited functions." <u>Intel Corp. v. VIA Techs., Inc.</u>, 319 F.3d 1357, 1366 (Fed. Cir. 2003) (citing <u>Budde</u>, 250 F.3d at 1376).

**B.  <u>First Challenged Limitation</u>**

The first challenged limitation reads: "controller means for automatically controlling said delivery means to deliver the selected medication dosage to the patient according to a first medication dispensing protocol." '065 patent at 6:7-10.  The Parties agree "that the claimed function is 'automatically controlling said delivery means to deliver the selected medication dosage to the patient according to a first medication dispensing protocol.'"  Dkt. #68 p.2.

Plaintiffs contend that the patent need not disclose an algorithm because the structure for this function is a controller - specifically, a pump controller.  Opp'n 16:14-17.  Plaintiffs claim that such a controller would be recognized by a skilled artisan as an electronic device with a known structure. <u>Id.</u> at 16:18-20 (citing Stone Decl. (Dkt. # 83-11 ¶ 18).  Plaintiffs analogize this case to <u>Telcordia Techs., Inc. v. Cisco Sys., Inc.</u>, 612 F.3d 1365 (Fed. Cir. 2010).  <u>Id.</u> at 15:17-16:17.

The patents at issue in <u>Telcordia</u> related to the transmission of data in telecommunications networks. <u>Telcordia</u>, 612 F.3d at 1367.  The defendant argued the sufficiency of the disclosure for "monitoring means"

with the function "evaluating the integrity of the multiplexed subrate communications on the first ring and the second ring." Id. at 1376-77.  The Federal Circuit found that "circuitry at a controller that determines if a defect exists with the multiplexed subrate communications" was sufficient corresponding structure for performing the "monitoring means." Id. The court found that "[t]he written description of the #763 patent adequately discloses the structure for the monitoring means in the node-to-node communication system." Id. at 1376.  The patent in Telcordia disclosed a description of the claimed structure:

> Each node continuously monitors and evaluates the integrity of the multiplexed subrate signals arriving at the node.  Illustratively, this could be accomplished by detecting the absence of a carrier signal in an analog signal environment, or the lack of any incoming signal in a digital environment.  When node 1 recognizes major line fault 122 in ring 100, controller 118 inserts an error signal onto the six subrate channels.  This could illustratively be accomplished by inserting a string of 1's on each channel in a digital environment. Node 4 performs the identical activity by similarly placing an error signal on the six subrate channels of ring 101.

Id.  The court held that "the district court did not

err by finding that an ordinary artisan would
understand the written description to clearly link or
associate the controller with the claimed function."
Id. at 1377.  Even though the patent failed to describe
the inner workings of the controller's circuit, because
"an ordinary artisan would have recognized the
controller as an electronic device with a known
structure," the specification disclosed enough
structure.   Id.

     Plaintiffs' expert, Dr. Stone, states that the
corresponding structure for this function "is a
controller or microcontroller."  Stone Decl. (Dkt. #
83-11) ¶ 18.  Dr. Stone points to language in the
specification disclosing a "pump controller" as the
relevant type of controller.  Id. (citing '065 patent
at 1:19-25, 2:49-53).  Dr. Stone explains that external
infusion pumps were generally known in the art at the
time of invention.  Id. at ¶ 15.  Furthermore,
according to Dr. Stone, the structure of such pumps was
well-known.  Id. at ¶ 16.  It was also known that a key
component of such systems was a pump controller.  Id.
Thus, Dr. Stone explains, "a person of ordinary skill
in the art would understand a 'pump controller' has a
known and specific structure."  Id. at 18.  Such a pump
controller, Dr. Stone claims, "was capable of
administering a basal rate" by enabling "the drive
motor to advance a piston plunger by sending an
electrical signal to the drive motor."  Id.  Each

signal sent from the pump controller would cause the drive motor of the pump to deliver a precise amount of fluid.  <u>Id.</u> at ¶ 15.  Additionally, those of ordinary skill understood that such pump controllers worked by sending signals either continuously or at periodic intervals to effectuate bolus or basal insulin delivery rates.  <u>Id.</u> at ¶ 16.  Dr. Stone further notes that the '065 patent specification cites U.S. Patent No. 4,562,751, which describes a similar medical infusion pump with a pump microprocessor.  <u>Id.</u> at ¶ 17.

