Luke L. Dauchot (S.B.N. 229829)
luke.dauchot@kirkland.com
Alexander F. MacKinnon (S.B.N. 146883)
alexander.mackinnon@kirkland.com
Allison Buchner (S.B.N. 253102)
allison.buchner@kirkland.com
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, California 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MEDTRONIC MINIMED INC.; MEDTRONIC PUERTO RICO OPERATIONS CO.; MINIMED DISTRIBUTION CORP., <br><br> Plaintiffs, <br><br> vs. <br><br> ANIMAS CORPORATION, <br><br> Defendant. | Case No. 2:12-cv-04471-RSWL-RZx <br><br> **DECLARATION OF PAUL K. MEYER** <br><br> **REDACTED** <br><br> Judge: Hon. Ronald S.W. Lew <br> Hearing Date: July 30, 2014 <br> Hearing Time: 10:00 AM <br> Location: Courtroom 21 <br><br> Pre-trial Conference: August 5, 2014 <br> Trial Date: September 2, 2014 |

Declaration of Paul K. Meyer

I, Paul K. Meyer, declare as follows:

1. I am over 18 years of age and competent to testify if necessary about the matters stated in this declaration.

2. I make this declaration in support of MiniMed's Opposition to Animas's Motion for Partial Summary Judgment Re Convoyed Sales and in support of MiniMed's Opposition to Animas's *Daubert* Motion to Exclude Reasonable Royalty Testimony of Paul Meyer. This declaration is based on my personal knowledge, and I would testify to the matters set forth in this declaration if called upon as a witness.

3. I have been retained by counsel for Plaintiffs Medtronic MiniMed Inc., Medtronic Puerto Rico Operations Co. ("MPROC"), and MiniMed Distribution Corp. ("MMD") (collectively, "MiniMed" or "Plaintiffs") in the above-captioned matter to provide my opinions regarding, *inter alia*, the damages incurred by Plaintiffs in the event that any of the patents asserted by Plaintiffs are found to be not invalid and infringed by Animas Corporation ("Animas").

4. I have provided an opinion about the damages suffered by MiniMed in this case, including lost profits and a reasonable royalty.

5. On March 11, 2014, I submitted the Expert Report of Paul K. Meyer ("Opening Rpt.") detailing my opinions and analyses regarding the damages incurred by MiniMed in the way of lost profits and reasonable royalties due to the infringement by Animas of the patents asserted by MiniMed in this case.

6. Attached hereto as **Exhibit 1** is a true and correct copy of my Opening Report.

7. On May 2, 2014, I submitted the Reply Report of Paul K. Meyer ("Reply Rpt.") detailing my opinions and analyses in reply to the opinions offered by Animas Corporation's damages expert, Dr. Michael Keeley.

8. Attached hereto as **Exhibit 2** is a true and correct copy of my Reply Report.

9. The information in my Opening Rpt. and my Reply Rpt. is true and

correct and reflects opinions I have formed in connection with my work on this case. When I cite specific sections from my reports in this declaration, I incorporate those specific sections by reference herein.

**Education, Training, and Experience**

10.   I hold a Bachelor of Science in Commerce from the University of Virginia.

11.   I am a founder and President of TM Financial Forensics LLC, a business, economic, financial, and damages consulting company that provides consulting services to business entities, United States government agencies, and legal counsel. I currently head the firm's intellectual property consulting practice.

12.   I am a Certified Public Accountant and am Accredited in Business Valuation (CPA-ABV). I am licensed as a CPA in California and Virginia.

13.   The CPA-ABV credential is granted exclusively to CPAs who demonstrate considerable expertise in business valuation through their knowledge, skills, and experience. The ABV examination tests a candidate's knowledge of the valuation of businesses, assets, business contracts, and financial instruments. There are many valuation methods and approaches addressed through the accreditation of CPA-ABVs that relate to the licensing of patents and other intellectual property, including licensing economic concepts.