Defendant's expert, Dr. Gail Baura, declares that she was unable to find any algorithm for performing the function of "***control means*** for automatically controlling said delivery means to deliver the selected medication dosage according to a first medication dispensing protocol."  Baura Decl. ¶ 11.  Dr. Baura emphatically concludes that the portions of the '065 patent specification cited by Dr. Stone do not disclose the algorithms he identifies.  <u>Id.</u> at ¶ 12.  In fact, Dr. Baura states that at the time of invention "a person of skill in the art could have devised a number of alternative algorithms for determining a first medication dispensing protocol."  <u>Id.</u> at ¶ 14. Moreover, Dr. Baura indicates that the patent does not state whether the "first medication dispensing protocol" is a basal or bolus dose.  <u>Id.</u>  Furthermore, even assuming the "first medication dispensing protocol" is a basal dose, several alternative

approaches could have been taken with respect to administering a basal dose.  Id.  Dr. Baura describes two examples: an evenly administered basal dose and one that delivers an increased basal rate in the pre-dawn hours.  Id.  Dr. Baura concludes that the specification "provides no guidance on how the dose would be determined (whether variable or flat) and hence does not disclose an algorithm."  Id.

Crucially, Dr. Baura fails to address whether a person of ordinary skill would have recognized a pump controller to be an electronic device with a known structure.  Instead, Dr. Baura dives into the analysis for the existence of an algorithm and reiterates that the algorithm identified by Dr. Stone for determining the first medication dispensing protocol is not disclosed in the specification (Baura Decl. ¶ 13) and that at the time of the invention, many alternative algorithms for achieving this function could have been developed (Baura Decl. ¶ 14).  Dr. Baura's analysis also appears to assume that the claimed function includes the calculation of the dispensing protocol, not just the function of delivering the first medication dispensing protocol.  Such as it is, Dr. Baura's testimony on this point is not persuasive.

The Court finds that Telcordia applies with respect to this limitation.  The function here is "automatically controlling said delivery means to deliver the selected medication dosage to the patient

18

according to a first medication dispensing protocol."
See Dkt. # 68 at p.2. This does not require, as
Defendant seems keen on insisting, that the pump
controller calculate the dosage requirements for the
user's first medication dispensing protocol. Simply
put, the unrebutted expert evidence indicates that a
pump controller was well known amongst those of
ordinary skill.

Furthermore, the specification clearly links this
function to the "pump controller." The specification
indicates that "[p]rogrammable control means are
normally provided for operating the pump drive motor
continuously, or at periodic intervals, to obtain a
closely controlled and accurate delivery of medication
over an extended time period." '065 patent at 1:21-24.
As Dr. Stone explains (Stone Decl. (Dkt. # 83-11) ¶
18), this disclosure would be understood by a person of
ordinary skill to clearly link the function to an
electronic device with a known structure – a pump
controller. At least for this function, given the well
known nature of its operation, the '065 patent need not
disclose the inner workings. See Videotek, 545 F.3d at
1339; Intel Corp., 319 F.3d at 1366; nVIDIA Corp., 259
F.3d at 1370-71.

According, the Court finds that Defendant has
failed to show by clear and convincing evidence that
the first challenged limitation is indefinite, as
Plaintiffs have produced unrebutted expert evidence

showing that a "pump controller" is an electronic device with a known structure.  Consequently, as Defendant has failed to meet its burden, the Court denies summary judgment as to this limitation.

**C.  Second Challenged Limitation**

The second challenged limitation reads: "controller means including means responsive to said data for recommending a second medication dispensing protocol." '065 patent at 6:13-16.  The Parties agree "that the claimed function is 'recommending a second medication dispensing protocol that is responsive to the blood data.'"  Dkt. # 68 p.3.

Both Parties appear to agree that an algorithm must be disclosed for this limitation.  See Opp'n 19:22-20:2; Reply 3:16-17.  Defendant argues that no algorithm is disclosed in the '065 patent capable of formulating a dispensing protocol.  See Mot. 9:1-18; Reply 7:18-9:2.  Plaintiffs contend that the '065 patent sufficiently discloses an algorithm.  Specifically, Plaintiffs identify a three step algorithm for carrying out the asserted function.  Stone Decl. (Dkt. # 83-11) ¶ 24.  These steps are:

(1) receiving blood glucose data; (2) comparing this blood glucose data with a patient's target blood glucose value to determine how much the blood glucose needs to be corrected and then using a patient-specific sensitivity factor to determine the amount of insulin necessary to

1   reduce the current blood glucose level to the
2   target blood glucose level; and (3) sending a
3   signal to the display representing the
4   recommended dosage of insulin (i.e. the product
5   of the calculation).