14.   The American Institute of Certified Public Accountants ("AICPA") established the Accredited in Business Valuation (ABV) credential in 1998 for CPAs who specialize in business valuation. All CPA-ABV candidates must pass an examination. The three major areas on the ABV exam are: Qualitative and Quantitative Analysis, Valuation Analysis, and Related Topics. The ABV exam tests a candidate's knowledge of business, asset and financial instrument valuation methods (including market methods), income- and asset-based methods, marketability and control issues, fair market value, financial forecasting and quantitative methods, and

industry and economic data analysis. See Accredited in Business Valuation (ABV) Examination at www.aicpa.org.

15. I have 25 years of experience determining reasonable royalties under: the construct of a hypothetical negotiation according to the *Georgia-Pacific* factors; licensing valuation techniques and licensing economic considerations; and financial, accounting and quantitative methodologies and techniques, which are consistent with valuation principles used to value businesses, assets, and financial instruments such as licenses.

16. I have testified as a damages expert in Federal Court trials on approximately 20 occasions as to reasonable royalty damages in patent infringement matters using a *Georgia-Pacific* approach, including in the Central and Northern Districts of California. I have testified in court on over 30 occasions regarding intellectual property valuation and related issues

17. I have testified to reasonable royalty damages using a *Georgia-Pacific* approach before numerous California district court judges, including Honorable Saundra Armstrong; Honorable Maxine Chesney; Honorable Samuel Conti; Honorable Phyllis Hamilton; Honorable Susan Illston; Honorable Lucy Koh; Honorable Consuelo Marshall; Honorable Elizabeth LaPorte; Honorable Joseph Spero; Honorable Vaughn Walker; and Honorable Claudia Wilken.

18. The reasonable royalty opinions that I have provided at trial have employed the *Georgia-Pacific* approach as accepted by the Federal Circuit, as well as peer-reviewed methodologies for analyzing reasonable royalties and for valuing financial contracts such as patent licenses. These approaches have been addressed in various publications, including the AICPA publications.

19. I have served as a damages expert for a plaintiff in a patent infringement lawsuit styled *Boston Sci. Corp. v. Johnson & Johnson*, No. C 02-790 SI (N.D. Cal. 2002).

20. As a Consulting Professor, I have taught accounting, finance, and

3
Declaration of Paul K. Meyer

quantitative methods at the Engineering School at Stanford University for over two decades. As a faculty member, I have taught licensing and reasonable royalty issues at the Sedona Patent Conference; USC Patent Conference; and the University of Texas Patent Conference at the PTO, among many others.

21. I am a member of the Licensing Executive Society ("LES"), as well as other licensing professional associations and hold the Certified Licensing Professional ("CLP") certification through LES.

22. I have consulted on dozens of patent licensing negotiations, advising clients on financial and economic licensing issues. I have testified at trial as a damages expert in some of the largest national intellectual property litigations over the last 10 years, such as *Oracle v. SAP* and *Mattel v. MGA Entm't*.

23. The licensing of patent rights involves determining the value of the underlying patent rights and entails payment of consideration by the licensee, through a reasonable royalty or other form of value. Valuation of patent rights is based on analysis of financial and economic licensing issues, including the use of peer-reviewed valuation methodologies such as market and income methods.

24. Determining a reasonable royalty using licensing economics is not a skill limited to economists and does not require graduate-level economic coursework. Supply and demand curves do not enter the picture. The proper inquiry, instead, is valuing an asset, which is the bundle of patent claims. CPAs trained in valuing assets and financial instruments such as licenses are as (if not more) qualified for the task as economists.

25. The approaches I use to arrive at reasonable royalty determinations are peer-reviewed and include those adopted by U.S. district court and Federal Circuit damages decisions (*e.g., Georgia-Pacific* and *Panduit*) and AICPA practice guides.