6   Id.  With respect to the second step, Dr. Stone
7   identifies three important variables well known to a
8   person of ordinary skill in the art: "(1) a current
9   blood glucose level, (2) a target blood glucose level,
10  and (3) a patient-specific insulin sensitivity factor."
11  Id. at ¶ 23.  From these variables, Dr. Stone states,
12  simple arithmetic can be used to compare the patient's
13  current blood glucose level with her target blood
14  glucose level to determine the amount of insulin
15  necessary to correctly reach the target blood glucose
16  level.  Id.  Such an algorithm, Dr. Stone explains,
17  would be well known and recognized by a person of
18  ordinary skill in the art.  Stone Decl. (Dkt. # 83-11)
19  ¶ 24.

20      The Federal Circuit "does not impose a lofty
21  standard in its indefiniteness cases." Finisar, 523
22  F.3d at 1341.  A patentee is allowed to express an
23  "algorithm in any understandable terms including as a
24  mathematical formula, in prose, or as a flow chart, or
25  in any other manner that provides sufficient
26  structure." Id. at 1340 (internal citation omitted).
27  Furthermore, "knowledge of one skilled in the art can
28  be called upon to flesh out a particular structural

21

reference in the specification for the purpose of satisfying the statutory requirement of definiteness." Creo Prods., Inc. v. Presstek, Inc., 305 F.3d 1337, 1347 (Fed. Cir. 2002).  The Court finds that Plaintiffs' identified three step algorithm is adequately disclosed in the specification.

In the first step of the algorithm, the controller receives blood glucose data.  See Stone Decl. (Dkt. # 83-11) ¶ 24.  Such a step is clearly outlined by the '065 patent specification.  The specification clearly describes the controller receiving data from the glucose sensor or meter.  See '065 patent at 4:25-30 ("data input is provided to the controller 24, as depicted in FIG.2, so that pump operation may be regulated in accordance with controller programming and in response to a current patient condition parameter such as blood glucose level"); 4:31-36 ("the controller 24 responds to manipulation of the buttons 22 in addition to the glucose reading data input"); 4:41-44 ("as shown in the flow chart of FIG. 3, the controller 24 responds to the initial programming and the glucose reading").  The glucose data, in turn, may be input through "a sensor adapted for receiving and reading a glucose test strip" or "an implantable or subcutaneous glucose sensor" that is "coupled to the sensor or meter."  '065 patent at 4:11-25.  Furthermore, such an input is further described in Figures 2 and 3 wherein the "GLUCOSE SENSOR/METER" in Figure 2 and "GLUCOSE

READING" in Figure 3 are linked to the "CONTROLLER." See '065 patent at FIG 2 and FIG 3.  It does not appear that Defendant challenges that the '065 patent discloses this step of the algorithm.  Moreover, Defendant does not offer any expert evidence on this point.  See Baura Decl. ¶¶ 15-17.

In the second step of the algorithm, the controller compares the blood glucose data received in step one with the user's target blood glucose level and, using certain variables, calculates how much insulin is needed to correct to the target level.  See Stone Decl. (Dkt. # 83-11) ¶ 24.  This step is also laid out in the '065 patent specification.  As Plaintiffs note, "as shown in the flow chart of FIG.3, the controller 24 responds to the initial programming and the glucose reading to provide the patient with one of three protocol alternatives" involving a new recommended dispensing protocol.  '065 patent at 4:41-5:5. Furthermore, "initial pump programming" is performed "in accordance with patient medication requirements." Id. at 1:34-36.  As explained by Dr. Stone, "patient medication requirements" would be understood by a person of ordinary skill in 1995 to include a target glucose value and an insulin sensitivity factor.  Stone Decl. (Dkt. # 83-11) ¶ 26.  Next, the '065 patent states that "blood glucose readings represent key data that can be used to determine current insulin requirements of a diabetic patient."  '065 patent 1:65-

67.   The expert evidence indicates that a person of ordinary skill would understand this to require a comparison between the current blood glucose reading and the patient's target blood glucose level.   Stone Decl. (Dkt. # 83-11) ¶ 27.