**The Asserted Claims**

26. I understand MiniMed is asserting seven patents in this action: U.S.

4
Declaration of Paul K. Meyer

Patent Nos. 5,665,065 ("the '065 patent"); 6,551,276 ("the '276 patent"); 6,554,798 ("the '798 patent"); 6,872,200 ("the '200 patent"); 6,936,029 ("the '029 patent"); 6,979,326 ("the '326 patent"); and 7,109,878 ("the '878 patent"). As discussed in my Opening Rpt. ¶¶ 35, all but the '065 patent derive from a common patent application and share the same specification.

27. Based on my review of Plaintiffs' Responses and Objections to Defendant's First Set of Interrogatories (dated February 4, 2013), my discussions with counsel, and my discussions with Plaintiffs' technical expert Dr. Robert Stone, I understand that the patented features include external infusion systems with a bolus calculator, multiple delivery patterns storage, and a wireless remote controller. Plaintiffs assert two claims from each patent. I have summarized my understanding in my Opening Rpt. ¶¶ 35–46. Six of the asserted patents derive from a common patent application and share the same specification. (Id.; Choy Decl. Ex. 9 (Rpt. of Robert T. Stone, Ph.D.), at ¶ 44.)

28. Based on information from Dr. Stone and my review of the patents, I have categorized the 14 asserted claims into three groups, covering insulin pump systems with (I) wireless remote controller ("Insulin Pump System with Wireless or Remote Control Device"); (II) bolus calculator ("Insulin Pump System with Bolus Estimator"); and (III) delivery pattern storage ("Insulin Pump System with Delivery Pattern Storage"). My analysis is in my Opening Rpt. ¶¶ 37 (Table 1), 229, 233–234.

29. Group I consists of claims 8 and 57 of the '276 patent; claim 29 of the '326 patent; claims 26 and 53 of the '878 patent; and claim 18 of the '029 patent. This group consists of claims relating to external infusion systems that include a wireless remote controller. (Opening Rpt. ¶ 37 (Table 1).) Group II consists of claims 4 and 9 of the '798 patent; claims 3 and 9 of the '065 patent; and claim 5 of the '029 patent. This group consists of claims relating to external infusion systems that include a bolus calculator. (Id.) Group III consists of claims 12 and 52 of the '200 patent and claim 22 of the '326 patent. Claims in this group related to external

5
Declaration of Paul K. Meyer

infusion systems with storage of delivery patterns, including multiple basal profiles and multiple bolus types. (*Id.*)

**The License** ▮

30. As discussed in my Opening Rpt. ¶¶ 162–176, as part of my *Georgia-Pacific* analysis, I analyzed MiniMed's licensing history.

31. As I explain in my Opening Rpt. ¶¶ 162–176, ▮

32. Based on the deposition testimony of Eric Geismar, I understand that this approach is consistent with how MiniMed approaches licensing.

33. MiniMed signed a license agreement ▮ As I explain in my Opening Rpt. (*e.g.*, ¶¶ 163–166 (Table 5), 167–168, 216), I have reviewed and analyzed that license in detail. It is my conclusion that ▮ is comparable to the hypothetical license that would have been negotiated between MiniMed and Animas in this case.

34. As I discuss in my Opening Rpt. (*e.g.*, ¶¶ 163–166 (Table 5)), the following table from my Opening Rpt. ¶ 166 summarizes my comparison of the ▮ with the hypothetical MiniMed-Animas negotiation:



35. In 2005, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Opening Rpt. ¶ 191.)

36. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

37. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

38. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Declaration of Paul K. Meyer

1 ▮

2 ▮

3 ▮

4 ▮

5 ▮

6 ▮

7 ▮

8    39.   ▮

9 ▮

10 ▮

11 ▮

12 ▮

13 ▮

14 ▮

15 ▮

16 ▮

17 ▮

18 ▮

19    40.   I have also considered the opinions of Animas's damages expert, Michael

20 Keeley, Ph.D., ▮ is comparable to the situation

21 in this case.  I specifically investigated the similarities and differences between the

22 negotiation of the ▮ and the hypothetical MiniMed-Animas

23 negotiation.  As addressed in my Reply Rpt. (*e.g.*, ¶¶ 65–77), I have concluded that

24 the negotiation with ▮ very similar to the case of a hypothetical

25 negotiation where a product is assumed to be infringing and the parties thereafter

26 negotiate a royalty rate.