The final step of the algorithm calls for the controller to display the recommended dosage.   This step is clearly disclosed by the '065 patent.   <u>See</u> '065 patent at 2:37-41 ("This medication delivery protocol can be implemented automatically, recommended via a visual display for convenient acceptance or rejection by the patient, or otherwise overridden in favor of a different or modified medication protocol."); 2:58-64 ("the altered protocol can be automatically implemented, but may in the alternative be recommended to the patient by means of the visual display for convenient acceptance or rejection by manipulation of one or more of the control buttons"); 4:36-40 ("Pursuant to one primary aspect of the present invention, the controller 24 functions in combination with the display 26 and the buttons 22 to provide the patient with important alternatives before actual medication delivery"); 4:51-54 ("As one import alternative, the controller software can be set to provide a recommended dispensing protocol which can be visually displayed to the patient by means of the display 26"); 5:32-34 ("An internal controller (not shown in FIG. 4) responds to the data input to provide

a recommended medication dispensing protocol via the display 26"). Furthermore, as the expert evidence indicates, a person of ordinary skill would understand the '065 patent specification to disclose this step. Stone Decl. (Dkt. # 83-11) ¶ 29.

From this, Dr. Stone concludes, a person of ordinary skill would have little trouble designing a software program to implement this algorithm. Id.

Defendant contends, however, that the algorithm Dr. Stone describes for calculating the second medication dispensing protocol is simply not disclosed in the '065 patent.

First, Defendant highlights the portions of the specification Plaintiffs refer to, arguing that they do not specifically identify the variables "target glucose level" or "patient-specific insulin sensitivity factor" Dr. Stone utilizes in his algorithm. These passages indicate that "initial pump programming is normally performed by the patient's physician or by other medical personnel" ('065 patent at 1:34-36), that "blood glucose readings represent key data that can be used to determine current insulin requirements of a diabetic patient" ('065 patent at 1:65-67), that the device responds to the current blood glucose reading to provide an appropriate medication delivery protocol to the patient or to provide the patient with one of three different protocol alternatives ('065 patent at 2:33-37, 4:41-44), that the controller responds to

manipulation of buttons and the glucose reading data to operate the pump element ('065 patent at 4:31-35), and that the invention provides the patient with a high degree of flexibility in adapting or modifying a medication dispensing protocol ('065 patent at 5:6-10). From this, Defendant argues that a person of ordinary skill would simply not understand the '065 patent to disclose an algorithm for calculating a second medication dispensing protocol. See Reply 8:22-9:2.

Second, Defendant also offers expert evidence to counter that offered by Plaintiffs. Defendant's expert, Dr. Baura, explains that she was unable to corroborate Dr. Stone's asserted algorithm with the passages of the specification purportedly disclosing the algorithm. Baura Decl. ¶ 15. Dr. Baura indicates that none of the sentences in the specification Dr. Stone cites "individually or together, discloses his algorithm." Id. Furthermore, Dr. Baura states that a person of skill in the art could have devised several alternative algorithms for determining a second medication dispensing protocol.[2] Id. at ¶ 16. For example, Dr. Baura explains that a person of ordinary skill could have used Dr. Stone's algorithm, used another point of a target insulin level range for the

---

[2] Defendant elaborates on this point by further citing to an academic article and treatise discussing algorithms for calculating correction boluses in insulin pumps. Reply 13:16-14:10 (citing Def.'s Ex. T at 956; Ex. S at 72-74).

target blood glucose level variable, taken into account the unused insulin rule, or adjusted for physical activity in some manner.  Id. ¶¶ 16-17.

Finally, Defendant focuses on the deposition testimony of the two named inventors of the '065 patent, Peter Lord and Fred Colman.  Reply 15:26-17:4. Specifically, Defendant points to Mr. Colman's statements purportedly indicating either that the '065 patent failed to disclose an algorithm or that the algorithm for this function was based on multiple readings rather than a single reading as Dr. Stone appears to indicate.  Id. at 16:11-17:4 (citing Def.'s Ex. F. (Colman Dep.) 50:25-53:15; 55:1-58:25; 61:20-22; 62:6-7.

At most, however, given the extent of Plaintiffs' evidence, the Court finds that there remain genuine issues of material fact with respect to whether a person of ordinary skill would be able to recognize an algorithm here for performing the function of recommending a second medication dispensing protocol in response to the blood data.  Such is not enough to grant summary judgment.  See Rembrandt Data Techs., LP v. AOL, LLC, 641 F.3d 1331, 1343 (Fed. Cir. 2011) (reversing district court's grant of summary judgment where genuine dispute of material fact regarding whether the specification disclosed an algorithm existed).