27

28

**Royalty Rate Opinions**

41.     I applied the *Georgia-Pacific* framework to a hypothetical negotiation between MiniMed and Animas to arrive at the reasonable royalty rates. (Opening Rpt. ¶¶153–225.) I considered each *Georgia-Pacific* factor and identified the bases for my analysis.

42.     As explained in my Opening Rpt., I have offered opinions on the applicable royalty rate for three scenarios.

43.     I have offered an opinion on the applicable royalty rate in the scenario that MiniMed grants a license to Animas to Group II or III patents. ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ My analysis is summarized in my Opening Rpt. ¶¶ 212–225.

44.     I have also offered an opinion on the applicable royalty rate in the scenario that MiniMed grants a license to Animas to Group I patents. ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ *See* Opening Rpt. ¶¶ 55, 56, 178–180; Reply Rpt. ¶¶ 56, 58 and 95.) I have summarized my analysis in my Opening Rpt. ¶¶ 212–225.

45.     I have also offered an opinion on the applicable royalty rate in the scenario that MiniMed grants a license to Animas to Group I and to at least one claim from Groups II or III. ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ This scenario requires assessment of the incremental value of a license to Group I over the value of a license to Groups II–III. Rather than simply "stack" the royalties by ▌▌▌▌▌▌▌▌▌▌▌▌▌▌ I adjusted the analysis to accurately reflect the incremental value of a license to Group I claims.

9
Declaration of Paul K. Meyer

46. My analysis began with ▊▊▊ for a license to a Group II bolus estimator or to a Group III delivery pattern storage claim from ▊▊▊ License. I next considered the incremental increase in revenue and market share if Animas also had a license to the wireless remote controller (Group I) claims. The OneTouch Ping requires such a scenario and license grant, because it was the first Animas pump to add a wireless remote controller. (*See* Opening Rpt. ¶¶ 178, 222.) ▊▊▊. (*Id.* ¶¶ 179, 216, 222.) ▊▊▊ (*Id.*) ▊▊▊

47. I did not base my analysis ▊▊▊ royalty rate solely on my personal experience in analyzing and valuing licenses. I relied on my decades of licensing analysis experience, in addition to the *Georgia-Pacific* factors described in my Opening Rpt. ¶¶ 153–225.

**Basis for Demand for the OneTouch Ping**

48. I have analyzed and documented evidence regarding demand for the OneTouch Ping features covered by the asserted claims. Based on my analysis, I have concluded that the "entire market value rule" was met, because the infringing features drive demand for the OneTouch Ping system, and the system operates as a single functional unit. (*See* Opening Rpt. ¶¶ 53–74, 226–242.) ▊▊▊. (*E.g., id.* ¶¶ 55, 56.)

49. ▊▊▊

1 ██████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████████

3 (Opening Rpt. ¶¶ 178–180, ¶¶ 198–199; see also Reply Rpt. Attachment 43.)

4

5 **Group I claims**

6 50. I analyzed extensive evidence from Animas and concluded that the

7 patented features of the Group I claims drive demand for the OneTouch Ping.

8 ██████████████████████████████████████████████████████

9 ██████████████████████████████████████████████████████

10 ██████████████████████████████████████████████████████

11 (Opening Rpt. ¶¶ 59–68.) ████████████████████████████

12 ██████████████████████████████████████████████████████

13 ██████████████████████████████████████████████████████

14 ████████ (Opening Rpt. ¶ 59.)

15 51. ███████████████████████████████████████████████

16 ██████████████████████████████████████████████████████

17 ████████████████████████. (Opening Rpt. ¶¶ 59–68.) ███

18 ██████████████████████████████████████████████████████

19 ███████████████████████████████████████████████ (Id.)