For one, Defendant's argument that the algorithm

for this function could include variables other than those included by Plaintiffs ignores the fact that many of these proposed variables are expressly disclaimed by the '065 patent specification.  <u>See</u> '065 patent at 2:42-43 ("depending upon subjective factors such as current patient activity, eating schedules, etc., the parameter responsive protocol can be accepted or modified to best suit the individual patient"); 5:1-5 ("implementation of a modified manually inputted protocol would normally occur after rejection of the proposed modified protocol, per block 36, so that the precise dosage and/or timing thereof can be varied according to actual patient activity, eating schedules, etc."); <u>see also</u> Stone Decl. (Dkt. # 83-11) ¶ 30.  In fact, the specification appears to delegate the responsibility for adjusting for these factors to the individual patient, and not to the device.

Additionally, both Parties present expert testimony analyzing the same patent and same evidence yet reaching differing conclusions.  <u>See generally</u> Stone Decl. (Dkt. # 83-11) & Baura Decl.  As a court ordinarily cannot "decide whether, for a specific function, the description in the specification is adequate from the viewpoint of a person of ordinary skill," and given that Plaintiffs' and Defendant's experts reach opposite results, the Court finds that a genuine issue of material fact exists.  <u>Elcommerce.com, Inc. v. SAP AG</u>, 745 F.3d 490 (Fed. Cir. 2014).

1    Finally, Defendant's reliance upon the deposition
2  testimony of the two named inventors is inconclusive.
3  The thrust of Mr. Lord's testimony is that he was
4  responsible for designing the hardware for the '065
5  patent.  See Def.'s Ex. E (Lord Dep.) 53:16-55:8.  Mr.
6  Colman's testimony, on the other hand, could be
7  understood to mean that the algorithm disclosed in the
8  '065 patent for this function is based on single
9  readings, in line with the algorithm described by Dr.
10  Stone.  See Def.'s Ex. F (Colman Dep.) 58:5-25.  Rather
11  than conclusively stating that the algorithm takes into
12  account multiple readings, as suggested by Defendant,
13  Mr. Colman's testimony could mean that a subsequent
14  single reading necessarily would take into account a
15  previous single reading.  In other words, Mr. Colman
16  does not definitively state that the algorithm utilized
17  by the controller in achieving this function is based
18  on multiple readings.  Such is not enough to show by
19  clear and convincing evidence that the '065 patent is
20  indefinite.

21    Therefore, the Court thus finds that Defendant has
22  failed to show by clear and convincing evidence that
23  the '065 patent fails to disclose an algorithm with
24  respect to the second challenged limitation.  As
25  Defendant bears this burden (see AllVoice, 504 F.3d at
26  1245), the Court denies summary judgment as to this
27  limitation.

28

**D.  Third Challenged Limitation**

The third challenged limitation reads: "patient accessible manual set means for enabling said controller means to deliver the medication to the patient according to a selected one of said first and second medication dispensing protocols."  '065 patent at 6:16-20.  The Parties agree "that the claimed function is 'enabling said controller means to deliver the medication to the patient according to a selected one of said first and second medication dispensing protocols.'"[3]  Dkt. # 68 p.4.

Defendant does not address why an algorithm is needed to achieve this function – instead, Defendant appears to cling to a blanket assertion that any mention of a "controller means" must be tied to an algorithm.  See Mot. 8:14-9:18.  Furthermore, Defendant does not explain its challenge to this limitation in its papers.

It is clear here that the specification does associate structure with the claimed function.  Here, the structure which performs the specified function is clearly indicated in the patent.  Specifically, control buttons ('065 patent at 2:58-64), buttons 22 ('065 patent at 4:55-57), and a dial 42 and plunger 44 ('065

---

[3] Oddly, Defendant recharacterizes the claimed function as "permitting the patient to reject the recommended second medication dispensing protocol in favor of the first medication dispensing protocol." Mot. 9:4-6.

patent at 5:34-37) are described as being used by the patient to select one of the medication dispensing protocols.   In fact, another court held as much in construing the same patent.   Kolter Decl. Ex. 4 p.40.

Accordingly, the Court finds that the '065 patent associates structure with the claimed function with respect to the third challenged limitation.   As such, the limitation is not invalid.

### IV. CONCLUSION

Because the Court finds that the challenged limitations of the '065 patent are not invalid for indefiniteness, the Court **DENIES** Defendant's Motion for Partial Summary Judgment in its entirety.   Accordingly, the Court addresses the claims construction issues in a separate order.

**IT IS SO ORDERED.**

DATED: 5/8/14

RONALD S.W. LEW

**HONORABLE RONALD S.W. LEW**
Senior U.S. District Judge