20 52. ██████████████████████████████████████████████

21 ██████████████████████████████████████████████████████

22 ███████████████████████████. (Id. ¶ 63; Reply Rpt. ¶ 22.) ██

23 ██████████████████████████████████████████████████████

24 ████████████████████████████ (Id. ¶ 67; Reply Rpt. ¶ 22.) ██

25 ██████████████████████████████████████████████████████

26 ██████████████████████████████████████████████████████

27 ███████ (Id. ¶ 63.) ████████████████████████████████████

28 ██████████████████████████████████████████████████████

11
Declaration of Paul K. Meyer

1 ▓▓ (*Id.* ¶ 63.) ▓▓
▓▓
▓▓. (*Id.* ¶ 63.)

4     53. ▓▓
▓▓
▓▓
▓▓
▓▓ (Choy Decl. Ex. 2 (AN 0252570–583),

9 at 571.) ▓▓
▓▓
▓▓
▓▓ (*Id.* at 578; Opening Rpt. ¶ 64.)

13 Furthermore, ▓▓
▓▓. (Opening Rpt. ¶ 64.)

15     54. ▓▓
▓▓
▓▓. (*Id.* ¶ 65.) ▓▓
▓▓ (*Id.* ¶

19 65.) ▓▓
▓▓. (*Id.* ¶ 66.) ▓▓
▓▓
▓▓ (*Id.* ¶ 231.) ▓▓
▓▓. (*Id.* ¶

24 231.) ▓▓
▓▓. (*Id.* ¶ 231.) ▓▓
▓▓
▓▓
▓▓ (*Id.* ¶ 231.)

55. ███████████████████████████

███████ (Id. ¶ 230.) ███████████████

███████████████████████████

███████████████████ (Id. ¶ 230.)

### Group II claims

56. I analyzed ██████████████████████, as well as deposition testimony from Animas and MiniMed witnesses and on that basis have concluded that the patented features and the benefits provided by the patents-in-suit drive demand for the OneTouch Ping system. (Id. ¶¶ 69–74, 233.)

57. ████████████████████████████

████████████████████████████. (Id. ¶ 70.) ██

████████████████████████████

████████████████████████████

████████████████████████████

██████ (Id. ¶ 70 (citing AN 0250322–0355 at 328).) ████

████████████████████████████

██████" (Id. ¶ 70 (citing AN 0250322–0355, at 330).) ████

████████████████████████████

████████████████████████ (Choy Decl. Ex. 3 (AN 0250322–0355), at 333, 335.) ████████

████████████████████████████

█████████ (Opening Rpt. ¶ 70 (citing AN 0215868–914, at 888, 890).) █

████████████████████████████

████████████████████████ (Choy Decl. Ex. 6 (12/18/2013 J. Lenart Dep. Tr.), at 56:7–11.) ████

13
Declaration of Paul K. Meyer

1 ██████████████████████████████████████████████████████████
2 ███████████████████████████████████████. (Id. at 54:10–14, 58:19–59:1.)
3    58.  ████████████████████████████████████████████████
████████████████████████████████. (Opening Rpt. ¶ 71.) ████████
████████████████████████████████████████████████
████████████████████████████████████ (Id. ¶ 72.)
████████████████████████████████████████████
████████████████████████████████████████
█████████████████████████████. (Id. ¶ 72.) ████████
████████████████████████████████████
████████████████████████(Opening Rpt. ¶ 71.)

### Group III claims

59. Based on my analysis of the evidence, I have concluded that the patented features of the Group III claims drive demand for the OneTouch Ping system.

60. <u>Multiple basal profiles and delivery pattern storage claims</u>: I have considered evidence that features covered by these claims provide benefits that are demanded by patients. (Opening Rpt. ¶ 236.) ████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

61. <u>Multiple bolus type claims</u>: I also considered evidence ████████
████████████████████████████████████████████
████████████ ██ ████████████████████████████
████████████████████████████████████████ ██
████████████████████████████████████████████
██████████████████████████

14
Declaration of Paul K. Meyer

**Convoyed Sales**

62. Based on my review of Animas documents and my own analysis, I have concluded that disposables should be included in my damages calculations because the asserted patent claims cover the entire OneTouch Ping system and/or enable the features that drive demand for the entire system, which operates as a single functional unit to provide patient insulin therapy. Disposables include reservoirs and infusion sets, ▮ (Opening Rpt. ¶ 26, 137 and Attachments 12 and 12.1, thereto.) My analysis is summarized in my Opening Rpt. ¶ 239, as supported by ¶¶ 25–34, 47, and 226–238.

63. My conclusion is based on my review of the record in this case, including Animas documents, deposition testimony from Animas witnesses, and expert disclosures from Animas witnesses. ▮ I also understand that OneTouch Ping marketing materials emphasize the patented features. Further, ▮ My reasoning is explained in my Reply Rpt. ¶¶ 11–12 and Attachment 43, and in my Opening Rpt. pages 24–33, and 88–89.

64. My conclusion is also based on my analysis as described in my Opening Rpt. ¶¶229–240, where I review documents and testimony that show ▮

1 █████████████████████████████████████████████

2 █████████████████████████████████████████████

3 ███████████████████████████████.

4　　65.　I have considered and cited all of the evidence regarding demand for the infringing features. The sources I reviewed include ████████████████ ███████ as well as testimony that directly relates to the infringing features of the OneTouch Ping. ████████████████████████████████ ████████████████████████████████ As a result, my opinion is that the infringing features drive demand for the OneTouch Ping and that the components are a functional unit, such that the entire market value rule has been satisfied. I explain my analysis in my Opening Rpt. ¶¶ 53–74, 226–242, and in my Reply Rpt. ¶¶ 6–13.

　　66.　As discussed in my Opening Rpt. ¶ 123, both Animas and MiniMed sell their durable pump systems with a four-year warranty period. The websites of both companies provide the details on the warranties. (*See, e.g.*, http://www.medtronicdiabetes.com/patient-support/tooldownload-library/warranties; www.animas.com/support/onetouch-ping-insulin-pump/warranty.) Additionally, both Animas and MiniMed sell infusion sets and reservoirs as part of their respective business models. (Opening Rpt. ¶¶ 13, 47.)

　　67.　As discussed in my Opening Rpt. ¶ 131, MiniMed and Animas pumps are both typically first-tier products for purposes of health insurance reimbursement. Therefore, patient co-pays are typically much less than the revenue received by each company.

**The Relationship Between Medtronic MiniMed Inc., MPROC, and MMD**

　　68.　To calculate the amount of profits lost by each plaintiff, I have studied the Plaintiffs' business functions, intercompany transaction records, transfer pricing policies, and intercompany agreements.

69. I have relied on those sources and on the testimony of the MiniMed and Medtronic, Inc. employees to model the flow of money between the plaintiffs in the ordinary course of business.

70. I have calculated the amount of profit that each plaintiff lost as a result of Animas's infringement, by fiscal year and by plaintiff. My analysis and results are found in my Opening Rpt. ¶¶ 146–152 and Reply Rpt. ¶ 110 (Updated Table 4) and Attachments 4A.U and 4A.1.U thereto.

71. I calculated the number of additional ███████████ sales of pumps, infusion sets, and reservoirs each plaintiff would have made in the "but-for" world in which no infringement by Animas would have occurred. My analysis is explained in my Opening Rpt. ¶¶ 132–137.

72. Next, I calculated the additional revenues, royalties, and costs that each plaintiff would have received and/or paid but for Animas's infringement ███████ ████████████████████████████████████████████████████████████████████████

███████████ Applying the same rules that the parties use during normal business operations allowed me to calculate and isolate the amount of profits that each plaintiff would have made in the but-for world. I describe my analysis in my Opening Rpt. ¶¶ 147–150.

73. As addressed in my Opening Rpt. ¶¶ 14 and 138, in the normal course of business, ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████

74. ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████

//
//
//

I declare under penalty of perjury that the foregoing is true and correct. Executed this 2nd day of July, 2014 in San Francisco, California.

/s/ Paul K. Meyer
Paul K. Meyer